UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                               :

UNITED STATES OF AMERICA

                               :

         - v. -

                               :      S1 23 Cr. 168 (JPO)

ANDRIS PUKKE,
    a/k/a "Marc Romeo,"
    a/k/a "Andy Storm,"                   :

                      Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S POST-TRIAL MOTIONS FOR A JUDGMENT OF AQUITTAL AND A NEW TRIAL

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Jeffrey C. Coffman
James McMahon
Kevin Mead
Assistant United States Attorneys
    *- Of Counsel -*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

I.    The Evidence at Trial ..................................................................................................... 2

    A.    Pukke Engaged in a Wire Fraud Scheme to Defraud Lot Buyers of Sanctuary Belize ...................................................................................................................... 2

        1. By 2011, Pukke Was Publicly Known as a Convicted Felon and Fraudster.............. 4

        2. Pukke Controlled Sanctuary Belize ................................................................. 6

        3. Pukke Misrepresented to Lot Buyers that He was not Involved in Sanctuary Belize, that All Money from Lot Sales Would be Used to Develop Sanctuary Belize, and that Sanctuary Belize Had Zero Debt .................................................. 10

            a.    Misrepresentations that Pukke Was Not Involved in Sanctuary Belize ........... 10

            b.    Misrepresentations That All Money From Lot Sales Would Be Used to Develop Sanctuary Belize and That Sanctuary Belize Had Zero Debt ............................ 13

            c.    Misrepresentations to Lot Buyer Nancy Cunningham ..................................... 17

            d.    Misrepresentations to Lot Buyer Frank Balluff ................................................ 19

            e.    Misrepresentations to Lot Buyer Carl Dudick ................................................. 22

        4. All Payments from Lot Buyers Did not Go to the Development of Sanctuary Belize ........................................................................................................... 24

            a.    Personal Investments in Start-Up Companies .................................................. 24

            b.    Purchase and Renovation of Waterfront Home ................................................ 25

            c.    Repayment of Personal Loan ........................................................................... 25

            d.    Child Support Payments .................................................................................. 26

            e.    Investment in Bahamian Land .......................................................................... 26

            f.    Payments to Family and Friends ...................................................................... 27

            g.    Other Diversions ............................................................................................. 27

        5. Sanctuary Belize Had Significant Debt ............................................................ 28

        6. The Sanctuary Belize Project Languished ......................................................... 30

    B.    Pukke Attempted to Obstruct an Official Proceeding ........................................... 31

II.    Pukke's Rule 29 Motion ................................................................................................ 36

ARGUMENT .......................................................................................................................... 37

I.    Applicable Law ............................................................................................................ 37

    A.    Rule 29 Standard ................................................................................................. 37

    B.    Rule 33 Standard ................................................................................................. 39

C.   Wire Fraud .................................................................................................. 40

D.   Obstruction of an Official Proceeding ..................................................... 42

II.  Discussion ............................................................................................................ 43

A.   There Was Sufficient Evidence for a Jury to Conclude That Pukke Had the Intent to Defraud Lot Buyers ............................................................................... 43

1.  "All Income Goes Directly to Development" ........................................ 46

2.  Pukke's Role ........................................................................................ 53

3.  "No Debt" ............................................................................................ 56

B.   There Was Sufficient Evidence for a Jury to Conclude That Pukke Intended to Obstruct an Official Proceeding ............................................................... 58

1.  Pukke Intended to Cause Callahan to Create a False Document ............. 59

2.  Pukke Intended That the False Document Would Be Conveyed to the Grand Jury ..................................................................................................... 67

CONCLUSION ........................................................................................................ 71

## PRELIMINARY STATEMENT

On July 10, 2024, after a three-and-a-half-week trial at which the Government presented overwhelming evidence that defendant Andris Pukke defrauded buyers of lots in a real estate development project he operated in the country of Belize and then attempted to obstruct a grand jury's investigation of his conduct, a jury found Pukke guilty of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and attempted obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

Following trial, Pukke moved for a judgment of acquittal or for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33.  (Dkt. No. 92 (the "Motion")).  In his Motion, Pukke argues: (1) there was insufficient evidence that Pukke had the specific intent to defraud (Motion 15-24); and (2) there was insufficient evidence that Pukke had the intent to obstruct an official proceeding (Motion 24-33).  Both of these arguments fail as a matter of fact and law.

The evidence at trial was more than sufficient to prove Pukke's intent to defraud lot buyers in Sanctuary Belize.  His argument otherwise is based on a far too narrow view of what the evidence showed Pukke led his victims to believe they were buying.  Although he now argues that he was selling nothing more than largely unimproved residential lots in a Belizean jungle, the evidence -- the marketing materials, the sales scripts and the testimony of the lot buyers -- all showed that Pukke was selling a promise to build a vibrant community with numerous amenities, as well as land fully supported by all requisite infrastructure.  Each of Pukke's three key misrepresentations related to essential elements of that bargain.

The evidence at trial was also more than sufficient to prove that Pukke intended to cause a witness to create a false document in order to obscure Pukke's repayment of a personal loan with

Sanctuary Belize funds, and that Pukke intended that the false document would be conveyed to a federal grand jury.  The Court should deny his motion in its entirety.

## BACKGROUND

### I.    The Evidence at Trial

At trial, the Government presented overwhelming evidence of Pukke's guilt, demonstrating that, following two prior federal criminal convictions and a civil settlement of a fraud case brought by the Federal Trade Commission ("FTC") that left him with a reputation as a convicted felon and fraudster, Pukke engaged in a scheme to defraud buyers of real estate at Sanctuary Belize, a 14,000-acre real estate development project that Pukke operated.  Pukke, and Sanctuary Belize personnel who worked for him, made three key misrepresentations to lot buyers:  (a) that Pukke was not involved with Sanctuary Belize, when in fact he controlled the company; (b)  that all of the money received from lot sales would be used to develop Sanctuary Belize's infrastructure and amenities, which was false because Pukke in fact embezzled at least $9.9 million; and (c) that Sanctuary Belize was free of debt, when in fact it had debt with a total principal amount exceeding $12 million.

One of ways Pukke embezzled funds was by using Sanctuary Belize funds to repay a personal debt he had incurred in connection with the FTC's prior civil fraud case.  The evidence at trial also proved that, after Pukke became aware that he was being investigated for his conduct at Sanctuary Belize, he attempted to obstruct an official proceeding by asking a witness to create a false accounting of those payments to suggest that they were made in payment of a Sanctuary Belize loan rather than the earlier personal loan.

### A.    Pukke Engaged in a Wire Fraud Scheme to Defraud Lot Buyers of Sanctuary Belize

The overwhelming evidence at trial showed that Pukke engaged in a years-long scheme to defraud victims in connection with Sanctuary Belize. Sanctuary Belize marketed residential lots in the development primarily to U.S. residents from in or about 2009 to in or about November 2018. Sanctuary Belize promised that it would construct a hospital, marina village, and other amenities for the development. Lot buyers could construct homes on their lots once the infrastructure, such as roads and electricity, was built out by Sanctuary Belize, and they would be able to take advantage of the amenities created by the Sanctuary Belize development. Sanctuary Belize ultimately defrauded thousands of individuals of over $120 million spent to purchase lots based on promises made by Sanctuary Belize.

Sanctuary Belize personnel made three key misrepresentations to lot buyers: a) that all of the money received from lot sales would be used to develop Sanctuary Belize's infrastructure and amenities, which was false because Pukke in fact embezzled more than $9.9 million; (b) that Sanctuary Belize was free of debt, when in fact it borrowed over $12 million; and c) that Pukke had no role or a minimal role in Sanctuary Belize, when in fact Pukke controlled the company. Those representations were made a number of times in a number of formats, and Pukke concedes that the Government proved each of these statements were made to lot buyers at Pukke's direction. (Mot. 5 ("Under the Rule 29 and Rule 33 standards, the government adduced evidence sufficient to prove that Sanctuary Belize employees made these statements to prospective lot buyers at Pukke's direction."))

### 1.  By 2011, Pukke Was Publicly Known as a Convicted Felon and Fraudster

In 1996, Pukke was convicted of mail fraud in the U.S. District Court for the Western District of Pennsylvania.  (GX 731).

In 2006, in the U.S. District Court for the District of Maryland, Pukke settled a lawsuit the Federal Trade Commission had filed against Pukke, AmeriDebt, Inc., which Pukke had founded, and DebtWorks, Inc. (the "AmeriDebt Case"), alleging unfair or deceptive acts or practices in promoting and offering credit counsel and debt management plans.  (Tr. 562-63; GX 720).  In the stipulated final judgment, Pukke agreed to the entry of a $172 million judgment against him, of which all but $35 million would be suspended as long as he turned over specified assets to the court-appointed receiver.  (GX 720).  The AmeriDebt Case generated substantial press attention from, among other sources, the New York Times, the Washington Post, and the Orange County Register, which published articles, available on the Internet, concerning Pukke's involvement and his settlement of the FTC's lawsuit.  (GX 741, 743, 747) (*see also* Tr. 535-36; GX 740, GX 742; GX 744-54; GX 756).

In March 2007, the court in the AmeriDebt Case held Pukke in contempt for failure to turn over property to the AmeriDebt receiver as required by the AmeriDebt settlement.  (GX 722 at 3). Approximately a month later, the court ordered Pukke incarcerated for failing to cure the contempt. (GX 722 at 3-4; Tr. 563).

On May 30, 2007, Pukke entered into a stipulation with various parties in the FTC case to be released from jail in return for attempting to cure his contempt.  (GX 722).  Pursuant to the stipulation, Pukke's friend, John Vipulis, agreed to pay $4.5 million to the AmeriDebt receiver ("the AmeriDebt Loan").  (Tr. 562-64; GX 722 at 4).  The stipulation required that Pukke not repay

all or any portion of the AmeriDebt Loan until after he had paid the judgment he owed to the FTC. (GX 722 at 6).

In 2011, Pukke was convicted, in the District of Maryland, of obstruction of justice in the AmeriDebt Case in connection with his acquisition of thousands of acres of land in Belize through two companies.  (GX 734 at 4, GX 736). Pukke's 2011 conviction resulted in additional press attention, including from the Washington Examiner, which published an article, available on the Internet, reporting that Pukke had been jailed for concealing funds from authorities.  (GX 752).

On May 11, 2017, the Wall Street Journal published an article, available online, about Sanctuary Belize.  (GX 756).  The article described Pukke's prior role in the AmeriDebt Case and his criminal record, and reported a statement from Peter Baker, the purported owner of development, that Mr. Pukke's involvement "had been minimal."  (*Id*.).

Pukke was well aware that his public reputation as a convicted felon and fraudster would make operating another business in the future very difficult, as his attorney aptly stated in Pukke's presence at his May 16, 2011 sentencing hearing:

> He is unable to start up again in view of the smear [ ] on his reputation.  You punch in Andris Pukke into Google, and you will see all these articles about fraud. I don't think this man can ever get a start back in business.
>
> . . .
>
> Of course, Mr. Pukke was, you know, fabulously wealthy, all that money is gone. He's now essentially destitute.
>
> . . .
>
> His reputation is unsalvageable.  That's a harsh thing to say, but I think it's about as clear as it can be.

(GX 735 at 4-7).

## 2.  Pukke Controlled Sanctuary Belize

As discussed below, the evidence at trial showed that Pukke controlled all of the Sanctuary Belize companies, which included Eco-Futures Belize Limited, Sittee River Wildlife Reserve, Eco-Futures Development, Eco-Futures Management, Buy Belize, Buy International, Newport Land Group, and Global Property Alliance.  (Tr. 720-22, 729-30, 722-23, 873-74).  Pukke concedes that he controlled Sanctuary Belize.  (Mot. 3 ("Pukke was intimately involved in Sanctuary Belize and worked hard every day to make the development succeed. He was a hands-on boss with minute attention to detail."))

Witness Paige Reneau knew Pukke[1] socially and became interested in working at Sanctuary Belize when she learned he had started a development in Belize.  (Tr. 720).  Reneau worked at Sanctuary Belize as a senior investment consultant and sales representative from 2012 to 2015 and was employed by several of the Sanctuary Belize companies, which initially operated out of 1401 Dove Street in Newport Beach, California (the "Dove Street Office"), where Reneau saw Pukke very frequently, and later expanded to other offices.  (Tr. 720-22, 741-42, 744-45).  Based on her three years working at Sanctuary Belize, Reneau understood that Pukke controlled the Sanctuary Belize companies.  (Tr. 720-22, 744, 749-50).  Pukke made Reneau a co-manager of Sanctuary Belize's Santa Anna office, and later demoted her back to salesperson.  (Tr. 742).  Later, it was Pukke who approved a proposal by Reneau and another Sanctuary Belize employee to attempt to sell Sanctuary Belize lots to potential Canadian buyers.  (Tr. 743-44).  In April 2015, Pukke emailed Reneau to ask her if she had any interest in coming back as a sales representative.  (Tr. 764; GX 418).  Reneau testified that Bill Bannon, who negotiated sales and participated in

---

[1] Reneau often referred to Pukke by his nickname, "Andi."  (Tr. 720, 757).

tours of Sanctuary Belize, Brandi Greenfield, Sanctuary Belize "Principal," Luke Chadwick, who was involved in the development of Sanctuary Belize, part-owner Peter Baker, sales manager Jim Catsos, co-manager Eric Hogan, Reneau, sales representative Rob Schafnitz, and CFO Rod Kazazi all worked for Pukke.  (Tr. 745-48).  Pukke decided what Sanctuary Belize personnel would say to lot buyers on phone calls.  (Tr. 749).  And it was Pukke who approved deals for all lot sales involving down payments of less than $5,000.  (Tr. 750-63; GX 419-29).  As Reneau explained, "Andi is the one who made all the decisions," (Tr. 755), "[t]he person that ran everything," (Tr. 756-57), and "the one who ran the entire operation."  (Tr. 758).

Witness Patricia Kaelin worked at Global Property Alliance from May 2013 until 2015, as director of finance and accounting, and was responsible for reconciling bank statements for Global Property Alliance and other Sanctuary Belize entities, including Buy Belize and Eco-Futures Belize, with a focus on expenses and money going out.  (Tr. 1066-70, 1115-16).  Kaelin initially worked at Dove Street Office and reported to CFO Rod Kazazi.  (Tr. 1069).  When Kaelin met Pukke after working in the office a few months, Kazazi told her that Pukke "runs the place."  (Tr. 1069-70).  Kaelin also observed that Pukke ultimately made all the decisions and was "in charge." (Tr. 1086-87).  On a later occasion, Kaelin learned Pukke had his own private office in the same building, on a separate floor, and that Pukke's office was "opulent" as compared to the other Sanctuary Belize offices.  (Tr. 1071).

Witness Brett Reynolds, an entrepreneur whose companies received substantial investments from Sanctuary Belize accounts at Pukke's direction, and who knew Pukke personally and used the Dove Street office where Pukke operated Sanctuary Belize for a time, understood that Pukke "ran the company" and was "in charge."  (Tr. 451, 455-56).

Witness John Vipulis, Pukke's lifelong friend, understood that Pukke was in charge of Sanctuary Belize from speaking with both Pukke and Baker, who was himself a childhood friend of Pukke's.  (Tr. 559, 574).

Witness Patrick Callahan, who lent funds to Sanctuary Belize, understood that Pukke was one of its owners.  (Tr. 1298-99).

