UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
UNITED STATES OF AMERICA

              -v-

ANDRIS PUKKE,
                  Defendant.
———————————————————————

23-CR-168 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      On July 10, 2024, a jury convicted Defendant Andris Pukke of one count of wire fraud and one count of attempted obstruction of an official proceeding. The conduct underlying the wire fraud charge involved a scheme to defraud American and Canadian investors in a luxury development in Belize called Sanctuary Belize. The conduct underlying the obstruction charge involved Pukke's attempted creation of a false exculpatory document relating to his repayment of a personal loan with Sanctuary Belize's funds. Before the Court now is Pukke's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons that follow, the motions are denied.

**I.  Background**

      Following a trial held from June 17, 2024, to July 10, 2024, Pukke was convicted of wire fraud, in violation of 18 U.S.C. § 1343, based on his ownership and operation of the development company Sanctuary Belize and a number of related companies. (ECF No. 92 ("Mot.") at 3-4; ECF No. 93 ("Opp.") at 9; Tr. at 720-23, 729-30, 873-74.)[1] Sanctuary Belize

---

[1] "Tr." in this Opinion denotes the complete trial transcript. (*See* ECF Nos. 62, 64, 66, 68, 70, 72, 74, 76, 78, 80, 82, 84, 86.)

was created to develop a luxury resort in Belize, and sold plots of land in that resort to investors in the U.S. and Canada. (Tr. at 408-09, 743-44, 885-86.) Sanctuary Belize marketed its development plans to individual lot buyers by promising that the project would be free of debt and that "all lot-buyer money [would be] put back into the property." (*Id*. at 49-50, 126, 142-43, 1222.) Sanctuary Belize employees also consistently told lot buyers that Pukke, who at the time had already been twice convicted of fraud (*id*. at 1570-75), was not involved with the project (*id*. at 51-53, 127-28, 1204-05, 1222).

Over the ten years during which he managed the company, Pukke diverted substantial sums of money from the project for personal use. (*See, e.g.*, *id.* at 455-58 (startup investments), 1390-93 (home remodeling); 1528-32 (summarizing payments made through Sanctuary Belize entities); *see also* Opp. at 27 ("Pukke embezzled more than $9.9 million from the Sanctuary Belize entities.").) Pukke also received a personal loan from John Vipulis (Tr. at 569-73, 601-02), which he partially repaid using money he obtained through Sanctuary Belize (*id*. at 579-82, 1369-75). He also received a business loan jointly from Vipulis and Patrick Callahan (*id*. at 575-58; 1298-1300), which he had not repaid at the time law enforcement seized the project (*id*. 581-83, 1312-15).

In part due to Pukke's diversion of funds (*see, e.g.*, *id.* at 1808-09), development languished relative to investors' expectations (*Id*. 138, 1217-19). Missing amenities included medical facilities, an international airport, restaurants, gas and electric utilities, a fully completed marina, a golf course, a casino, and more. (*Id*. at 138, 889-95, 927-28.)

An FBI criminal investigation into Sanctuary Belize began in January 2018. (*Id.* at 517.) Then, in late 2018, the Federal Trade Commission seized Sanctuary Belize and all development work stopped. (*Id*. at 1726-28.) By July 14, 2021, a federal grand jury investigation into Pukke

and Sanctuary Belize had begun. (*Id*. at 517-21.) Around November 18, 2021, Pukke's attorney at the time, Ty Cobb, agreed to meet with a federal prosecutor to "discuss Mr. Pukke." (*Id*. at 521.) The meeting occurred on December 17, 2021, and concerned the criminal investigation of Pukke. (*Id*. at 522-23.) Between these two dates, on December 8 and 9, 2021, Pukke asked Vipulis to solicit a letter from Callahan stating that Callahan had asked Pukke to repay Callahan's share of the business loan through Vipulis. (*Id*. at 590-94.) The purpose of this request was apparently to demonstrate that Pukke's loan repayments to Vipulis were meant to satisfy his business-related debts, rather than his purely personal debts. Callahan refused Pukke's request (*id.* at 1324-25), and, at trial, both Vipulis and Callahan testified that the loan repayments were solely meant to satisfy Pukke's personal debt. *(Id*. at 593, 1314.)