Pukke received notifications of Sanctuary Belize deposits and payments, (*See, e.g.,* Tr. 1101-02, GX 227, GX 2087), approved invoices before Sanctuary Belize sent payments, (*see, e.g.,* GX 2073-74), and made decisions concerning assessment of Sanctuary Belize lot buyers' late fees and interest, (GX 2257).  (*See also* GX 2016-18, GX 2304, GX 2314, GX 2325, GX 2345-46, GX 2348-49, GX 2352, GX 2354-56, GX 2358-59, GX 2414).

In November 2018, FTC personnel traveled to Sanctuary Belize's office at 333 Michelson Drive, Orange County, California, (the "333 Michelson Office") as part of an "immediate access" during which they gathered documents and records from the company.  (Tr. 180-81, 186, 264, 406-31).  Pukke was present outside the company's office building and approximately 15 to 20 Sanctuary Belize telemarketing employees were present in the office.  (Tr. 181-82, 185-86, 344).  Pukke's workstation was in a large room he shared with Frank Costanzo a/k/a Frank Connelly and Rod Kazazi, Sanctuary Belize's Chief Financial Officer.  (Tr. 188-89, 336, 747; GX 1002).  Documents found at Pukke's workstation and computer included, among others: (1) a list of online advertising accounts for the website sanctuarybelize.com, belizerealestatebrokers.com, and sanctuarybelize.com, with associated passwords and email addresses/usernames including andrisflower@yahoo.com, storm.andy@yahoo.com, andrisspukke@yahoo.com, and pukkeandris@yahoo.com, as well as a list of passwords for email accounts

srwrbelize@yahoo.com, storm.andy@yahoo.com; ekkup@msn.com;[2] andrisflower@yahoo.com,
and pukkeandris@yahoo.com; (2) a list of Wells Fargo bank account numbers under the names
Pamela Pukke, Jordan Pukke, Payton Pukke, Jasmin Pukke, and Kaelin Pukke; (3) an unsigned
"Affidavit of Ownership" of Angela Chittenden[3] regarding the transfer of real property at 104
Kings Place, Newport Beach, California (the "Newport Beach Residence") to Pukke as trustee of
the AAC Family HYCET Trust; (4) an unaddressed August 26, 2010 letter, signed by John Usher
and Marc Romeo, both as Director SRWR, with the salutation "Dear Sanctuary Belize Property
Owner," notifying that Sittee River Wildlife Reserve ("SRWR") had contracted with "Eco-Futures
Development, Inc." as the official developer of Sanctuary Belize and requesting that all future
payments be directed and payable to Eco-Futures Development, Inc.; (5) multiple invoices
addressed to "Kings Residence" at the Newport Beach Residence address reflecting the installation
of over $10,000 of television and audio equipment, and an earlier dated quote for the installation
of similar equipment addressed to ekkup@msn.com; (6) development maps and drawings of
Sanctuary Belize with handwritten notes on them; (7) and a "Memorandum of Association of Sittee
River Wildlife Reserve" and "Articles of Association of Sittee River Wildlife Reserve"
establishing SRWR as a not for profit corporation under the laws of Belize, both dated March 20,
2003, designating Pukke as one of five "permanent director[s]" and signed by five Subscribers,
including Pukke – with Pukke's name listed first in both instances. (Tr. 190; GX 2406-A-GX

---

[2] "Ekkup" is "Pukke" spelled backwards. This email address was Pukke's. (*See* Tr. 448, 572, 754,
1312; GX 1222 (Meta subscriber record for ekkup@msn.com Facebook account registered to
Andris Pukke)).

[3] Witnesses generally understood Chittenden to be Pukke's longtime girlfriend, (Tr. 450, 1083-
84), and Pukke stipulated that he was in a long-term relationship with Chittenden from
approximately 2011 until at least approximately 2018, (GX 1480-81).

2406-H).  The October 18, 2018 resignation letter of Buy International Property Director Rachel Whitton, addressed to the attention of four individuals at Sanctuary Belize, with Pukke listed first among them, was also found on Pukke's computer.  (Tr. 292; GX. 2412).

A filing cabinet near Pukke's workstation during FTC's immediate access of the Sanctuary Belize office contained numerous wire transfer and ACH transfer records for payments made from Sanctuary Belize companies Eco-Future Development and Buy International to John Vipulis, (GX 2407-A), Gordon Barienbrock, (GX 2407-B-GX 2407-C), Payton Pukke, (GX 2407-E), Kaelin Pukke, (GX 2407-F), Jordan Pukke, (GX 2407-G), Jasmin Pukke, (GX 2407-H), and the John Pukke Estate, (GX 2407-I).  (Tr. 265-67; GX 1002).

### 3. Pukke Misrepresented to Lot Buyers that He was not Involved in Sanctuary Belize, that All Money from Lot Sales Would be Used to Develop Sanctuary Belize, and that Sanctuary Belize Had Zero Debt

#### a. Misrepresentations that Pukke Was Not Involved in Sanctuary Belize

Sanctuary Belize personnel actively denied Pukke's involvement in Sanctuary Belize and the projects' marketing materials deliberately omitted his name.  In some cases, the marketing materials referred to Pukke by one of his aliases, "Marc Romeo" or "Andi Storm."  An example of such a document listing "Marc Romeo" as one of the principals, but not Andris Pukke, is GX 125, below:



When Patricia Kaelin asked who Marc Romeo was, Kazazi explained that it was Pukke's alias.  (Tr. 1083).

Pukke himself admitted under oath to using the Marc Romeo and Andy Storm aliases in connection with Sanctuary Belize.  (GX 738 at 7, 10, 13).  The recovery email for the storm.andi@yahoo.com email address was ekkup@msn.com.  (GX 1211 (Yahoo Email Subscriber Record)).

Shortly before the May 11, 2017, Wall Street Journal article about Sanctuary Belize was published, (GX 756), coconspirator Frank Connelly, an executive at a Sanctuary Belize entity, drafted a proposed response to the Wall Street Journal's request for comment by Sanctuary Belize in which he referenced the company's "no-debt business model" and said that "Mr. Pukke was a paid employee of the third-party company that handles our sales and marketing, period!  He is neither an owner, shareholder or director of any of the development companies. . . the judge found that Mr. Pukke's role was limited to that of an employee and nothing more." (GX 2232).  Connelly

11

sent that proposed response to Sanctuary Belize senior manager Peter Baker, copied Pukke, and wrote, "Peter, Andi [Pukke] will probably want to do one more run through and then it's good to go." (*Id.*). Pukke then responded, "I think it's good. Pete, go ahead and send it." (*Id.*)

In another exchange between Pukke and Connelly, Connelly wrote, "WHAT THE FUCK!!!!!!" when he realized that another individual associated with Sanctuary Belize had copied Pukke on an email to a lot buyer. (GX 2419). Pukke responded, "I doubt [the lot buyer] noticed that I was CC'd on it. Likely only my email shows up, not my name. [The Sanctuary Belize employee] does need to be more careful about that. Please let him know when you talk to him next." (*Id.*). Connelly replied, "I will. We take exhaustive measures to create distance and careless error could be major setback." (*Id.*).

In the fall of 2017, FTC paralegals posing as potential lot buyers engaged in recorded telephone calls with Sanctuary Belize sales personnel. (Tr. 294, 296-97, 327-30). During one call, an undercover FTC paralegal expressed concern to Sanctuary Belize salesperson Frank Connelly, a/k/a Frank Costanza, about an allegation she had seen in a lawsuit that Andris Pukke was in control of Sanctuary Belize. (Tr. 335-36; GX 321-B at 7-8). Connelly assured her that "Pukke has no relationship or ownership or control of this development or the property," and that his only relationship was that "he has been, in the past, contracted with for marketing services . . . as a vendor, basically." (GX 321-B at 8-9). The undercover lot buyer pressed, asking "you're assuring me he hasn't been involved in any way since then or like is he involved in any way other than just the marketing," Connelly responded, "no, absolutely not." (GX 321-B at 9). The undercover lot buyer pressed further, asking "So this - - he's not someone you've seen in years? Like you're not regularly interacting with him or anything?" (GX 321-B at 12). Again, Connelly answered "no." (*Id.*). In fact, however, Connelly and Pukke worked together in Sanctuary Belize's 333 Michelson

Office, where Pukke's desk was located just "a couple feet" from Connelly's, in the same large room.  (Tr. 336; GX 1002).

Witness Paige Reneau, a former Sanctuary Belize sales representative and co-manager who started working at Sanctuary Belize in 2012, explained that when a potential client asked her over the phone whether Andris Pukke had anything to do with Sanctuary Belize, another sales representative who had started before her, Robert Schafnitz, "castigated" her for using Pukke's name, and explained that she was "not to say his name anywhere but to use the name Marc Romeo." (Tr. 720, 765).  Potential lot buyers asked Reneau approximately twice whether Pukke was involved in Sanctuary Belize.  (Tr. 768-69).  Reneau answered "no," fully aware that her answer was false, because that was what she had been instructed to do.  (Tr. 769).  Although Reneau saw a number of marketing materials for Sanctuary Belize during her three years working there, she never saw one that identified Pukke's role at the company. (Tr. 771).

> b. <u>Misrepresentations That All Money From Lot Sales Would Be Used to Develop Sanctuary Belize and That Sanctuary Belize Had Zero Debt</u>

Sanctuary Belize personnel and marketing materials repeatedly represented that all of the money Sanctuary Belize received from lot sales until the project was complete would be used to develop Sanctuary Belize's infrastructure and amenities, and that Sanctuary Belize had no loans. For example, a publication containing the Sanctuary Belize name and logo entitled "Top 5 Tips for Mitigating Risk While Investing Abroad" that was given to potential lot buyers, states in relevant part that:

> Choosing a developer with no debt takes away the biggest risk of failure, because every dollar earned can go right back into the development itself.  . . . *Sanctuary Belize has been completely debt free since the land was first purchased in 2003. All income goes directly to development and not a dollar goes to paying any loans.*
>
> . . .

For debt-free developers who are able to offer in-house financing, they are in the prime position of being able to depend on monthly cash flow from their buyers to fund progress.

The bigger the book of loans the developer has, the bigger the cash flow available for development.  This serves almost as insurance that progress will continue regardless of any new buyers entering the picture.

*Sanctuary Belize has offered in-house financing for the last five years, and as such has built up a monthly receivables list in the high six figures.  Even if not a single new buyer comes on board, we can count on that monthly income to keep moving forward.*

(GX 1239, GX 1313, GX 1231-34, GX 1236-39) (emphasis in original) (the "Top 5 Tips for Mitigating Risk Brochure").  In December 2013, Pukke personally edited a Sanctuary Belize email to be sent to prospective lot buyers containing a hyperlink to the Top 5 Tips for Mitigating Risk Brochure.  (Tr. 523-25; GX 1239-B, GX 2139, GX 2139-A, GX 2139-B).

Similarly, Sanctuary Belize's written script for "virtual tours" stated:

ZERO DEBT – number one challenge facing many developers is their income is not their own – *When you buy in SB [Sanctuary Belize] not a penny goes to paying a loan – it goes right into the progress of the development.*  This project will never foreclose – and no question over whether or not it will come to completion.  There is zero risk of failure.

(GX 448-A at 8 (emphasis added)).

Sanctuary Belize advertised on the Internet, television, and radio, and its sales representatives called prospective buyers throughout the United States, including in Manhattan in the Southern District of New York.  (Tr. 722-23, 725).

Sanctuary Belize representatives told lot buyers the money Sanctuary Belize received from lot sales would go to building "world class amenities in a gated community."  (GX 2409-B at 10).  They touted the planned construction of a nearby 18-hole championship golf course (GX 2408-A), an international airport (*id.*), and a Marina Village within Sanctuary Belize "that will have

14

everything you need without having to go into Hopkins or Placencia," (GX 2409-A at 5, GX 2409-B at 7).  This was important, because Hopkins and Placencia (towns in Belize) are approximately 20 and 30 minutes away from Sanctuary Belize, respectively, and as defense witness Richard Sussman conceded, Belize is a developing nation and there were no real alternatives near Sanctuary Belize for things such as shopping or eating.  (Tr. 1930-31).

Internal emails and sales scripts found throughout Sanctuary Belize's office further proved that Sanctuary Belize sales representatives pitched prospective clients by touting that Sanctuary Belize had "zero debt," (GX 2408-A), that it was a "debt free developer," (GX 2409-C at 10), and that it was "one of the ONLY, DEBT FREE developments in the entire world."  (Tr. 279; GX 2409-A) (emphasis in original).  (*See also* GX 414 at 7, GX 415 at 3, GX 436 at 5, GX 444-A, GX 444-C, GX 2410-C at 19, GX 2410-D at 5 and 7, GX 2410-E at 4; GX 300-A).  Sanctuary Belize sales representatives explained to prospective clients: "So what that means for you is you don't have to worry about dealing with a developer who borrowed too much money and went bankrupt, and you're left with a useless piece of property, that will never happen because they have NO debt."  (GX 2409-A at 9, 2409-B at 4) (emphasis in original).

Sanctuary Belize also sent prospective lot buyers a link to what Pukke referred to as the "No Debt" video.  (Tr. 532-35; GX 1103, GX 1103-A, GX 1104, GX 1104-A).  Referring to the video in a November 2018 email in which the video was hyperlinked, Pukke stated: "[w]e show this to all clients."  (Tr 532-35; GX 1103).  The video purports to explain the "equity model" of development and its reduced risk for buyers, and further leads prospective buyers to believe the developer takes his profit only after development is complete, in that as more and more units are sold:

more funds are then diverted to development and less to marketing until such time as the developer is sold out and all funds are then used to bring the development to final completion. Finally, the developer is left with the balance and legacy of the receivables, which should continue for many years to come, which ultimately become his profit.

(GX 1104-A at 5:10-5:27).

During a recorded call with an undercover FTC paralegal in the fall of 2017, Sanctuary Belize personnel touted the property as "debt-free," (GX 308-B at 25-27), and "completely debt free," (GX 305-B at 7, GX 318-B at 28, 29), and represented that "every dollar" from sales would be put back into the project, (GX 308-B at 27), and "straight into the completion of everything they need at the marina and everything else that they've been doing," (GX 318-B at 28, 29).

Reneau explained that Sanctuary Belize sales representatives used sales scripts when speaking with potential lot buyers over the phone. (Tr. 726-27). Pukke approved sales scripts, including GX 413, which contained the same assurances that Sanctuary Belize had "ZERO debt," and was "completely debt free," and that additional amenities were planned and underway, including a golf course, international airport, and hospital. (Tr. 727; GX 413 at 2-4). During her "thousands and thousands" of calls with potential lot buyers, Reneau frequently gave assurances that Sanctuary Belize had no debt, because that was what was in the script and what sales representatives were told to say "every time when we spoke to a potential client." (Tr. 778-79, 800-02; GX 416). Reneau also frequently assured potential buyers over the phone that all of the money they paid would be reinvested back into the development. (Tr. 779). Reneau worked in a room full of other Sanctuary Belize telemarketers who were using similar scripts, and she overheard them making the same representations about Sanctuary Belize having no debt and where money paid by lot buyers would go. (Tr. 802-03). Reneau sent potential buyers form emails repeating the "zero debt" assurance. (Tr. 799-800; GX 437 at 7). Sales representatives gave

16

potential buyers the aforementioned virtual tour of Sanctuary Belize over the Internet and phone, which repeated the false assurances that it had no debt and that all payments from lot buyers would go towards development, after which the sales representatives tried to obtain a $5,000 down payment on a lot. (Tr. 728-33, 783-86; GX 435, GX 438, GX 439, GX 448-A at 8). The next step was to get the potential buyer to travel to Belize to take a tour of Sanctuary Belize, during which they would meet with other salespeople and tour the development, with goal being that they would buy a lot at the end of the tour. (Tr. 735-36). Through Sanctuary Belize, Pukke sold lots to thousands of buyers throughout the United States, including the Southern District of New York. (Tr. 885-86; GX 200).