Following his trial, Pukke moved on September 9, 2024 for judgment of acquittal or, in the alternative, a new trial, arguing that the evidence was insufficient to support the jury's guilty verdict. (Mot.) With respect to wire fraud, Pukke argues that the Government did not prove his specific intent to defraud, primarily because, he argues, he actually provided investors with the benefits that they had been promised. (*Id.* at 15-23.) With respect to obstruction, Pukke argues that the Government did not prove that he intended to solicit a false document or that he intended to deliver it to a grand jury. (*Id.* at 24-33). The government opposed Pukke's motion on October 24, 2024 (Opp.), and Pukke replied on November 7, 2024 (ECF No. 98).

## II.    Legal Standard

### A.    Rule 29

Rule 29 provides that upon a defendant's motion after trial, "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal" if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. A defendant challenging the sufficiency of the evidence "bears a heavy burden, as the standard of review is exceedingly

deferential to the jury's verdict." *United States v. Gu*, 8 F.4th 82, 86 (2d Cir. 2021) (quotation marks omitted). A court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). A successful Rule 29 motion must show that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). A valid verdict may be "based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quotation marks omitted).

**B.     Rule 33**

Rule 33(a) allows courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Granting Rule 33 motions "must be done sparingly and in the most extraordinary circumstances." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (quotation marks omitted). Although Rule 33 "'confers broad discretion upon a trial court,' a court must only grant a Rule 33 motion to avoid a perceived miscarriage of justice." *United States v. King*, No. 21-CR-255, 2023 WL 6311450, at *3 (S.D.N.Y. Sept. 28, 2023) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). It is inappropriate for the court to "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Archer*, 977 F.3d at 188 (quotation marks omitted). Rather, there "there must be a real concern that an innocent person may have been convicted." *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (cleaned up).

As with Rule 29, courts "generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility," *United States v. McCourty*, 562 F.3d 458, 475

(2d Cir. 2009); *see also United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (explaining that courts may not second-guess a jury's credibility determinations except in "exceptional circumstances," such as "where testimony is patently incredible or defies physical realities" (quotation marks omitted)). Concerning sufficiency challenges, the Rule 33 standard has been described as "allied" with that of Rule 29. *See United States v. Dervishaj*, No. 13-CR-668, 2017 WL 11465350, at *1 (E.D.N.Y. Mar. 3, 2017). Accordingly, and because Pukke makes no arguments specific to Rule 33 as opposed to Rule 29, the Court analyzes his arguments under both rules together.

### III. Discussion

#### A. Wire Fraud

A defendant violates 18 U.S.C. § 1343 when he engages in a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." "The essential elements of . . . wire fraud are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the . . . wires to further the scheme." *United States v. Runner*, No. 24-1040, --- F.4th ----, 2025 WL 1888317, at *4 (2d Cir. July 9, 2025). This includes situations where a fraudster "uses a material misstatement to trick a victim into a contract that requires handing over her money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim *net pecuniary loss*." *Kousisis v. United States*, 145 S. Ct. 1382, 1388 (2025). *Cf. Ciminelli v. United States*, 598 U.S. 306, 309 (2023) (holding that mere concealment of potentially valuable information, without more, is not wire fraud). Thus, as long as a misrepresentation is material with respect to the "likely or actual behavior of the recipient of the alleged misrepresentation," it need not cause "economic loss" in order to qualify as fraud. *Kousisis*, 145 S. Ct. at 1396-97.

5

And, while intent to deceive is required, a fraudster need not intend to cause "harm" going to the "nature of the bargain itself." *Runner*, 2025 WL 1888317 at *4-5, 7.

Pukke argues that no rational juror could have found specific intent to defraud lot buyers, because lots were delivered to buyers, and the buyers therefore suffered no economic losses. (Mot. at 6-7). But such losses are not required under the rule set forth in *Kousisis*. Rather, the Government presented sufficient evidence to allow the jury to find that Pukke committed fraud by communicating material misrepresentations about Sanctuary Belize's ownership, structure, and management that were intended to—and did—induce investors to part with their money. Based on all of this evidence, the jury found beyond a reasonable doubt both (1) that the misrepresentations were "material"—that is, that they "would have mattered to a reasonable person in making such a decision" (Tr. 2370); and (2) that Pukke acted with specific intent to defraud—that is, "with awareness of its fraudulent or deceptive character[,] with an intention to be involved in the scheme to defraud and to help it succeed, and with a purpose of obtaining money or property from the victim" (Tr. 2373). The evidence was sufficient to support those findings by the jury.