### c.  Misrepresentations to Lot Buyer Nancy Cunningham

Witness Nancy Cunningham testified that in 2008 she and her husband learned of Sanctuary Belize, and after entering information into its website spoke with sales representative Bill Bannon. (Tr. 1191-92, 1196-97). Bannon explained that lot prices were higher at Sanctuary Belize than some other communities in part because "all the money . . . from lot payments was going to go right back into the development of the community," and that it had no debt, so all the money could go back into the community. (Tr. 1192-93). In November 2008, the Cunninghams entered into a contract to buy a lot in Sanctuary Belize for $119,900, with a $20,000 down payment and $812.50 monthly payments. (Tr. 1193-94, 1248; GX 157). Cunningham's husband then traveled to Belize to tour the development. (Tr. 1195). Afterwards, the couple received an email from Sanctuary Belize explaining, "Why we will succeed" with the answer "We own our property, all 14,000 acres, debt free." (GX 168 at 22).

Before traveling down to Sanctuary Belize herself, Cunningham did internet searches and came across a travel blog that referenced Pukke's involvement in Sanctuary Belize and his history

17

of fraud, which caused her concern. (Tr. 1198, 1204). In 2009, Cunningham asked Brandi Greenfield, of Sanctuary Belize's marketing team, about Pukke's involvement, and was told that Pukke was no longer involved and no longer welcome in the country of Belize. (Tr. 1204-05). The Cunninghams then continued to make their monthly payments for the lot. (Tr. 1290-91). In May 2009, Cunningham traveled to Sanctuary Belize to tour the development. (Tr. 1205-07).

In April 2012, the Cunninghams took their first trip together to Sanctuary Belize for a tour and presentations from Sanctuary Belize personnel including Luke Chadwick. (Tr. 1212-13). Chadwick reiterated that Sanctuary Belize was debt free and that "all the money from lot sales was going to go back into the development." (Tr. 1214). During this trip, Cunningham observed that none of the amenities had been completed, despite the passing of the timeline for completion that the Cunninghams had been given when they had purchased their lot in 2008. (Tr. 1214-15).

The Cunninghams went back to Sanctuary Belize in December 2013 and May 2014 and were concerned about the lack of progress of the development. (Tr. 1217). When they asked about the lack of progress, they were given explanations including Belize's long rainy season, the Belizean government not allowing construction to move quickly, and that not enough people were buying lots. (Tr. 1217-18). At this point, the Cunninghams had become dissatisfied with their purchase of the lot, which they fully paid for. (Tr. 1217-19). Cunningham decided to sell the lot, but was unable to get a realtor to list it. (Tr. 1219-20). The Cunninghams ultimately sold their lot in April 2018, through a Facebook page called Belize Expats, for a loss of approximately $20,000. (Tr. 1220-22).

Cunningham testified that the statements by Sanctuary Belize personnel that Sanctuary Belize had no debt, that all money from lot buyers would go to development, and that Andris Pukke was no longer involved in Sanctuary Belize were important to her decision to buy a lot,

18

because those representations "mitigated the risk that we were taking." (Tr. 1222). She explained that having no debt meant they would have money to build the amenities that were promised, including the Marina Village, and that the assurance that Pukke was not involved mitigated the risk based on his history. (Tr. 1223-24).

### d. Misrepresentations to Lot Buyer Frank Balluff

Witness Frank Balluff testified that he learned of Sanctuary Belize through a magazine advertisement in late 2011. (Tr. 96). Balluff contacted Sanctuary Belize and spoke with Robert Schafnitz, whose title was Director of Investment Relations. (Tr. 97). Schafnitz told Balluff that all money received from lot buyers would be going directly into the development of the property. (Tr. 100-01). Balluff asked how the developers were supposed to make their money if all the money from lot buyers was going to build the development, and Schafnitz told him that the developers would make their money on the back end, when the development was completed, from planned commercial portions of the development, including a shopping area and hotel. (Tr. 100-01). Schafnitz sent Balluff a document entitled "Sanctuary Belize Investment Prospectus" and a link to a Sanctuary Belize webinar. (Tr. 101, 115; GX 110, GX 113, GX 123, GX 124). Balluff also conducted his own research on the internet and was concerned to discover that Andris Pukke had been involved in Sanctuary Belize. (Tr. 120). Balluff was concerned because he read about Pukke's past dealings at AmeriDebt, and what Balluff referred to as a "scam." (Tr. 120-21). To ease his concerns that Sanctuary Belize might be a "similar situation," Balluff questioned Schafnitz about what he had read, and Schafnitz responded that Pukke was no longer involved in the development of Sanctuary Belize. (Tr. 122).

In the spring of 2012, Balluff and his wife flew to Belize for a five-day tour of Sanctuary Belize as part of a group of approximately 30 people. (Tr. 123-25; GX. 114). While there,

Sanctuary Belize personnel took them by the international airport that was supposed to be built there. (Tr. 124-25). Sanctuary Belize employees made sales pitches during the tour and stated "a lot of times" that Sanctuary Belize had no debt. (Tr. 125, 142). The Sanctuary Belize employees said that Sanctuary Belize was very safe financially "because they had no loans with any banks or anybody else," and both Schafnitz and Luke Chadwick, one of the three "Principals" listed on Sanctuary Belize promotional materials, told Balluff that all of the money from lot buyers would go back into the development. (Tr. 126, 142, 170-71; GX 125). Nobody ever told Balluff that only payments on principal would go back into the development or that interest payments would not go back into the development. (Tr. 126). Balluff was told that large amounts of money from lot buyers would not go to the principals, or Andris Pukke, at the current stage. (Tr. 126, 171). Balluff spoke with Chadwick to express his concerned about Pukke and to get assurances that Pukke was no longer involved in Sanctuary Belize. (Tr. 127). Chadwick assured Balluff that Pukke was not involved and that Pukke had given up the development because of his legal problems. (Tr. 127). Balluff asked if any principals were taking any money out of the project, and Chadwick responded, "no, we're not taking any money out until the back end, when we get in the commercial aspects, and that's where we're going to make our money because we'll have a successful hotel and a shopping district, and we're going to retain ownership of that stuff." (Tr. 127).

Balluff described in detail a side trip during the tour that Chadwick invited Balluff and his wife to take with Chadwick and one other couple to an ice cream parlor in a town outside Sanctuary Belize. (Tr. 127-28). During that trip, when Chadwick took Balluff and his wife to the side, Balluff brought up information he had seen about Pukke on the internet and asked Chadwick to look him in the eye and shake his hand and tell him that Pukke had no involvement in the project.

(Tr. 128).  Chadwick did exactly that while promising Balluff that Pukke had no involvement.  (Tr. 128).  By the end of the trip, Balluff believed him.  (Tr. 128).  The representations that Pukke had no involvement in Sanctuary Belize were important to Balluff's decision to buy a lot in Sanctuary Belize because Pukke's past raised a concern that the same thing (i.e., fraud) might be happening at Sanctuary Belize.  (Tr. 142-43).  Balluff would not have bought a lot at Sanctuary Belize without these representations.  (Tr. 143).  Despite repeated instances of "high pressure sales tactics" as described by Balluff, he decided not to make a decision while at Sanctuary Belize and continued to discuss the matter after returning home.  (Tr. 129-30).  Ultimately, Balluff decided to buy a lot for $380,000, and executed a May 1, 2012 memorandum of sale.  (GX 117).  Balluff paid Sanctuary Belize a $190,000 down payment and agreed to make monthly payments of $2,544.64 including tax.  (Tr. 131-33; GX 117).

Approximately two years later, Balluff became unhappy with his purchase due to the speed of development and because the international airport that was supposed to be in progress had been shut down and was not being built at all.  (Tr. 136, 138, 153).  Worse yet, in approximately 2015 Balluff learned that Pukke might be involved in project.  (Tr. 138-39).  Specifically, Balluff saw a photograph posted by Sanctuary Belize employees showing Pukke at the resort with an alias, Marc Romeo, listed under his picture.  (Tr. 139).  Balluff asked Schafnitz about Pukke's involvement, specifically referenced the posted information, and continued pushing until Schafnitz "finally got upset and shouted that, of course, I didn't tell you he was involved because nobody would have bought property, or you wouldn't have bought your property, and probably a lot of people wouldn't have bought property if he was involved."  (Tr. 139).  Balluff unsuccessfully tried to sell his lot, first through a secondary market for lots run by Chadwick.  (Tr. 141).  Balluff later unsuccessfully tried to sell his lot through a real estate agent, but the agent told him that nobody in Belize would

get involved in listing it due to the problems at Sanctuary Belize.  (Tr. 142).  Another agent was also unsuccessful in selling it for him.  (Tr. 157-58).  Balluff's lot was eroding very badly into a canal, and utilities were never installed.  (Tr. 163).

Ultimately, after paying a total of approximately $310,000, Balluff stopped making payments and does not know whether he still owns the lot or not.  (Tr. 142-43).  Balluff stopped sending payments because he believed that his property was worthless once he learned that Pukke was involved, and that additional payments would be like "flushing money down the toilet."  (Tr. 154-55).

### e.  Misrepresentations to Lot Buyer Carl Dudick

Witness Carl Dudick learned of Sanctuary Belize in 2018 from an online advertisement, which led him to an online tour that he watched from his home in Westchester County, in the Southern District of New York. (Tr. 41-42).  Before travelling to Sanctuary Belize for an in-person tour, Dudick researched Sanctuary Belize and found several negative news articles about it that mentioned Andris Pukke, who purportedly was no longer involved in the project.  (Tr. 45-46).  The articles concerned Dudick, who decided he "wanted to make sure that [Pukke] was no longer involved."  (Tr. 46).  So, when Dudick and his wife paid Sanctuary Belize the required $1,000 deposit and traveled to Belize to tour the development in September 2018, Dudick brought the articles concerning Pukke with him in order to show them to personnel he met on site.  (Tr. 42-43, 47-48).

The Dudicks toured the entire Sanctuary Belize development and learned about the amenities that were promised, including a hotel, medical facility, and golf course.  (Tr. 52).  "Eric" was one of the Sanctuary Belize personnel who gave presentations about the property and appeared to be the person "in charge."  (Tr. 48-51).  The Dudicks met Baker, the purported part owner and

developer of the property, and his wife, who together explained the finances of the community, including its "no debt philosophy. (Tr. 49). It was important to Dudick, in deciding whether to invest in Sanctuary Belize, that all lot-buyer money was to be put back into the property and that there were "no huge monies outstanding," as he was told by the Bakers. (Tr. 48-50). The Bakers told him that, going forward, the project would be paid for through monthly receivables – that is, money already owed to the project. (Tr. 85). The "no-debt" model was important to Dudick because it made it seem like it was a "very sound investment." (Tr. 50). Had Dudick known that Sanctuary Belize had more than $10 million in debt, he would have reconsidered buying a lot there. (Tr. 90). Had Dudick learned that one of Sanctuary Belize's principals was diverting money from the project for his personal use, it would have affected his decision to buy a lot there. (Tr. 90). Dudick showed "Eric" the articles and questioned him as to whether Pukke was still involved with Sanctuary Belize. (Tr. 51). "Eric" responded unequivocally "no" and "absolutely not." (Tr. 51-52). This assurance that Pukke was no longer involved in Sanctuary Belize was important to Dudick in making his decision to buy a lot. (Tr. 52). Indeed, Dudick explained that it was his "final deciding factor," because Dudick had been concerned about Pukke's prior criminal history and involvement in the project's prior failure as described in the Wall Street Journal, and "didn't want to be any part of it if he was part of it." (Tr. 52-53). Had Dudick known that Pukke was actually running the project, it absolutely would have affected his decision buy a lot. (Tr. 91).

After touring Sanctuary Belize and receiving the foregoing assurances, Dudick decided to buy a lot for approximately $160,000, including a "Development Price" of $135,000. (Tr. 64-65; DX L). Sanctuary Belize agreed that Dudick would pay no homeowners associations fees until electricity and water were run to his lot. (Tr. 65-66; GX 140). Dudick paid $10,000 by credit card and later sent an additional down payment of $28,920 by check to Sanctuary Belize entity Eco

Futures Development.  Dudick (Tr. 59-61; GX 137).  Dudick's installment payments of $468.82 for development and $72.01 for the land were to continue 20 years.  (Tr. 62-63; GX 134, GX 135). However, Dudick made only one set of installment payments.  (Tr. 64).  Although Dudick still owns the lot, he has not built a home on it as he had hoped.  (Tr. 67, 82).

### 4. All Payments from Lot Buyers Did not Go to the Development of Sanctuary Belize

The representation that every dollar a lot buyer sent to Sanctuary Belize would go to develop Sanctuary Belize's infrastructure was false.  In fact, as the Motion concedes, Pukke embezzled more than $9.9 million from the Sanctuary Belize entities.  (Mot. 7 ("Under this heading ('all income'), the government did prove that Pukke used some Sanctuary Belize funds for personal purposes, such as renovating a home in Newport Beach, California and investing in startups."); *see also* GX 1003 (Summary of Payments Connected to Andris Pukke)). For example:

#### a.  Personal Investments in Start-Up Companies

From in or about March 2014 to in or about October 2018, Pukke directed that more than $1.8 million of Sanctuary Belize funds be used to make personal investments in Outsource.com, later called Remote.com; Online Wedding Solutions, also known as Wedding Solutions or Wedding.com; Chivalry.com; and Attorney.com.  (*See* GX 1003 at 5, GX 2197 (Email from Pukke to Kazazi: "Hey buddy, I know we're pretty tight but can you send $10 to attorney.com?  Boat show later?"), GX 2175, GX 2179-81, GX 2185, GX 2187, GX 2189, GX 2198, GX 2200, GX 2202, GX 2229).  These payments were falsely recorded on the books of Sanctuary Belize entities as professional fees, loans receivable, legal fees, Marketing (online advertising), and loan receivable, (GX 1003 at 5), but Reynolds, the entrepreneur who started the companies and communicated with Pukke about them, testified that they did no business with Sanctuary Belize,

24

and that the payments were purely investments, which Pukke directed be held mostly in Chittenden's name.  (Tr. 446-64, 478-90).

### b.  Purchase and Renovation of Waterfront Home

Pukke purchased and renovated a waterfront home in Newport Beach, California (the "Newport Beach Residence") for his own use with $1,150,000 he took from Sanctuary Belize entities from June 2012 through December 2014.  (*See* Tr. 1385-95; GX 500-01 (Contractor Invoices for Newport Beach Residence), GX 1307 (Stipulation of Testimony of Escrow Agent re: wire transfers from Global Property Alliance used to purchase of Newport Beach Residence); GX 510-518 (Recorded Deeds for Newport Beach Residence from March 2012 through September 2017 reflect repeated title transfers to Pukke, Chittenden, or trusts under their control); GX 1003 at 2 (Summary of Payments in Connection with Newport Beach Property)).  Payments to the contractor were recorded on Global Property Alliance's books as a "master planning" expense. (GX 1003 at 2, GX 2315)).  Pukke and Chittenden lived in the home together.  (*See* Tr. 1385-95 (Testimony of Contractor Scott Willson)).