Furthermore, even if the Government were required to show economic losses, it did so. A rational juror could find that Pukke's intentional diversion of $9.9 million from Sanctuary Belize that could have been used on development had the obvious and predictable effect of slowing down that development and thus depriving investors of the amenities they expected to enjoy. *See supra* Section I. While investors did receive property with some value, it was not as valuable as what they expected and paid for. A rational jury could conclude that the unforeseen lack of medical facilities, an airport, a marina, restaurants and shops, and more constituted

6

economic losses that were directly related to the violation of promises Pukke made to his investors, including that "all income" would be put into development.

Pukke contends that the $9.9 million constituted his salary, and that buyers should have foreseen it as an ordinary development cost. (Mot. at 9.) However, this argument is undermined by the fact that buyers were consistently told that Pukke was not involved with Sanctuary Belize at all. It is also contradicted by Pukke's own behavior and reporting of the funds. (*See* Opp. at 52 (detailing efforts Pukke made to disguise the payments).) Pukke did not report this money as income and claimed to be earning only an hourly salary from Sanctuary Belize. (Tr. 1535-44.) Pukke also paid for personal investments directly through Sanctuary Belize entities. (*See, e.g.,* Tr. 462-63.)

Accordingly, the evidence was sufficient to convict Pukke of wire fraud.

**B.  Obstruction**

A defendant violates 18 U.S.C. § 1512(c)(2) when that defendant "corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so." The obstructive act must "have a relationship in time, causation, or logic with the judicial proceedings," and "the endeavor must have the natural and probable effect of interfering with the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (quotation marks omitted). While such a "nexus," *United States v. Reich*, 479 F.3d 179, 185-86 (2d Cir. 2007), requires foreseeability, it does not require that the defendant actually know that a grand jury has convened or is about to convene. *See United States v. Binday*, 804 F.3d 558, 590-91 (2d Cir. 2015), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023); *see also United States v. Pugh*, 945 F.3d 9, 21 (2d Cir. 2019). "A grand jury proceeding is

foreseeable if the defendant was aware that he was the target of an investigation." *United States v. Brooks*, 828 F. App'x 9, 11 (2d Cir. 2020) (summary order) (cleaned up).[2]

### 1. False Document

Pukke first insists that he did not request a false document from Callahan at all, either because Callahan did in fact request that Pukke repay the business loan through Vipulis, or because Pukke believed that Callahan made such a request. (Mot. at 26-29.) It is undisputed that Pukke sent at least some payments to Vipulis related to a personal loan from Vipulis alone, and unrelated to the business loan that Vipulis and Callahan had jointly given to Pukke. (Tr. 579, 589.) Callahan also testified at trial that he had never requested repayment through Vipulis, and that he believed that Pukke's payments to Vipulis were only intended to satisfy Pukke's personal debt. (*Id.* 1324-25.) Vipulis likewise testified that the repayments were not in satisfaction of the joint business loan. (*Id.* at 579-82.) In light of Pukke's repeated lies and misrepresentations, a reasonable juror could certainly have credited Callahan's and Vipulis's testimony and concluded that Pukke solicited a document he knew to be false.

### 2. Intent to Obstruct

Finally, Pukke contends that even if he solicited a false document from Callahan, he did not have the specific intent for it to be provided to a grand jury, and no rational juror could find the required nexus to convict him for obstruction. (Mot. at 29-35.) There are two components of the requisite inference: (1) that Pukke knew a grand jury proceeding was either imminent or ongoing; and (2) that Pukke knew the false document he created would interfere with the grand jury's proceedings. The Government adequately proved both at trial.

---

[2] Although some of these cases, including *Aguilar*, dealt with Section 1503 rather than Section 1512, the nexus requirement is the same for both. *See Reich*, 479 F.3d at 186.

Regarding the first inference, the circumstantial evidence was sufficient for rational jurors to conclude beyond a reasonable doubt that Pukke knew about the grand jury. At the time Pukke created the document, his lawyer was engaged in active negotiations with federal prosecutors concerning an ongoing criminal investigation of Pukke, and in mid-November 2021 reached out to prosecutors to set up a meeting. (*See* Mot. at 13; Tr. 521-22.) That conversation occurred on December 17, 2021 and the discussion was "in part about the criminal investigation into Mr. Pukke[.]" (Tr. 523.) Furthermore, Pukke had multiple prior experiences being prosecuted for fraud and had waived indictment at least once before. (Tr. 1570-75.) From this a rational juror could conclude that Pukke was aware that a grand jury either was already investigating him or soon would be. *Cf. Pugh*, 945 F.3d at 22 (determining that the defendant knew a grand jury would be impaneled based on the well-publicized prosecutions of third parties for similar conduct); *Brooks*, 828 F. App'x at 11 (finding a sufficient nexus where the defendant knew his conduct was illegal, knew the conduct was being investigated, and was told by a co-conspirator that "the heat was on").