### c.  Repayment of Personal Loan

From July 2012 through October 2018, Pukke transferred more than $4.2 million Vipulis from the Sanctuary Belize entities to repay the AmeriDebt loan.  (Tr. 586; GX 1003 at 16, GX 2183, GX 2196-A, GX 2238).  As described above, this was a personal loan unrelated to Sanctuary Belize, and, moreover, Pukke was prohibited from repaying that loan until he satisfied the judgment in the AmeriDebt Case.  These transfers were recorded on the books of the Sanctuary Belize entities as loans.  (Tr. 1031-38; GX 2326, GX 2327, GX 2308).

25

### d. Child Support Payments

From in or about July 2012 to in or about September 2018, Pukke directed the transfer of more than $700,000 from Sanctuary Belize entities to a bank account in the name of his father's estate.  (*See* GX 1003 at 12; *see also, e.g.*, GX 2188 (July 3, 2014 email from Pukke to Kazazi: "Hey, buddy, can you send $30 to outsource and $15 to my father's estate? . . . I saw we got a decent sized wire in yesterday."), GX 2211 ("January 5, 2015 email from Pukke to Kazazi: "Hey, buddy, I'll be in in an hour or so.  Let's sit down and catch up on everything when I get there.  In the meantime, I need you to send ten to my father's estate account this a.m. Thanks."), GX 2212).  Pukke served as his father's estate's sole representative and was the only signatory on the account.  (*See* GX 862-C at 1, 3, 4).   The funds were then paid in substantial part to, or on behalf of, Aimee Vaccarelli and Lesley Beador, by checks bearing Pukke's signature.  (*See* GX 862-A-1, 862-A-2 (Checks)).  Both women had at least one child fathered by Pukke's brother and received the funds for the benefit of those children.  (*See* GX 1312 and 1314 (Stipulations of Testimony)).  Absent the transfers from the Sanctuary Belize entities, the estate account would not have had sufficient funds with which to make the payments.  (*See* GX 862-D (Estate Bank Account Statements)).  Global Property Alliance's, Buy International's, Eco-Futures Development's, and Foundation Development Management's QuickBooks accounting records recorded these payments to the John Pukke Estate as loan payments and consulting fees.  (GX 2306, GX 2322-24).

### e. Investment in Bahamian Land

From August 2017 through October 2018, Pukke caused wire transfers totaling slightly more than $1 million from the Newport Land Group, a company controlled by Pukke, to the escrow account of an attorney in Florida.  (GX 1003 at 10).  The account held by the Newport Land Group

from which these payments were made was funded almost entirely by payments from Buy International, Eco Futures Development, and Global Property Alliance, all Sanctuary Belize entities.  (*See* GX 801-B).  The payments were sent to buy land in the Bahamas on behalf of the Newport Land Group.  (*See* GX 543 (August 17, 2017 Agreement for Sale of Bahamian Property and Related Documents), GX 1309 (Stipulation of testimony of escrow agent that the funds Newport Land Group sent were for the purchase of the Bahamian property, which purchase closed on September 15, 2017)).

f.  Payments to Family and Friends

From March 2012 through July 2015, Pukke caused transfers of more than $1.2 million of Sanctuary Belize funds to be made directly to, or on behalf of, his family members and friends. (Tr. 1084 (Chittenden ran Beach Bunny), 1850 (Testimony of defense witness Anthony Mock, who worked for Sanctuary Belize and was the stepfather of Kaelin, Jasmin, Jordan, and Payton Pukke, that Pukke's children did not work at Sanctuary Belize); GX 1003 at 20, GX 2407-E through GX 2407-H)).

g.  Other Diversions

Sales manager Jim Catsos received salaries and commissions of approximately $30,000 per month, but explained to Patricia Kaelin that he "didn't get to keep it all," and that "part of it went to the boss, to Andi."  (Tr. 1088, 1095).

Pukke lied about his income from Sanctuary Belize both under oath when in court and on his tax returns.  During a November 13, 2015 violation of supervised release hearing in the District Court for the District of Maryland, the court asked Pukke: "Now, all those entities that are related to the Sanctuary Belize projects, you are not getting any compensation other than $10 an hour?" (GX 738 at 1, 5).  Pukke answered: "Correct."  (*Id.* at 5).  Pukke's IRS Forms 1040 for tax years

27

2012 through 2014 reported wages and adjusted gross income in equal amounts, always less than $34,000, each year, and the IRS had no record of having received a Form 1040 for Pukke for tax years 2011, 2017, or 2018. (GX 2-5, GX 1311).

Patricia Kaelin explained that because the Sanctuary Belize entities utilized a lot of wire transfers, which entailed paying wire transfer fees and made it more difficult for her to "figure out what they were for" when reconciling the bank statements, she suggested to Kazazi that they switch to using ACH transfers, which would not incur fees and would make the expenses easier to categorize. (Tr. 1074-76). Kazazi rejected her suggestion "because a wire transfer requires a federal warrant." (Tr. 1076, 1080). Because it was difficult to obtain a complete and accurate accounting of the various Sanctuary Belize entities that were sending and receiving funds that were transferred though the same bank account, Kaelin also suggested to Kazazi that the receivables and expense sides be united in a single QuickBooks file. (Tr. 1081-82). After months of Kaelin asking, Kazazi ultimately told her to stop asking questions, explaining "you don't understand, you are not one of us. If you keep asking questions, you are going to lose your job. We are all friends. We are all connected. You're an outsider." (Tr. 1082-83).

### 5. Sanctuary Belize Had Significant Debt

Notwithstanding Pukke's assertions through Sanctuary Belize marketing materials and personnel that Sanctuary Belize had no debt, Sanctuary Belize had significant debt and was also spending significant amounts of lot buyer funds to repay that debt. The parties stipulated that:

- If called to testify, Violet Mahis would have testified that she and her husband, Cleo Mathis, controlled CVM Corporation, and that CVM Corporation loaned Eco-Future Belize $2.5 million in approximately February 2013. (GX 1302) (the "Mathis Loan").

28

- If called to testify, Gordon Barienbrock would have testified that he is the trustee of the Gordon Barienbrock Family Trust ("GBFT"), which made loans to Eco Futures beginning in approximately August 2014, including a $1 million loan in or about October 2014; that GBFT's loans to Eco Futures were consolidated in or about November 2017 into a single loan in the amount of $4,635,500; and that Eco Futures made some loan repayments to GBFT, but did not fully pay back the $4,635,500 loan.  (GX 1304) (the "Barienbrock Loan").

The promissory note for the Mathis Loan stated that borrower Eco-Future Belize was the developer of Sanctuary Belize, was signed by Usher and Chadwick, and called for repayments over a five-year term commencing on April 1, 2013.  (GX 920).  Global Property Alliance's accounting records recorded a $2.5million deposit in a QuickBooks account entitled "CVM Loan Payable (Mathis)," with outgoing wires to CVM Corporation from January 13, 2014 through September 21, 2015 totaling more than $1.25 million.  Eco-Futures Development's QuickBooks accounting records reflect outgoing wires to CVM corporation from February 2017 through October 2018 in a total amount of more than $280,000.  (GX 2342).

The November 10, 2017 promissory note for the Barienbrock Loan was signed by Kazazi, identified the borrower as Eco-Futures Belize, specified that Eco Futures "has loaned borrower funds secured by deeds of trust on land in this development," provided that the loan would be amortized over 20 years starting on January 1, 2018, with monthly payments of $44,750,000, and provided that it would be secured by a first deed of trust on the marina property currently known as the "hotel site."  (Tr. 1049-51; GX 910).  Global Property Alliance's, Sittee River Wildlife Reserve's, and Eco Futures Development's QuickBooks accounting records reflect 2014 credits in the "Loan Payable" account with memo lines reflecting that they are "deposits made by

Gordon," 2016 credits from Gordon Barienbrock in the "Loan Payable Gordon Barienbrock" Account, and 2016 through 2018 payments to Barienbrock in 2017 and 2018 totaling more than $1 million, some with the notation "G.B. Loan," and "loan repayment."  (Tr. 1053-59; GX 2020-21, GX 2343).

As detailed in Section I(B), below, in December 2010 Sanctuary Belize also borrowed more than $5 million from John Vipulis and Patrick Callahan to build its marina.

### 6.  The Sanctuary Belize Project Languished

At the same time that Pukke was diverting Sanctuary Belize funds for his own use and Sanctuary Belize was repaying loans, the project languished.  Even as late as 2018, when the Sanctuary Belize receiver's representative, Andrew Sotak, traveled to Belize to tour the development, of the 1816 lots that had been surveyed, only approximately 70 had homes built on them.  (Tr. 895).  Although Sanctuary Belize received revenue of more than $126 million from lot sales, (Tr. 903; GX 1003 at 27), much of the development of Sanctuary Belize that Pukke promised to lot buyers had not been completed.  For example, some roads were inaccessible or incomplete, some subdivisions were entirely undeveloped, water and electric utilities infrastructure had not been run to all of the lots, the planned hotel in the marina had not been built, a significant number of canals had not been completed, and other than a beach club that had a kitchen facility, none of the planned marina restaurant buildings had been built.  (Tr. 889-93, 928).  The marina itself had been constructed, but with only 59 of the planned 120 boat slips.  (Tr. 894).  While Sanctuary Belize's Marina Village was to include a number of boutique and high-end retail shops, restaurants, and a boardwalk adjacent to the marina area, none of these buildings had been built. (Tr. 893-94).  The planned golf course had not been built.  (Tr. 894).  The planned casino had not been built.  (Tr. 894-95).  Simply put, the evidence showed that due to all the missing infrastructure

and amenities, many lots at Sanctuary Belize were unusable or undesirable locations on which to build a home.  Although Sanctuary Belize sold more than 1,000 lots, only approximately 50 to 75 homes were ever built.  (Tr. 67, 885-86; GX 200).

### B.   Pukke Attempted to Obstruct an Official Proceeding

One of the debts that Sanctuary Belize falsely denied was a $5.3 million loan from John Vipulis and Patrick Callahan made to Sanctuary Belize in 2011 in order to build its marina.  (Tr. 562-72; GX 722).  However, Vipulis made an earlier $4.5 million loan to Pukke personally, in 2007, in order to obtain Pukke's release from imprisonment (*i.e.*, the AmeriDebt Loan).  (Tr. 562-64; GX 722 at 4).  In releasing Pukke, the U.S. District Court for the District of Maryland ordered that Pukke not repay any portion of the AmeriDebt Loan until after Pukke had paid the judgment he owed to the FTC.  (GX 722 at 6).  As noted above, from July 2012 to October 2018, Pukke caused Sanctuary Belize to make payments to Vipulis of more than $4.2 million.  (GX 1003 at 16).  The evidence at trial showed not only that those payments were to repay Vipulis for the personal, AmeriDebt Loan, and were thus not legitimate uses of Sanctuary Belize funds from lot buyers, but also that Pukke subsequently attempted to an obstruct a grand jury investigation into his conduct at Sanctuary Belize by asking Callahan to generate a false document that would have falsely indicated that the payments to Vipulis were for the Marina Loan.

Pukke's lifelong friend, John Vipulis testified that he gave Pukke the $4.5 million AmeriDebt Loan in 2007 in order to obtain Pukke's release from imprisonment.  (Tr. 562-72; GX 722).  Although the U.S. District Court for the District of Maryland's Order Approving Stipulation for Conditional Release (GX 722) provided that $1.25 million of the $4.5 million wired by Vipulis would be paid in consideration of property in Latvia, (GX 722 at 6), Vipulis had not wanted to buy

the property, and both Pukke and Vipulis understood that Pukke owed Vipulis the full $4.5 million that Vipulis had paid for Pukke's release.  (Tr. 640-43).

In late 2010, despite not having paid Vipulis back any portion of the AmeriDebt Loan, Pukke asked Vipulis for an additional approximately $5 million loan to build the marina at Sanctuary Belize.  (Tr. 574-75).  Vipulis agreed to lend Pukke the additional funds so that Pukke would be able to take Sanctuary Belize "to the next level" and repay Vipulis the AmeriDebt loan.  (Tr. 575).  Vipulis did not lend Pukke the full amount himself, but instead they arranged to split the loan with his business partner, Patrick Callahan, each lending half of the amount.  (Tr. 575-76).  Callahan sent all of the funds to Pukke from a company that was owned by Vipulis and Callahan.  (Tr. 576-77).  Vipulis and Pukke did not discuss an interest rate for the loan, did not have a written loan agreement, and did not discuss a timeline for repayment.  (Tr. 578).

Patrick Callahan testified that he and Vipulis agreed with Pukke to make the $5.3 million Marina Loan in the fall of 2010, with each contributing half of the funds, through an entity they co-owned, Harlequin Holdings ("Harlequin").  (Tr. 1299-1300).  Callahan agreed to contribute mainly due to Vipulis's request.  (Tr. 1300).  Callahan's understanding was that Vipulis wanted to make the loan because Vipulis had another loan outstanding with Pukke, and that "by having Sanctuary Belize, [Pukke] would have a method or a way of repaying the existing loan that [Vipulis] had outstanding."  (Tr. 1300).  No written agreement was entered into at the time Vipulis and Callahan agreed to lend the $5.3 million.  (Tr. 1302).  Later, for purposes of administering the actual bank wires, they put together a loan agreement between Sittee River Wildlife Reserve and Vipulis and Leeward Trust Corporation, a law firm acting on behalf of Harlequin.  (Tr. 1302-05; GX 524).  As Callahan explained, the sending and receiving banks would not perform the wire transfers without supporting documentation.  (Tr. 1303-04).  Although the written document

specified a loan value of $3 million, their agreement was that the loan would be between $5 and $5.5 million, but they documented $3 million in order to begin sending wires to Sanctuary Belize, with the intent to document future amounts as needed.  (Tr. 1303).  Although the written document specified an interest rate of four percent, their actual agreement was that there would be no interest.  (Tr. 1304; GX 524).  They further agreed that payments would begin once Pukke was out of jail[4] and back on the project.  (Tr. 1305).

Beginning in December 2010, Callahan arranged for the loan funds to be sent primarily to Eco-Futures, Ltd., but also to companies working on the marina for Sanctuary Belize, and $395,000 to Pukke's "wife," which Callahan recorded as "Andi personal."  (Tr. 1307-09; GX 520).  Callahan monitored the construction of the marina because it was important to him that the money go to the marina so that Sanctuary Belize could be sustainable going forward and able to generate income to repay both the first loan (*i.e.*, AmeriDebt Loan) and the second loan (*i.e.* the Marina Loan).  (Tr. 1309-10, 1354-55).  Callahan understood that Pukke was the owner of Sanctuary Belize, and that the repayments would come from the cash flows of Sanctuary Belize.  (Tr. 1358).