Regarding the second inference, Pukke's argument that he only intended the false document to influence prosecutors but stop short of getting to the grand jury is not plausible, much less the only conclusion that a rational juror could draw. The Government is correct that a juror could reasonably conclude that Pukke knew from his prior experiences that any grand jury would solicit documents from either the federal prosecutor, or from Callahan or Vipulis. (Opp. at 68-69.) And, by creating a false document that he sought to place in the possession of all three, Pukke could easily have foreseen that the document would in some way interfere with the grand jury's proceedings, either directly through a subpoena or by influencing the prosecutors' management of the grand jury.

9

Pukke argues that, because he intended the false document only to influence prosecutors, rather than grand jurors, his actions lack the required nexus. But soliciting a document from a third party to prevent a grand jury indictment has an obvious "relationship in time, causation, or logic" with the grand jury—namely, trying to convince the grand jury not to indict—and is an endeavor that has "the natural and probable effect of interfering with the due administration of justice." *Reich*, 479 F.3d at 185 (quoting *Aguilar*, 515 U.S. at 599). "[A] defendant does not need to know with certainty that his conduct would affect judicial proceedings, nor does his conduct need to actually obstruct justice." *United States v. Kumar*, 617 F.3d 612, 621 (2d Cir. 2010). Thus, courts have found a sufficient nexus where a defendant "was aware that he was the target of an investigation," even if the investigation was potentially "regulatory" in nature, and even where "a grand jury had not been commenced or specifically discussed." *Binday*, 804 F.3d at 590 (quotation marks omitted).

Pukke cites *Aguilar*, along with *United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002), and *United States v. Schulte*, No. 17-CR-548, 2023 WL 5561141 (S.D.N.Y. Aug. 29, 2023), for the proposition that merely lying to criminal investigators does not rise to the level of obstruction. (*See* Mot. at 30-35.) But all three of those cases involved oral statements made directly by the defendants in interviews during law enforcement investigations. *See Aguilar*, 515 at 601; *Schwarz*, 924 F.2d at 109; *Schulte,* 2023 WL 5561141 at *4. In *Aguilar*, "the Supreme Court recognized that, if the government had produced other evidence that Aguilar knew his actions would have the 'natural and probable effect of interfering with the due administration of justice,' then the requisite 'nexus' requirement might be met." *United States v. Mangano*, 128 F.4th 442, 482 (2d Cir. 2025). "*Aguilar*'s case-specific dicta about a situation where all that was

10

proved was the defendant 'uttered false statements' is thus inapposite to the case at hand," where the evidence of Pukke's interference with the grand jury is much more fulsome. *Cf. id.* at 482.

In addition, as the district court in *Shulte* observed, the creation and submission to prosecutors of "false documents" is distinct, given that there is "a key difference between the issuance of a grand jury subpoena *duces tecum* seeking the production of documents and the questioning of a subject by an investigating agent." 2023 WL 5561141 at *6 (quoting *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 168 (2d Cir. 2008)). "[F]abrication of relevant documents" is therefore "likely to impact the grand jury's deliberations" in a way that merely lying during an interview is not. *Id.*

Here, Pukke did not merely lie to law enforcement officials. Rather, he involved multiple third parties, solicited false documents, aimed to provide those documents to prosecutors, and did so with the intent of impeding a criminal investigation into his conduct. He also, as explained above, likely knew that a grand jury either had already been impaneled or soon would be. This goes beyond the limited conduct discussed in *Aguilar*, *Schwarz*, and *Schulte*. *Cf. United States v. Wellman*, 26 F.4th 339 (6th Cir. 2022) (finding the nexus requirement met when a defendant asked a third party to sign a false document to give to law enforcement investigators). And, taken together, this evidence is sufficient for a rational juror to conclude that Pukke intended to obstruct the grand jury's operations.

### IV.    Conclusion

For the foregoing reasons, Pukke's motion for a judgment of acquittal or a new trial is denied.

      The Clerk of Court is directed to close the motion at Docket Number 92.

      SO ORDERED.

Dated: July 25, 2025
       New York, New York

                                                     J. PAUL OETKEN
                                                  United States District Judge