Vipulis testified that after the loan was made, Pukke sent Vipulis an email indicating that Pukke was in a position to being making repayments on "the loan," without specifying the AmeriDebt Loan or the Marina Loan.  (Tr. 579).  Vipulis treated the repayments as going towards the AmeriDebt Loan.  (Tr. 579, 589).  Vipulis further testified that Pukke never started making repayments on the Marina Loan.  (Tr. 585).  Vipulis understood that Callahan was not being repaid, and that had the repayments been for the Marina Loan, Callahan "would be getting repaid half the amount as well."  (Tr. 580).

---

[4] Pukke was sentenced to 18 months' imprisonment in May 2011 for obstruction of justice in connection with the AmeriDebt Case.  (GX 734 at 4, GX 736 at 2).

On October 31, 2012, Callahan emailed Pukke, "November is upon us, and we agreed for the payments to begin on November 1.  Let's discuss what the amount is."  (GX 523).  It was only through this email exchange that Callahan learned for the first time from Pukke that he had been sending $10,000 monthly payments to Vipulis for the prior five months.  (Tr. 1311-12; GX 523).

Vipulis testified that he did not send Callahan any portion of the loan repayments he received from Pukke.  (Tr. 582-86).  The repayments stopped after Vipulis's account was frozen as a result of Pukke sending Vipulis the funds, after which Vipulis gave the more than $4 million he had received from Pukke to the FTC.  (Tr. 581-84).

Callahan testified that neither Harlequin nor Callahan ever received any payments on the Marina Loan.  (Tr. 1314-16, 1321-23; GX 521, GX 2326-27).  Callahan further testified that Vipulis received all loan repayments that Pukke made, and that based on Callahan's communications with Vipulis, the payments were going towards the first loan (*i.e.*, the AmeriDebt Loan).  (Tr. 1314-15).  Though Callahan was communicating regularly with Pukke, Callahan never had a discussion with Pukke to the contrary.  (*See* Tr. 1369-79).

Federal Bureau of Investigation Special Agent Brandon Racz testified that a grand jury investigation into Sanctuary Belize was underway by at least July 14, 2021.  (Tr. 517-21).  On that date, the grand jury issued a subpoena signed by Assistant United States Attorney ("AUSA") James McMahon.  (Tr. 517-21; GX 8).  Both Vipulis and Callahan testified before the grand jury.  (Tr. 600, 1328).

While the grand jury investigation relating to Sanctuary Belize was underway, (Tr. 521-22), "[o]n or about November 18, 2021, Ty Cobb, Esquire, on behalf of his client, Andris Pukke, agreed to meet with AUSA McMahon in White Plains, New York, on December 17, 2021, to

discuss Mr. Pukke." (GX 1315). On December 17, 2021, Cobb and AUSA McMahon met in person and discussed the criminal investigation of Pukke. (Tr. 522).

On December 8, 2021, after the meeting between Pukke's attorney and the AUSA overseeing the grand jury investigation was scheduled, and just nine days before the meeting occurred, Pukke sent Vipulis the following WhatsApp text message:

> ANDI: I really hate to bother you with this but I just spoke to my attorneys and we need to do an accurate accounting of where money went and I need PC's help. ***Can you ask him if he or his attorney would be willing to confirm that he loaned us the money to finish the marina in 2011, including the amount, and that he requested we pay it back to you?*** I know he wants to stay out of this but I really need his help to confirm that, even if it comes from his attorney. I have emails[5] from him that pretty clearly suggest it but a letter from him is really what I need. ***I just need him to confirm the amount he loaned and that he requested that it be paid back to you.*** Hopefully he's willing to do that. Sorry again for the hassle and thanks again for everything!!

(Tr. 589-91; GX 601) (emphasis added).

Vipulis explained that he understood that "PC" in the message was a reference to Patrick Callahan, and that based on Vipulis's knowledge of the Marina Loan, Pukke's request that Callahan or his attorney confirm that Callahan had requested that repayments for the Marina Loan be sent to Vipulis did not make sense. (Tr. 591, 593). To Vipulis's knowledge, neither Vipulis nor Callahan had ever requested that repayments of the Marina Loan be paid to Vipulis. (Tr. 592-93).

Vipulis did not respond to Pukke's initial message. (GX 601). The next day, Pukke sent a follow-up message to Vipulis:

> ANDI: Can you help me with this? I don't need much. Just a quick letter or email confirming it. If he has a problem doing that for some reason let me know and I'll try to figure out another way. Thanks!

---

[5] Although Pukke presented a substantial defense case, he did not introduce these purported emails.

(GX 601). Vipulis responded, "Check your signal," by which Vipulis was referring to a "more secure" messaging service that would ensure others would not be able to copy or see their communications, and the two ended their WhatsApp communications about the subject. (Tr. 593-95; GX 601). To the extent they continued the discussion over Signal, Vipulis no longer had copies of the messages because they had been "set to erase after a few days." (Tr. 596). Vipulis testified that he passed Pukke's message on to Callahan, and that Callahan rejected Pukke's request. (Tr. 592).

Callahan testified that Vipulis read Pukke's foregoing December 8, 2018 text message to Callahan over the phone, (Tr. 1323), and that Callahan's told Vipulis that he would not "cooperate with this text" and had "nothing to offer." (Tr. 1324). Callahan asked Vipulis to convey to Pukke that "[a]nything [Callahan] had to offer would not support [Pukke's] case." (Tr. 1325). Callahan further testified that he never requested that Pukke pay the Marina Loan back to Vipulis or told Pukke that he should make payments on the Marina Loan to Vipulis. (Tr. 1324). Further, Callahan was not aware of Vipulis ever having told Pukke to make payments on the Marina Loan to Vipulis. (Tr. 1324; *See also* Tr. 1372 ("[Pukke] must have gotten [Vipulis's] wire instructions to start payments, and I was not aware of that.")).

## II.    Pukke's Rule 29 Motion

In his motion, Pukke argues that the evidence was insufficient to prove both counts charged. First, Pukke argues that the Government did not prove that Pukke had the specific intent to defraud, because none of the false statements evinced intent to inflict economic loss or deprive buyers of the benefits of their bargains. (Mot. 15-24). Second, Pukke argues that the Government did not prove that Pukke intended to obstruct an official proceeding, because Pukke did not request

a false document and did not know or intend that it be conveyed to the grand jury. (Mot. 24-33). Both arguments fail as a matter of fact and law.

## ARGUMENT

### I.    Applicable Law

#### A.    Rule 29 Standard

"To prevail on an insufficiency of the evidence claim under Rule 29, a defendant bears the 'heavy burden' of showing that 'no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.'" *United States v. Mensah*, 515 F. App'x 59, 61 (2d Cir. 2013) (quoting *United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010)); *see also, United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (noting the defendant's "heavy burden" in a Rule 29 motion); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (explaining that a jury's verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). In other words, "'[a] judgment of acquittal' is warranted 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).

When evaluating a Rule 29 motion, the Court should "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted); *accord United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995). Even where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting *United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006)). Thus,

"[t]he task of choosing among the permissible competing inferences that can be drawn from the evidence is for the jury, not a reviewing court." *United States v. Salemo*, 499 F. App'x 110, 112 (2d Cir. 2012) (quoting *United States v. Coppola*, 671 F.3d 220, 239 (2d Cir. 2010)); *see also Espaillet*, 380 F.3d at 718 ("courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)); *id.* ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of … the weight of the evidence and the reasonable inferences to be drawn for that of the jury." (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999))); *United States v. Ulloa*, 511 F. App'x 105, 107 (2d Cir. 2013) (reasoning that a conviction must be affirmed, after "credit[ing] every inference that could have been drawn in the government's favor, … so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt" (quoting *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006))).

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also United States v. Cherico*, No. 08 Cr. 786 (CM), 2012 WL 1755749, at *2 (S.D.N.Y. May 16, 2012) (McMahon, *J.*) (same); *United States v. Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it.").  Accordingly, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *Guadagna*, 183 F.3d at 130 (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)); *see Martinez*, 54 F.3d at 1042 ("[I]t is the task of the jury, not the Court, to choose among competing inferences.").

Moreover, in a sufficiency analysis, the Court is not tasked with evaluating the quantum of evidence as to any element. Indeed, it is "well-settled that a conviction may be sustained on the basis of the testimony of a single witness, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 112 (2d Cir. 2008). And, of course, the assessment of witness credibility is "the province of a jury properly instructed" and the "proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury," not in a motion based on the alleged insufficiency of the evidence. *United States v. Truman*, 688 F.3d 129, 139–40 (2d Cir. 2012) (quoting *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989)).

## B.    Rule 33 Standard

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances." *See also Ferguson*, 246 F.3d at 134; *see also United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020). To find that a "manifest injustice" has occurred and thus grant a motion under Rule 33, the district court must conclude, taking into account all of the facts and circumstances of the case, that there is "a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134; *see also United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015) ("A defendant's motion for a mistrial may be granted where something has

occurred to interfere with the defendant's right to a fair trial."). A new trial should not be granted when the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134. Moreover, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *Archer*, 977 F.3d at 188. The defendant bears the burden of proving that he is entitled to a new trial under Rule 33. *See United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

### C.    Wire Fraud

To prove wire fraud, in violation of 18 U.S.C. § 1343, the Government must establish three elements beyond a reasonable doubt: (1) a scheme to defraud another of money or property; (2) knowing participation in the scheme with specific intent to defraud; and (3) use of the wires to further the scheme. Leonard B. Sand *et al.*, *Modern Federal Jury Instructions: Criminal* § 44-3; *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). As the Court charged the jury in relevant part:

> Intent to defraud means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another.
>
> . . .
>
> The government, however, need not prove that any intended victim was actually harmed, only that such harm was intended or contemplated by the defendant.
>
> . . .
>
> A misrepresentation must relate to an essential element of the bargain, rather than being collateral to the bargain. A misrepresentation is about an essential element of the bargain if, for example, it creates a discrepancy between benefits reasonably anticipated because of the misrepresentations and the actual benefits which the defendant delivered or intended to deliver, or if it misrepresents the economic value of the bargain. False statements or misrepresentations that are merely collateral to

the bargain and meant to induce a customer to enter into a transaction that he or she would otherwise avoid are insufficient to prove intent to defraud.

(Tr. 2373-74); *see United States v. Jabar,* 19 F.4th 66, 76-77 (2d Cir. 2021) ("essential element of the bargain," "discrepancy between benefits" and "merely collateral" language); *United States v. Schwartz*, 924 F.2d 410, 421 (2d Cir. 1991) ("essential element of the bargain" language); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("discrepancy between benefits," and contemplated harm language).

The cases have consistently rejected arguments that there can be no intent to defraud merely when a consumer gets what he paid for. Instead, the customer must get "exactly" or "all" that he paid for. *See United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) ("[W]e have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the *full* economic benefit of its bargain") (emphasis added); *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (no fraud where victims "received *exactly* what they paid for and there was no discrepancy between benefits reasonably anticipated and actual benefits received") (emphasis added); *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (no fraud where "the [victims] received *all* they bargained for, and [the defendant's] conduct did not affect an essential element of those bargains") (emphasis added).

While, as the Court charged, good faith is a defense,

[i]f the defendant participated in the scheme with the intent to the cause some financial or property loss to another, the fact that the defendant honestly believed, rightly or wrongly, that the scheme would ultimately work out such that the victim would not lose money or property will not excuse fraudulent actions or false representations by him.

41

(Tr. 2375); *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) ("no amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors, or not cause anyone harm, will excuse fraudulent actions or false representations").

### D.    Obstruction of an Official Proceeding

To prove obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2, the Government must establish three elements beyond a reasonable doubt: (1) that the defendant obstructed, influenced, or impeded an official proceeding, or attempted to do so, by impairing the availability or integrity of records, documents, or objects used in an official proceeding; (2) that there was a nexus, or a relationship, between the defendant's conduct and the official proceeding; and (3) that the defendant acted corruptly.  Adapted from Leonard B. Sand *et al.*, *Modern Federal Jury Instructions: Criminal* § 46-69; *United States v. Fischer*, 144 S. Ct. 2176, 2186 (June 28, 2024); *United States v. Aguilar*, 515 U.S. 593, 599 (1995).  As the Court charged the jury in relevant part:

> [A] federal grand jury investigation is an official proceeding. An investigation by federal prosecutors or law enforcement officers alone is not an official proceeding.
>
> The law does not require that the official proceeding be pending at the time of the defendant's actions as long as the proceeding was foreseeable such that the defendant knew that his actions were likely to affect the proceeding.
>
> . . .
>
> [T]he government must prove beyond a reasonable doubt that the defendant's actions involved impairing the availability or integrity of records, documents, or objects for use in an official proceeding, which includes creating a false document or false witness testimony.
>
> . . .
>
> The nexus element means the defendant's conduct must have a relationship in time, causation, or logic with the official proceeding. That is, the defendant's conduct must have the natural and probable effect of obstructing the official proceeding.

42

Here, the defendant must have had a specific intent to obstruct a federal grand jury proceeding, not just a federal law enforcement investigation. Even if the defendant knew of the existence of a federal grand jury proceeding, and attempted to cause a witness to create a false document regarding issues pertinent to that proceeding, that would not violate the law unless the defendant also knew or intended that the false document would be conveyed to the grand jury.

(Tr. 2379-81); *see Fischer*, 144 S. Ct. at 2186 ("impairing the availability or integrity of records, documents, or objects" language); *Aguilar*, 515 U.S. at 599 ("nexus" language).

## II.   <u>Discussion</u>

### A.   **There Was Sufficient Evidence for a Jury to Conclude That Pukke Had the Intent to Defraud Lot Buyers**

Pukke ignores much of the evidence, as well as the applicable law, when he argues that the lot buyers received the benefit of their bargains and, therefore, the evidence of his intent to defraud was insufficient.  The evidence clearly showed the lot buyers did not receive all they bargained for.  Pukke also ignores the evidence, common sense, and the requirement that this Court draw all inferences in favor of the Government on post-trial review when he argues that none of the three misrepresentations "evinced intent to inflict economic loss."  (Mot. 17).  Each of the three misrepresentations was directly relevant to essential elements of the buyers' lot purchases and misrepresented the economic value of the bargain.

The marketing brochures, sales scripts, and sales contracts showed that Pukke was selling far more than unimproved land in the jungle.  He was selling a promise that he "was building the best development in all of the America's [sic]."  (GX 1110 at 14).  The development was going to be a "sheltered 14,000-acre residential resort haven" that would be a "private sporting paradise." (GX 112 at 11).  It would "promote[] a life of active living by offering a variety of adventurous outdoor pursuits," such as scuba diving, snorkeling, fishing, kayaking, sailing, hiking, mountain

climbing, horseback riding and mountain biking." (*Id*. at 13).  It would have "unequalled" amenities, including a "world class marina village" that "will bustle with everything a Belizean coastal town should." (GX 113 at 6).  The village would have a boutique hotel, restaurants, bars, a "full size American Grocery Store," bakeries, fresh fish and produce stands, art galleries, a weekend farmers' market, medical clinic, post office, an international school for children, cultural activities, and a church, among other things.  (GX 113 at 6; GX 2059-B at 1, 9-10).  Sanctuary Belize agreed with each lot buyer to clear roads and run utilities to each lot so that the lots would be ready for the homes the lot buyers would build.  (*See, e.g.,* DX L(development agreement)).

After at least seven years of construction, Sanctuary Belize was still not finished when the Federal Trade Commission seized the property in November 2018.  (*See* Tr. 1727 (developer worked at Sanctuary Belize from 2011 to November 2018 when FTC seized property)).  Approximately thirty percent of the roads had not been built, so some areas planned for development were not accessible.  (Tr. 177).  Approximately forty percent of the power and water lines had not been built.  (Tr. 176-77).  The Marina Village had not been built, with the exception of a marina office, small gas station and some sundry buildings.  (Tr. 893).  The only restaurant built was at the beach club.  (Tr. 892).  The hotel, golf course and casino had not been built.  (Tr. 892-894).  The marina, which was supposed to have 120 slips, had only 59 slips.  (Tr. 894).  It was Sanctuary Belize's responsibility to build all these promised amenities.  (Tr. 888-95 (Testimony of Andrew Sotak)).

Under these circumstances, promises about the developer's reliability and financial stability were directly relevant to the economic value of the bargain.  All else equal, risk decreases the value of an asset.  The respective values of the lots were tied directly to the reliability of the developer as perceived by potential buyers because the lot owners were dependent on the developer

44

to finish the project.  A lot, particularly in an inaccessible area, without utilities and without the promised amenities described above, is obviously worth less than an immediately buildable lot with all the promised amenities built and operating.  The former is an asset with fixed costs of a mortgage, homeowners' association fees and taxes that cannot be used at all or at least to the full extent promised by Pukke.  The former also carries risks that the development will never be completed at all, will not be completed as promised or will not be completed within a time frame when it would be useful to a lot buyer.  An ongoing project, such as Sanctuary Belize, that is being developed by a reliable developer is more likely to be completed as promised within a reasonable time frame than a project by an unreliable developer.  Similarly, a project being developed by a financially stable developer is less likely to fail for financial reasons.  Lots in unfinished projects with reliable, financially stable developers are worth more than lots in unfinished projects with unreliable and financially unstable developers.

Pukke certainly understood these truisms.  His marketing materials stated "Choosing a developer with no debt takes away the biggest risk of failure, because every dollar earned can go right back into the development itself. . . . Sanctuary Belize has been completely debt-free since the land was first purchased in 2003.  All income goes directly to development and not a dollar goes to paying any loans."  (GX 2059-B (sales script); GX 2052 (sales brochure entitled "Top 5 Tips for Mitigating Risk While Investing Abroad")).  The sales script said that Sanctuary Belize was debt-free three times and further said that most people who contact Sanctuary Belize are attracted to the development for that reason.  (GX 2059-B at 1, 5, 10).  Another sales script states:

> Now let's talk about financial stability.  One of the things about this property that sets it apart from anyone else, is that they are **one of** the ONLY, DEBT FREE developments in the entire world.  So that that means for *you* is you don't have to worry about dealing with a developer who borrowed too much money and went bankrupt, and you're left with a useless piece of property.  This will never happen

because they have NO debt and because they have no debt they are able to offer you flexible in-house financing with incredible rates, terms and developer discounts!

(GX 2409-D at 10 (emphasis in original)).  Another promotional brochure stated:

Obviously if you're going to even consider an opportunity like this, you're going to want to deal with a top notch developer.  Let's talk a little about credibility and financial standing. . . . Now let's talk financial stability.  One of [the] things about this property that sets it apart from anyone else, is they are **one of** the ONLY, DEBT FREE developments in the entire world.

(GX 2409-A at 8-9).  Yet another sales script incorporated much of the above language and asked rhetorically:

So what you have here is an award winning, debt free developer who's building the best development in all of the America's [sic].  Does this look like a developer you would want to do business with?

(GX 1110 at 14).  An FTC paralegal, who was posing as a lot buyer, was told by a Sanctuary Belize salesperson:

It's very, very, very rare that you ever come across a development that has been paid for in full. . . . [Developers who fail are] not making enough sales and they can't proceed with paying off that or even getting the amenities finished. . . . All the money that comes in on those sales are [sic] going straight into the completion of everything they need at the marina and everything else that they've been doing.

(GX 318-B at 28).  This salesperson also represented that the developer was "completely debt-free," not that he just owns the land without encumbrance, and that Sanctuary Belize's development would "stay on track" even if sales slowed.  (GX 318-B at 28-29, 31).

## 1.   "All Income Goes Directly to Development"

The "all income goes directly to development" misrepresentation is directly relevant to the economic value of the bargain.  The $9.9 million Pukke stole from the project is a material portion of the $30 million to $35 million that had been spent on the project's development through November 2018.  (Tr. 1793).  The stolen funds, at least 28 percent of which had been spent on the

project, would have put the project that much closer to completion that much faster. The evidence showed that, just as one example, one million dollars would have paid for four more miles of roads, when thirty percent of the roads were still not completed. Ten million dollars would have finished all the roads. (Tr. 1808-09, 1813).

The extra $10 million therefore would have reduced the risks of outright failure or a failure to complete the project within a reasonable time period. It would have rendered the lots fully usable for their intended purpose that much faster. The false "all income" statement was also direct support for Pukke's claims that he was a financially stable developer, who did not need to incur debt to finish the project. All of those things correspond with a reduction of risk and an increased value of the owners' lots. Pukke's deprivation of that reduction in risk and increased lot value is the contemplated harm. That is all the Government was required to prove, contrary to Pukke's repeated suggestions otherwise, (Mot. 19-20). *United States v. Jabar*, 19 F.4th 66, 81 (2d Cir. 2021) (government not required to prove actual harm).

Most of the lot buyers who testified said the "all income" misrepresentation was important to their decisions to buy because the assurance that all of their funds would go toward development led them to believe that the investments were lower in risk and more attractive. Frank Balluff testified that the "all income" misrepresentation was important to his decision to buy a lot because "for one, it was in another country but even if it was in the U.S., the financial strength would be important to me." (Tr. 143). Nancy Cunningham believed it "mitigated the risk we were taking." (Tr. 1222). Similarly, Carl Dudick testified it meant "the community was in the black." (Tr. 49-50). Even Michael Curley, the defense witness who testified "nothing was going to deter me from purchasing," acknowledged that another $10 million available for development would mean "more money, the faster you can move. So I guess anything extra would help make it develop faster."

47

(Tr. 1718, 1725).  Increasing risk and slowing the development were two ways Pukke "intended to cause direct pecuniary harm to [his] intended victims."  (Mot. 19) (arguing the Government has not explained otherwise), *citing Starr,* 816 F.2d at 100.  The jury had more than ample evidence to conclude that a reasonable investor would find the "all income" misrepresentation to be material and directly relevant to the economic value of the bargain for these reasons.

None of Pukke's arguments change that conclusion.  The fact that some lot sale income went to cover administrative costs does not render Pukke's thefts irrelevant.  "Development" as that word was used in "all income goes directly to development" obviously included administrative fees.  The "equity model" video, which was shown to all potential buyers, expressly acknowledged that there were marketing fees.  (GX 1103A (video); GX 1104 (defendant states video shown to "all clients")).  Any reasonable buyer would understand that "development" needed administrative backup and that a development funded by lot sale income would need sales, which made marketing and its accompanying fees and commissions necessary.  Any reasonable buyer who dealt with a Sanctuary Belize salesperson would understand that the salesperson was being paid.  Any reasonable buyer who went on a Sanctuary Belize tour or read Sanctuary Belize marketing materials would understand those things cost money.  The Government never contended otherwise; in fact in closing, it argued:

> The defendant ordered his employees to say that all the money from lot buyers went back into the development.  That was a lie.  And I want to clear something up that I think [the] defense has been trying to confuse.  The government isn't arguing that that was a lie because Sanctuary Belize paid rent for an office or had expenses or had employees, no.  It was a lie because $10 million that could have been spent on development, that was promised to be spent on finishing the development instead went right into the defendant's pocket.

(Tr. 2235-36).  Pukke's argument is nothing more than an attempt to knock down a straw man.

48

Pukke's argument that his thefts were the equivalent of his salary is also unavailing.  The thefts were clearly not salary.  They were not paid directly to Pukke; instead, Pukke directed that payments be sent on his behalf directly from Sanctuary Belize accounts to his intended recipients. (*See, e.g.,* GX 2175, GX 2178-81, GX 2185-88, GX 2191-92, GX 2195, GX 2197-98, GX 2200-01, GX 2206, GX 2208, GX 2211-12, GX 2214, GX 2229).  The payments were disguised on the books of the Sanctuary Belize entities as legitimate, development-related expenses.  (*See, e.g.,* GX 1003 at 5, 12, 16, 20, 23 (payments booked as legal fees, loans, professional fees, marketing fees and consulting fees)).  No Sanctuary Belize entity reported the payments to Pukke on Forms W-2 or 1099 in at least a majority of the years in which the payments were made.  (GX 2-6 (defendant's adjusted gross income always lower than amount of embezzled funds on IRS transcripts from 2012 through 2015)).  Pukke did not report these payments as income to the Internal Revenue Service. (GX 1003 (showing payments made from December 2011 through October 2018); GX 2-6 (payments do not appear on defendant's tax returns from 2012 through 2016)); GX 7 (defendant failed to file return in 2017)).  Pukke testified in 2015 that he received only $10 an hour from Sanctuary Belize.  (GX 738).  As demonstrated below, Pukke took active steps to conceal that he had any relationship with Sanctuary Belize.  The payments could not also be excused as profits taken by Pukke.  As the defense concedes, the equity model video that was shown to all potential buyers specified that the developer took his profit at the end of the development process.  (GX 1103-A, GX 1104; Mot. 20).  Under these circumstances, it was perfectly reasonable for the jury to conclude that the payments were not legitimate salary or draws of profits.

Contrary to Pukke's argument, there is no confusion about how much money should have been spent to fulfill the promise that all income from lot sales would go to development.  (Mot. 21).  All income means *all* income.  Pukke chose those words and then chose to have potential

buyers hear them repeatedly.  (GX 2139-A (defendant commented on draft brochure containing "all income" statement); GX 1103-A, GX 2052, GX 2059-B (statement contained in marketing materials)).  Nor did the Government have to demonstrate how much money was actually spent on infrastructure as Pukke suggests.  (*See* Mot. 21).  That argument depends on Pukke's artificial and irrelevant distinction between costs of building roads and other physical improvements and administrative costs.  As noted above, all such costs to develop Sanctuary Belize were included in "development."  Further, what was relevant was how much money was *not* spent on infrastructure as it should have been: the $9.9 million embezzled by Pukke.

In order to prove wire fraud, the Government was not required to trace every single dollar stolen by Pukke directly to lot sales.  Rather, it was sufficient to show, as the Government did, that Pukke took money from accounts funded by lot sales.  (GX 1003 at 1-26 (showing payments to defendant from Global Property Alliance, Buy International, Eco Futures Development and Foundation Development Management); at 27 (showing more than $126 million in principal and interest from lot sales deposited to Global Property Alliance and Eco Futures Development)).  That, along with the proof of Pukke's knowledge that he was not entitled to the money, as evidenced by the efforts to hide and to disguise the payments described above, was more than sufficient to permit the jury to conclude that Pukke stole money from lot sales.

But the evidence did show that Pukke stole money that came directly from lot sales.  For example, Pukke directed a Sanctuary Belize staff member by email to send $30,000 to Outsource, one of his personal startup investments, from Global Property Alliance on October 17, 2014:

> Hey buddy.  I just logged on and saw that we received a payment for $23K.  I know things are still ridiculously tight but if there's anyway [sic] you can get that Outsource wire out first thing in the AM it would be very helpful. . . .

(GX 2201).  The statement for the account of Global Property Alliance, a Sanctuary Belize entity, with account number ending in 5021 showed a deposit of $23,260.94 from a lot buyer on October 9 and another deposit of the same amount on October 17.   (GX 814-C at 485, 486; GX 200 (identifying payor as a lot buyer in North Ridge, the same division of Sanctuary Belize in which witness Carl Dudick bought a lot)).  The 5021 account showed eleven deposits from confirmed lot buyers in a total amount exceeding $160,000 from October 1 to October 14.  (GX 200, GX 814-C).  On October 17, $30,000 was transferred from the 5021 account to another Global Property Alliance with account number ending in 5098 and the payment to Outsource was made from the 5098 account that day.  (GX 817-E at 569).  The payment to Outsource could not have been made without the $30,000 transfer, as the 5098 account had a balance of less than $8,000 at the end of the prior day.  (GX 817-E at 583).  Thus, the payment to Outsource was funded at least in significant part by money from Sanctuary Belize lot sales.

There is no evidence to support Pukke's suggestion that the money to fund the Outsource payment, and the many other thefts by Pukke, came from sources other than lot sales.  There were few sources of other revenue.  The marina was not operating in 2014 and, even as of November 2018, only had about 50 slips.  (Tr. at 1814-15).  The restaurant was not finished.  (Tr. at 1829-30).  Money from Mango Springs Development, to which Pukke points, did not come into the bank accounts until September 2014 and stopped coming in in January 2016.  (DX AW-01).  Finally, Ms. Alpaugh never said "that there were 11 Sanctuary Belize entities with revenues from revenues from non-lot sales sources."  (Mot. 22).  Instead, she said she did not know because she had not looked:

> Q.     Fifteen.  So this reflects four, is that right, or is that a larger number?

51

A.    It reflects the four that I identified as having revenue accounts, yes, revenue as tied to lot sales for the search terms that I had discussed, so revenue, principal, interest, lot.

Q.    And so the other account[s], the other 11, have other sources of income?

A.    Yes, they may have other sources of income.

Q.    Do you have a sense of how much income?

A.    I do not.  That was beyond the scope of what I was asked.

(Tr. 1018-19).  This testimony also cannot support any suggestion that the evidence was not sufficient to sustain a conviction.  It was not evidence.  Ms. Alpaugh was testifying on voir dire before the Court outside the presence of the jury.

Finally, the jury reasonably disregarded defense witness Anthony Mock's incredible testimony that an additional $5 million to spend on Sanctuary Belize would not have made a significant difference in the project's development.  (Tr. at 1794; Mot. 20.)  First, the correct number is the approximately $10 million that Pukke embezzled, not $5 million.  Second, an additional $10 million would represent an approximately 30% addition to the $30-35 million that Mock said had been spent on Sanctuary Belize, which is a very significant increment.  Third, Mock was a biased witness who was attempting to help Pukke—he was married to Pukke's ex-wife and had received large amounts of money from Pukke for his work on Sanctuary Belize.  (Tr. at 1790, 1835.).  Fourth, a jury could reasonably have used its common sense to conclude that $10 million could indeed have been used to make additional progress on Sanctuary Belize over the course of seven years of development.  And fifth, Mock admitted on cross examination that the additional funds would indeed have made a difference in developing Sanctuary Belize.  (Tr. at 1813-16.)

52

### 2. Pukke's Role

The evidence was more than sufficient to prove that the misrepresentation that Pukke played no role, or a very limited role, in Sanctuary Belize bore on the economic value of lot purchases. To argue otherwise ignores the commonsense principle that any reasonable buyer would hesitate to enter into a business relationship with a known convicted fraudster, and that any reasonable secondary market buyer would hesitate to buy property in a development run by a known convicted fraudster.

The evidence showed that Pukke had a history of fraud. He had prior felony convictions for mail fraud and obstruction of justice. (GX 731, GX 736). He was found liable for $172 million in damages in a lawsuit brought by the Federal Trade Commission alleging that he engaged in unfair and deceptive acts and practices in connection with AmeriDebt, his prior business. (GX 720). That lawsuit received wide coverage in the media. (GX 741, GX 743, GX 747, GX 752). Even his own attorney acknowledged at the sentencing in his obstruction case that Pukke's "reputation is unsalvageable" and "I don't think this man can ever get a start back in business." (GX 735 at 4).

Pukke responded to this problem by lying. He denied (and caused Sanctuary Belize employees to deny) that he played any role in the development, and used aliases to hide his involvement when necessary. (GX 125 (identifying "Marc Romeo" as a principal of Sanctuary Belize), GX 2204 (defendant claimed "I pulled myself away from SB a long time ago")). Pukke admitted under oath to using the Marc Romeo and Andy Storm aliases. (GX 738 at 7, 10, 13).

Most of the lot buyer witnesses testified that they were told Pukke was not involved in Sanctuary Belize, including all of the witnesses who asked about Pukke's involvement because

they had become aware of reports of his prior involvement and his history of fraud.[6]   Not surprisingly, the same witnesses testified that they would not have purchased a lot had they known of Pukke's actual role at Sanctuary Belize.  For example, Carl Dudick testified that he read a media article about Sanctuary Belize that was critical of Pukke.  As a result, Dudick testified, he "wanted to make sure that [the defendant] was no longer involved.  (Tr. 46).  Dudick brought the article with him when he took his tour of Sanctuary Belize and asked the person in charge of his tour whether Pukke was still involved.  The Sanctuary Belize employee responded "absolutely not." (Tr. 51).  Dudick agreed that this statement was important to him in his decision to buy a lot and described that answer as his "last deciding factor" in that decision.  (Tr. 52).  Similarly, Nancy Cunningham was concerned about what she read about Pukke's past in a travel blog "[b]ecause you don't want -- I guess you don't want a person like that to be -- you wonder is it going to happen again." (Tr. 1204).  When she raised it with a Sanctuary Belize employee, she was told Pukke was no longer involved in Sanctuary Belize and was not welcome in Belize.  (Tr. 1204-05).  That statement mitigated what Cunningham saw as a risk of investing in a foreign country.  (Tr. at 1222-23).  Frank Balluff also read about Pukke's past and was concerned "because I would be concerned that the Belize thing could be a similar situation."  (Tr. at 121).  He asked Luke Chadwick, whom he understood to be the owner of Sanctuary Belize, about it in an ice cream shop and was assured that Pukke was no longer involved.  (Tr. at 128).  Balluff would not have bought a lot absent this assurance because he otherwise "wouldn't want to be involved with somebody that had that kind of a past, and I'd be concerned that the same thing might be happening with Sanctuary Belize."

---

[6] It would, of course, make little sense for Sanctuary Belize sales representatives to discuss the issue of Pukke's involvement at all absent a question from a potential lot buyer.

(Tr. at 143). Even defense witness Michael Curley admitted he would be "leery" if someone in marketing or sales at Sanctuary Belize was a convicted felon. (Tr. at 1713-14).

The lie that Pukke was not involved in Sanctuary Belize bore on the economic value of the lots. When they bought their lots, the lot buyers took on the risk that the developer would not complete the project. The lot buyers were entirely dependent on the developer to finish the development so that they could turn their lots from unimproved and inaccessible foreign jungle into vacation or retirement homes. The value of the lots assumed that the development would be completed as promised, as inaccessible jungle land in another country has little to no value. The risk that the developer would take their money or otherwise fail to complete the development would obviously affect both demand for the lots and the lots' values. And the risk that the developer would take their money or otherwise fail to complete the development was self-evidently higher if the developer had a repeated history of fraud.

The evidence showed Pukke certainly thought so. He went to great efforts to hide his role in Sanctuary Belize. When a Sanctuary Belize employee mistakenly included him on an email to a lot buyer, Pukke said "He does need to be more careful about that. Please let him know when you talk to him next." The recipient of that email responded "I will. We take exhaustive measures to create distance and careless error could be major setback." (GX 2419). When Pukke heard that the Wall Street Journal intended to report that Pukke was involved in Sanctuary Belize, Pukke coordinated and reviewed a response that claimed he was only an employee of a third-party vendor that handled sales and marketing for Sanctuary Belize. (GX 756, GX 2232).

The impact the truth of Pukke's role in Sanctuary Belize would have had on lot values is the reason why *United States v. Regent Office Supply Co.,* 421 F.2d 1174 (2d Cir. 1970) and *United States v. Mittelstaedt,* 31 F.3d 1208 (2d Cir. 1994) do not apply here. In *Regent,* the defendants

lied to get access to potential customers of their stationery products but made no misrepresentations about the quality or price of the products. *Regent*, 421 F.2d at 1179-83. The defendant in *Mittelstaedt,* a consultant to a village, obscured his identity as the owner of properties the village was purchasing. 31 F.3d at 1211-14. There was no evidence that the defendant's failure to disclose his ownership interest in the land impacted the purchase price of the land. *Mittelstaedt,* 31 F.2d at 1213-14. In both cases, the misrepresentations at issue had no impact on the quality or value of what was being sold. Here, for the reasons stated above, the lie to lot buyers that Pukke was no longer involved in Sanctuary Belize was central to the bargain.

Finally, the Second Circuit has previously approved this same fraud theory. In *United States v. Stitsky*, 536 F. App'x 98 (2d Cir. 2013), an individual with a prior fraud conviction hid his role in the company he controlled because he knew how significant potential investors would find his prior conviction. *Id.* at 106. The Second Circuit concluded that misrepresentation (and other similar misrepresentations) was "sufficient to prove that Shapiro intended fraudulently to induce investors to entrust him with their money." *Id.* at 108.[7]

### 3.  "No Debt"

Pukke has attempted to restate the facts and the law in an effort to suggest that his misrepresentation that Sanctuary Belize had no debt does not support a conviction on wire fraud. However, the evidence was clear that Pukke and his employees told lot buyers that Sanctuary Belize had no debt, period, when it actually had three debts with a total principal amount exceeding $12 million. (*See, e.g.,* GX 305-B, GX 318-B ("completely debt-free"); GX 1104 (equity model

---

[7] While *Stitsky* did not explicitly discuss the essential element of the bargain, it was a Second Circuit opinion that post-dated many of the cases on that topic, *see Schwartz*, 924 F.2d at 421; *Starr*, 816 F.2d at 98, and the Circuit was therefore aware of that aspect of fraudulent intent requirement when it concluded that there was sufficient evidence of fraudulent intent in that case.

video explaining financing of development with no debt); GX 1110 ("they have NO debt"); GX 2052 ("Choose a Developer with ZERO DEBT"); GX 2059-B (buyers attracted to Sanctuary Belize because of "[t]he debt free company behind it"); GX 2232 ("Our no-debt business model . . . is a MAJOR reason why most of them purchase"); GX 2409-D ("they are **one of** the ONLY, DEBT FREE developments in the entire world")).  While the no debt lie was sometimes accompanied by a representation that the land was unencumbered, there was more than sufficient evidence that lot buyers were told repeatedly over a period of years that Sanctuary Belize just had no debt.

That evidence belies Pukke's efforts now to recast his lie as relating only to a lack of encumbrance on the land.[8]  The evidence showed that the buyers bargained for more than "lots free of encumbrances." (Mot. 18).  They bargained for a debt-free developer who was building a debt-free development because that was exactly what they were repeatedly told they were getting.

The debt-free lie was far more than a false representation that was "designed to induce [lot buyers] to buy." (Mot. 18).  It bore on the economic value of lot purchases because it created an image of a financially stable developer who would not have any difficulties, at least financially, with finishing the project.  It therefore appeared to reduce one of the biggest risks of buying a lot, namely that the developer would fail, leaving buyers with nothing but inaccessible land in a foreign jungle.  The possibility that Sanctuary Belize may have had some short-term accounts payable arising from development work does not alter this calculation of risk.  A credit card holder who uses his card only for convenience and pays his balance in full every month is more financially stable than a credit card holder who incurs increasing debt by continually running a balance.

---

[8] In any event, the Barienbrock Loan was in fact secured by a first deed of trust on the "marina property currently known as the 'hotel site.'"  (*See* GX 910) (Barienbrock Loan Promissory Note)).

Pukke also misstates the law when he suggests that the Government was required to show that the debt had an "adverse economic impact" on lot buyers or had "negative economic consequences for the project." (Mot. 17). Rather, the Government only had to show that the no-debt promises misrepresented the economic value of the bargain. As a result, arguments that the debt was "favorable" or that lenders did not attempt to foreclose on their security interests are irrelevant. Similarly, an expert opinion about the positive aspects of debt, (*see* Mot. 5), which was not evidence at all in this trial and was provided in a different case by a different party, is also irrelevant.[9]

The "no debt" lie as lot buyers actually heard it was designed to create the false appearance of reduced risk, which was directly related to the value of the lots.

**B.      There Was Sufficient Evidence for a Jury to Conclude That Pukke Intended to Obstruct an Official Proceeding**

Pukke again ignores much of the evidence when he argues that "the evidence was insufficient to prove Pukke's intent to obstruct because he did not ask Callahan to create a false document," (Mot. 24), and that "there is no evidence that Pukke knew or intended that the document would come before a federal grand jury." (*Id.* at 27). The evidence clearly showed that Pukke attempted to get Callahan to create a false accounting of the repayments made to Vipulis in order to obscure Pukke's use of Sanctuary Belize funds to repay his personal AmeriDebt Loan, and that Pukke did so in order to cause that false document to be conveyed to the grand jury.

---

[9] Moreover, a lot buyer who visited Sanctuary Belize and was told that the project had no debt would have concluded that the project had no debt overhang, such that the project's future income could be directed towards continuing to build the infrastructure, rather than to debt payments. No matter how favorable the debt arrangements were, a lot buyer would therefore have been deceived by the combination of the "no debt" lie and viewing the progress of the project into concluding that Sanctuary Belize was both less risky and in a better financial situation than it actually was.

1.  <u>Pukke Intended to Cause Callahan to Create a False Document</u>

Pukke argues that the evidence was insufficient to show that Pukke asked Callahan to create a document that was false, because: (1) Pukke's text message to Vipulis requested that Callahan create an "accurate accounting," (GX 601); and (2) the information Pukke asked Callahan to "confirm" was true.  (Mot. 24-27).

As an initial matter, Pukke's suggestion that his simple invocation of the words "accurate accounting" required the jury to interpret his request literally is without merit.  Pukke's use of the word "accurate" is reasonably understood only in the context of Pukke's related conduct, and the entirety of Vipulis and Callahan's testimony.  Pukke's use of the words, "accurate accounting," is curious.  If the accounting Pukke was specifying was "accurate," why would Pukke need to say that to Vipulis and Callahan?   Pukke's use of the word "accurate" is reasonably interpreted, instead, as an effort to communicate his desire that the details as he specified them in his text message, including that the payments were for the Marina Loan and that Callahan requested that Pukke make those payments to Vipulis, should be the trio's story going forward.

The jury's reasonable conclusion that Pukke's use of the word "accurate" was not a genuine request, but instead a fraudster's effort to get stories straight while seeking to maintain plausible deniability, was supported by, among other things: (1) the overwhelming evidence of Pukke's history of using fraudulent accounting to conceal his years-long theft of millions of dollars of additional Sanctuary Belize funds as part of the same scheme, including through false QuickBooks accounting entries, holding personal investments in the names of nominees, and funneling embezzled funds through his father's estate, as detailed in connection with the wire fraud count, above; and (2) Vipulis's reaction to Pukke's request, including his response that they should move their conversation to Signal, a "more secure" messaging service that would ensure others would

not be able to copy or see their communications, and one in which the records of their communications would be "set to erase after a few days" and are no longer available.  (Tr. 593-96; GX 601).

In any event, notwithstanding Pukke's inclusion of the word "accurate" in his initial WhatsApp message to Vipulis, Pukke was requesting that Callahan "confirm" something that Pukke knew was not true.  The jury's rejection of Pukke's argument and its finding that Pukke was requesting that Callahan create a document that would falsely indicate that the payments to Vipulis were for the Marina Loan and that Callahan requested that Pukke send the repayments to Vipulis were more than sufficiently supported by the evidence, including:

- Notwithstanding Pukke's request that Callahan produce a letter stating that he requested that repayments of the Marina Loan be sent to Vipulis, Callahan testified that he never made such a request, and had no knowledge of Vipulis ever making such a request.  (Tr. 1324);

- Vipulis had no knowledge of Callahan ever telling Pukke that repayments of the Marina Loan should be sent to Vipulis, (Tr. 593), and testified that Pukke's request that Vipulis ask Callahan to "confirm that [Callahan] loaned us the money to finish the marina in 2011, including the amount and that [Callahan] requested we pay it back to [Vipulis]," made no sense, (Tr. 592);

- At the time he requested that Callahan create the document, Pukke knew that Callahan might be unwilling to do so.  (*See* GX 601: "Hopefully he's willing to do that," and "If he has a problem doing that for some reason let me know."));

- The AmeriDebt Loan was older (2007) than the Marina Loan (2010);

60

- The May 2007 order releasing Pukke from incarceration required that Pukke not repay any portion of the AmeriDebt Loan until after Pukke had paid the far larger judgment Pukke owed to the FTC.[10] (GX 722 at 6). Nevertheless, Pukke was determined to repay Vipulis, his lifelong friend. (*See* GX 2089 (July 11, 2008 Email from Pukke to Vipulis's counsel: "I'll be doing everything in my power to make [Vipulis] whole on the $4.5mm as soon as I possibly can."));

- The Marina Loan carried zero interest rate (Tr. 578 (Vipulis), 1304 (Callahan)). The seemingly odd decision to borrow/lend additional money on top of the AmeriDebt Loan, which could not be repaid until the FTC judgment was satisfied, at zero interest no less, was made only because the purpose of the loan was to enable Pukke to repay the earlier loan from Vipulis, as both Vipulis and Callahan testified. (Tr. 575, 1300);

- On October 31, 2012, Callahan emailed Pukke, "November is upon us, and we agreed for the payments to begin on November 1. Let's discuss what the amount is." (GX 523). It was only through this email exchange that Callahan learned for the first time that Pukke had been sending $10,000 monthly payments to Vipulis for the prior five months. (Tr. 1311-12; GX 523);

- Pukke sent all of the repayments to Vipulis, who lent Pukke all of the AmeriDebt Loan funds and did not share any portion of the repayments with Callahan, (Tr. 583), and no payments to Callahan, who lent half of the Marina Loan funds. (Tr. 1316);

---

[10] This was a $172 million judgment, of which all but $35 million had been suspended on the understanding that Pukke would turn over specified assets to the court-appointed AmeriDebt receiver and otherwise cooperate with the FTC. (GX 720).

- On August 24, 2017, Pukke asked Sanctuary Belize CFO Rod Kazazi by email for a spreadsheet showing the total amount paid to Vipulis, with the explanation: "I want to do an accounting of where things stand with him," and no reference whatsoever to Callahan, who lent half the Marina Loan funds.  (GX 2238);

- Loan repayments were recorded in Eco-Futures Belize's QuickBooks account 19049, named "Loan (John Valdis Vipulis)," and the schedule of loan repayments that Kazazi prepared and emailed to Vipulis was titled "JVV Payments," with JVV being Vipulis's initials, and no reference to Callahan.  (GX 2196-A, GX 2196-B).

- Payments made to Vipulis from Eco-Futures Development, Global Property Alliance, and Foundation Development Management were recorded in those Sanctuary Belize entities' Quickbooks accounts titled "Loan-John Valdis Vipulis".  (Tr. 1031-38).  None of the Sanctuary Belize entities' accounting entries contained any reference to Patrick Callahan or Harlequin.  (*See* GX 2019, GX 2308, GX 2326);

- Vipulis testified that Pukke never started making repayments on the Marina Loan, that the repayments were for the AmeriDebt Loan, and that had the repayments been for the Marina Loan, Callahan would have been getting repaid half the amount as well.  (Tr. 580, 585, 589); and

- Both Vipulis and Callahan understood that the repayments were for the AmeriDebt Loan and treated them as such.  (Tr. 579, 589 (Vipulis), 1314-15 (Callahan)).  And, though Vipulis and Callahan communicated regularly with Pukke, they never had a discussion with Pukke to the contrary.  (*See* Tr. 529 (Vipulis), 1369-79 (Callahan)).

Pukke argues that the evidence does not show that he was requesting a false document because: (1) Vipulis and Callahan testified on cross examination that at least some of the payments

62

to Vipulis were for the Marina Loan, (2) Pukke's "most logical" inference from Callahan's use of the word "we" in reference to Callahan and Vipulis, when discussing repayments with Pukke was that Pukke and Callahan's repayment discussions were about the Marina Loan, which Callahan shared with Vipulis, and (3) even "if credited," Callahan's testimony that he never requested that Pukke pay the Marina Loan back to Vipulis does not support a conclusion that Pukke was requesting a false letter, because, he argues, from Pukke's point of view Callahan had "at least acquiesced in that procedure." (Mot. 26-27). These arguments as to what the evidence showed are without merit because they ignore substantial evidence, view other evidence in the light most favorable to Pukke, and do not in any event undermine the jury's conclusion that Pukke was requesting a false document.

On direct and initial cross examination, Vipulis testified that all of the payments he received from Pukke were for the $4.5 million AmeriDebt Loan, and that Pukke never started paying the Marina Loan. (Tr. 585, 589, 630). It is true that Vipulis later testified on cross examination that, "in hindsight," at least some of the payments Vipulis received were for the Marina Loan. (Tr. 637-38). But as Vipulis made clear on redirect examination, his answer was based on an "assumption" that Pukke had previously paid Vipulis $1 million in 2010 (and that it was paid for the Marina Loan) – an assumption that had been injected through a document shown by defense counsel to Vipulis to refresh his recollection, 3587-008:

> Q. And can you take a look at this document, these, and see if this refreshes your recollection that Mr. Pukke paid you about a million dollars in 2010, in May of 2010?
>
> . . .
>
> Q. Unfortunately, you need to read the whole exchange, I think. There is one from you and – that's in the middle and then at the top, there's a response. It's in

reference to an e-mail that was sent from another person to you, and that's at the bottom.

A. If it's here I must have received them.

Q. So you did receive about a million dollars from Mr. Pukke in 2010, right?

A. Yes. But I -- could you tell me what it was for?

(Tr. 606). The email itself was not admitted into evidence. Vipulis made clear on redirect examination that his testimony that some of the payments he received from Sanctuary Belize were for the AmeriDebt Loan was based on an "assumption" that the email he was shown was accurate, and that he actually had no recollection of having received $1 million from Pukke in 2010. (Tr. 638-40). Although the defense presented a substantial defense case, it introduced no other evidence of the purported $1 million 2010 payment having been made or what it was for. Thus, the jury was entitled to credit Vipulis's initial testimony that all of the approximately $4.2 million paid to Vipulis from Sanctuary Belize was for the AmeriDebt Loan.

Callahan's agreement with defense counsel that some of the funds Sanctuary Belize paid to Vipulis were for the Marina Loan is fairly understood as a simple reflection of his lack of knowledge of the actual amount of the AmeriDebt Loan, which Callahan only knew to be "in the neighborhood of $4 million" and "approximately $4 million." (Tr. 1314, 1352). The jury had more information about that loan, including the May 2007 stipulated order reflecting that Vipulis paid $4.5 million, and Vipulis's testimony that the AmeriDebt Loan was $4.5 million. Callahan's agreement with defense counsel that some of the $4.2 million paid was for the Marina Loan, (Tr. 1379-80), is thus fairly interpreted as Callahan's simple agreement with defense counsel that, if Sanctuary Belize sent "more than $4 million," to Vipulis, a $4 million loan meant that "there was more," and that the excess would have gone to the Marina Loan. (*See* 1379-80).

The jury's verdict reflects its simple, reasonable disagreement with Pukke's argument that the "most logical inference" of Callahan's use of the word "we," in reference to Callahan and Vipulis, when referring to loan payments, is that their discussions concerned only the Marina Loan, which Callahan Shared with Vipulis, or at least that "Pukke could have understood" this to be the case. (Mot. 26). Pukke's argument to the contrary files in the face of the evidence. Pukke himself referred to "loan*s*" (plural) in his reply to the very email that defense counsel relies upon to suggest that Pukke would have understood that they were only discussing the one, Marina Loan, and "not the one that Vipulis had made to Pukke," (AmeriDebt Loan). (GX 523 ("I just want to make sure you don't think that I've been investing any money that could be used to repay your **loans** towards other projects) (emphasis added)).

In any event, the document Pukke requested that Callahan generate was intended to falsely reflect that *all* of the Sanctuary Belize funds sent to Pukke were for the Marina Loan, and even the defendant does not argue that there was insufficient evidence for the jury to conclude that this was untrue. As importantly, Pukke also requested that the document falsely state that "Callahan requested that [the Marina Loan] be repaid back to [Vipulis]." (GX 601). Pukke sought the false letter because he knew he was the subject of a federal criminal investigation. Sanctuary Belize's repayments of the AmeriDebt Loan posed a problem for him, because his use of Sanctuary Belize funds to repay a personal debt (one that he was prohibited from repaying until having satisfied the FTC judgment, no less), was strong evidence of fraud, as discussed with respect to Count One, above. Use of the funds to repay a Sanctuary Belize debt incurred to build the marina was preferable, but all of the repayments had gone to Vipulis, whereas the Marina Loan had been disbursed by Harlequin, and Callahan had lent half of the Marina Loan funds. That is why it was

important, from Pukke's perspective, that the letter state that it was ***at Callahan's request*** that the payments for the Marina Loan were all sent to Vipulis – which Callahan testified was untrue.

Pukke does not argue that there was evidence in the case that Callahan had in fact requested that Marina Loan repayments be sent to Vipulis.  Rather, he argues that "[e]ven if credited, [Callahan's] testimony does not support the verdict because from Pukke's point of view, Callahan had made such a request, or had at least acquiesced in that procedure."  (Mot. 27). First, with respect to the suggestion that Callahan's testimony need not be credited, the evidence must, of course, be reviewed "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government."  *Walker*, 191 F.3d at 333 (internal quotation marks omitted).  Second, Pukke's argument about what Pukke understood or believed is based not any testimony of Pukke as to his understanding, but solely upon inferences he argues the jury was required to make based upon his email communications with Callahan.  But those emails simply do not support Pukke's interpretation.  The jury was not required to make the inference, as Pukke suggests, that Callahan ever requested that Marina Loan repayments be sent to Vipulis.  To the contrary, when Callahan learned that Pukke had been sending payments to Vipulis for five months, Callahan's response was "it is VERY important that we talk today.  that was not our agreement," (GX 523), and on post-trial review all inferences are drawn in the Government's favor.  Pukke's argument that Callahan acquiesced to this procedure is of no moment, because Pukke's request was different.  There could be no dispute, after all, that the payments were made to Vipulis, as the transfers are reflected in bank records.  The question would be why they were made to Vipulis.  Pukke's text message makes clear that he wanted a letter that stated that they were sent to Vipulis at Callahan's request.  With this, the fact that Pukke sent all the payments to Vipulis would be less likely to be viewed as an indication that they were for the AmeriDebt Loan made wholly by

Vipulis.  However, Pukke knew this assertion would be less credible if made by Pukke or Vipulis.

Pukke wanted what he knew would be a false document from Callahan.  Callahan wanted no part

of what he knew would be a false document.

        2.  <u>Pukke Intended That the False Document Would Be Conveyed to the Grand Jury</u>

Pukke's argument that "there is no evidence that Pukke knew or intended that the document

would come before a federal grand jury," (Mot. 27), ignores substantial circumstantial evidence of

Pukke's knowledge and intent and the requirement that this Court draw all inferences in favor of

the Government on post-trial review.  The jury concluded, consistent with the requirements set

forth in the Court's instructions, that Pukke's conduct "ha[d] a relationship in time, causation, or

logic with the official proceeding," and "the natural and probable effect of obstructing the official

proceeding."  (Tr. 2379-81); *Aguilar*, 515 U.S. at 599.  The jury was instructed that "[e]ven if the

defendant knew of the existence of a federal grand jury proceeding, and attempted to cause a

witness to create a false document regarding issues pertinent to that proceeding, that would not

violate the law unless the defendant also knew or intended that the false document would be

conveyed to the grand jury."  The jury's reasonable conclusion that Pukke had this knowledge or

intent should not be disturbed.

Here, shortly before Pukke requested that Callahan create the false document, the grand

jury was issuing subpoenas specifically requesting documents relating to Andris Pukke, signed by

the AUSA handling that investigation, (Tr. 511; GX 8), the very same AUSA Pukke's attorney

arranged to meet with on November 18, 2021 and then met with on December 17, 2021 to discuss

the investigation of Pukke.  (Tr. 522; GX 1315).  Both Vipulis and Callahan ultimately did in fact

testify before the grand jury.  (Tr. 600, 1328).

67

Section 1512 expressly provides that the "official proceeding" that is obstructed by the defendant's actions "need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(f)(1).  Since the grand jury investigation need not have begun at the time of the defendant's obstructive actions, it logically follows not only that proof of Pukke's actual knowledge of the federal grand jury investigation is unnecessary, but also that the grand jury need not have even issued a subpoena that would have required production of the false document had Callahan created it, let alone that Pukke had actual knowledge of such subpoena.

The evidence showed that one of the grand jury's functions is to collect documentary evidence, (Tr. 518), including by issuing subpoenas to produce documents or appear before the grand jury, (Tr. 518-19).  The evidence also supported a reasonable finding that Pukke was aware of the functions of the grand jury, in that Pukke was represented by counsel who was in communication with the AUSA handling the grand jury investigation when he sought the false letter from Callahan, and that Pukke had been advised of the grand jury process and confirmed his understanding of his right to indictment by a grand jury at least twice previously, at the time of his 1996 guilty plea to mail fraud in the U.S. District Court for the Western District of Pennsylvania and his 2011 guilty plea to obstruction of justice in the U.S. District Court for the District of Maryland.  (GX 730 and 733 (Waivers of Indictment)).

Thus, the jury was presented with substantial circumstantial evidence of Pukke's knowledge and intent in generating the false exculpatory letter, including the functions of the grand jury with regard to collecting documentary evidence, Pukke's familiarity with the grand jury process, the prior issuance of at least one grand jury subpoena seeking documents relating to Pukke, and Pukke's efforts to generate the false document right at the time his attorney was engaging in efforts to meet with the prosecutor whose signature appeared on that subpoena.  This

68

evidence permitted the jury to reasonably find that, in addition to intending to obstruct the grand jury proceeding through transmission of the false exculpatory document to the prosecutor overseeing the grand jury investigation, Pukke knew and intended the natural and probable result of the false document's generation by Callahan, a key witness regarding the loan repayments to Vipulis – that the false document would be produced to the grand jury.

Pukke bases his argument on: (1) *Aguilar*, which held that 18 U.S.C. § 1503's nexus requirement had not been satisfied, for lack of proof that the defendant, who knew that his conduct was being investigated by a federal grand jury, knew or intended that his lies to an investigating federal law enforcement agent who might or might not have testified before the grand jury, 515 U.S. at 600; and (2) *United States v. Schwarz*, 283 F.3d 76, 105-110 (2d Cir. 2002), which held that Section 1503's nexus requirement had not been satisfied when a defendant lied to investigating federal law enforcement agents and a prosecutor after having been served with a grand jury subpoena.

According to Pukke, "the nexus here is even more attenuated" than those in *Aguilar* and *Schwarz*. (Mot. 29). But that is not the case. Unlike *Aguilar* and *Schwarz*, which concerned Section 1503 and involved defendants' false exculpatory oral statements to law enforcement, here the jury found that Pukke violated Section 1512(c)(2) by attempting to cause the transmission of a false exculpatory document to the grand jury. The jury reasonably found that the false exculpatory document, had it been generated as Pukke requested, would have been transmitted to the grand

jury, if not through Pukke's counsel to the AUSA overseeing the grand jury investigation,[11] then

ultimately by Callahan or Vipulis in response to a grand jury subpoena for documents. *See, e.g.,*

*United States v. Reich*, 479 F.3d 179, 183-85 (2d Cir. 2007) (finding sufficient nexus under §

1512(c)(2) between submission of forged court order to a party to a court proceeding and the

party's dismissal of that proceeding); *United States v. Sutherland*, 921 F.3d 421, 428 (4th Cir.

2019) (finding sufficient causal relationship under § 1512(c)(2) between defendant's submission

of false documents to the U.S. Attorney's office and a pending grand jury proceeding).

As the Court held in denying Pukke's motion to dismiss and adopting the reasoning in

*Sutherland*, "[t]here is a key difference between making false statements to a law enforcement

agent, the situation in the Supreme Court's *Aguilar* decision, and fabrication of documents . . .

because the fabrication of relevant documents, as in *Sutherland*, is likely to impact the grand jury's

deliberations." (June 3, 2024 Tr. 11-12 (citing *United States v. Schulte*, No. 17 Cr. 548 (JMF),

2023 WL 5561141 (S.D.N.Y. Aug. 29, 2023)).

Pukke argues that it would not suffice if Pukke's intent were merely for his attorney to

transmit the false exculpatory document to the AUSA handling the grand jury investigation. (*See*

Mot. 30). But he is again attacking a straw man. This is not the argument the Government made

to the jury, and the evidence was sufficient for the jury to find that Pukke intended that the

---

[11] Pukke points out that prosecutors have no constitutional obligation to present exculpatory information to a grand jury. (Mot. 31 (citing *United States v. Williams*, 504 U.S. 36, 51-55 (1992)). On this basis, he argues that the Government's argument to the jury that the AUSA overseeing the grand jury investigation could have given the false document to the grand jury "was not just speculation unsupported by any evidence, it was inconsistent with real-world practice." (Mot. 31). "It is the policy of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person." JUSTICE MANUAL, 9-11.233.

document be conveyed to the grand jury. The Court's instructions to the jury made clear that, in order to convict Pukke of Count Two, it had to find that Pukke "also knew or intended that the false document would be conveyed to the grand jury," (Tr. 2381). The jury is presumed to follow the court's instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Accordingly, the Court should deny Pukke's motion.

## CONCLUSION

There was sufficient evidence for the jury to find Pukke guilty beyond a reasonable doubt on both Counts One and Two. The Court should deny Pukke's motion in its entirety.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    /s/_____
        Jeffrey C. Coffman
        James McMahon
        Kevin Mead
        Assistant United States Attorneys

Dated: October 24, 2024
        New York, New York