UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v -

ANDRIS PUKKE,
a/k/a "Marc Romeo,"
a/k/a "Andy Storm,"

Defendant.

23 Cr. 168 (JPO)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# GOVERNMENT'S SENTENCING MEMORANDUM

JAY CLAYTON
United States Attorney for the
Southern District of New York

JEFFREY C. COFFMAN
JAMES MCMAHON
KEVIN MEAD
Assistant United States Attorneys

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v -

ANDRIS PUKKE,
a/k/a "Marc Romeo,"
a/k/a "Andy Storm,"

Defendant.

: 23 Cr. 168 (JPO)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT'S SENTENCING MEMORANDUM

***"I am 68 years old and I have to continue working in order to secure my retirement."***

***"The purchase of two lots is a financial disaster. . . . At age 75 and 81 we are not in a position to overcome this financial loss. We are living on a fixed income that does not meet monthly expenses."***

***"I had put every penny of our inheritance into that property as I paid in full on my purchase. . . . My quality of life is not what I imagined it should have been . . .. That was our nest egg."***

***"There is no way we can recoup the lost moneys. I am now 73 and working at Walmart to offset our retirement money lost."***

The defendant is a repeat offender who continues to disclaim responsibility for his most recent massive fraud scheme and obstruction of justice. He masterminded and was the principal beneficiary of a scheme that went on for nearly a decade and left hundreds of victims in its wake. His repeated lies and deception have caused substantial anguish and financial devastation. The foregoing quotations are taken from statements of just four of the hundreds of victims of the defendant's most recent crimes. His motive was simple greed. His criminal history, conduct in

this case, and lack of remorse make clear that he poses an ongoing risk to the public, including during any term of supervised release: He has already ignored two other courts' conditions of probation and supervised release by repeatedly committing serious federal crimes during supervision, and has now been convicted – twice – for obstructing, or attempting to obstruct, investigations into his conduct. A sentence of not less than 20 years' imprisonment is necessary and appropriate in this case.

## I. Background and Offense Conduct

The defendant engaged in most of the conduct underlying his convictions in this case after his (1) 1996 conviction for mail fraud in the U.S. District Court for the Western District of Pennsylvania; (2) 2006 civil settlement and entry of a $172 judgment against him in connection with a lawsuit filed by the Federal Trade Commission ("FTC") alleging unfair or deceptive practices in connection with the defendant's company, Ameridebt, Inc.; (3) 2007 imprisonment for contempt of court for failure to turn over property to the Ameridebt receiver as required; and (4) 2011 conviction for obstruction of justice in the U.S. District Court for the District of Maryland in connection with his secret acquisition of thousands of acres of land in Belize without having paid the Ameridebt judgment. Presentence Investigation Report ("PSR") ¶¶ 8-12.

Not content to merely acquire and sell vast tracks of land while hiding his assets from the Ameridebt court with that judgment outstanding, beginning in 2009 the defendant masterminded another large, almost decade-long scheme to defraud hundreds of victims across the United States and the world through the sale of real estate at Sanctuary Belize, a 7,673-acre development project in Belize that he controlled. PSR ¶¶ 13-43. The defendant and his employees marketed residential lots, primarily to Americans, in what he promised would become "the best development in all of

the America's [sic]." GX 1110 at 14. The development was going to be a "sheltered 14,000-acre[1] residential resort haven" that would be a "private sporting paradise." GX 112 at 11. It would "promote[] a life of active living by offering a variety of adventurous outdoor pursuits," such as scuba diving, snorkeling, fishing, kayaking, sailing, hiking, mountain climbing, horseback riding and mountain biking." *Id.* at 13. It would have "world class amenities in a gated community," GX 2409-B at 10, including a championship golf course, GX 2408-A, a nearby international airport, *id.*, and a marina village within the development "that will have everything you need," GX 2409-A at 5, 2409-B at 7, such as a boutique hotel, restaurants, bars, a "full size American Grocery Store," bakeries, fresh fish and produce stands, art galleries, a weekend farmers' market, medical clinic, post office, an international school for children, cultural activities, and a church. GX 113 at 6; 2059-B at 1, 9-10. Sanctuary Belize also agreed with each lot buyer to clear roads and run utilities to each lot so that the lots would be ready for the homes the lot buyers would build. *See, e.g.,* Def. Ex. L (development agreement).

After at least seven years of construction, Sanctuary Belize was still not finished when the Federal Trade Commission seized the property in November 2018. *See* Tr. 1727 (developer worked at Sanctuary Belize from 2011 to November 2018 when FTC seized property); *See also* PSR ¶¶ 35, 36. Approximately thirty percent of the roads had not been built, so some areas planned for residential development were not accessible. Tr. 177. Approximately forty percent of the power and water lines had not been run to residential lots. Tr. 176-77. The Marina Village had not been built, with the exception of a marina office, small gas station and some sundry buildings.

[1] The Sanctuary Belize property itself consisted of 7,673 acres. The nearby Plenty Tract, which was part of Sanctuary Belize but was not to have any residential lots, consisted of an additional 5,488 acres, for a total of 13,161 acres. Kanantik, a nearby residential development similar to Sanctuary Belize and also controlled by the defendant, consisted of 5,746 acres. Def. Ex. SSO06 at 12.

Tr. 893. The only restaurant built was at the beach club. Tr. 892. The hotel, golf course and casino had not been built. Tr. 892-894. The marina, which was supposed to have 120 slips, had only 59 slips. Tr. 894. It had been Sanctuary Belize's responsibility to build these promised amenities. Tr. 888-95. Ultimately, the defendant defrauded hundreds of individuals of the more than $77 million they spent to purchase lots based on promises he and his employees made.

A. The Defendant Lied to Lot Purchasers

The defendant and his employees carried out the fraud by making three key misrepresentations to lot buyers: 1) that the defendant was not involved with Sanctuary Belize, when in fact he controlled the company; 2) that all of the money received from lot sales would be used to develop Sanctuary Belize's infrastructure and amenities, which was false because the defendant embezzled at least $9.9 million; and 3) that Sanctuary Belize was free of debt, when in fact it had debt with a total principal amount exceeding $12 million.

1. False Representations About the Defendant's Role

The defendant went to great lengths to hide his involvement in Sanctuary Belize. PSR ¶¶ 30-34. He directed Sanctuary Belize personnel to deny his involvement in the development and the projects' marketing materials deliberately omitted his name. In some cases, the marketing materials referred to the defendant by one of his aliases, "Marc Romeo" or "Andy Storm." The defendant admitted under oath to using the Marc Romeo and Andy Storm aliases in connection with Sanctuary Belize. GX 738 at 7, 10, 13.

The defendant's employees actively denied his involvement. For example, in the fall of 2017, an FTC paralegal posing as a lot buyer in an undercover capacity asked Sanctuary Belize salesperson Frank Connelly about an allegation she had seen in a lawsuit that the defendant was in control of Sanctuary Belize. Tr. 335-36; GX 321-B at 7-8. Connelly assured her that "Pukke

has no relationship or ownership or control of this development or the property," and that his only relationship was that "he has been, in the past, contracted with for marketing services . . . as a vendor, basically." GX 321-B at 8-9. When the undercover asked "you're assuring me he hasn't been involved in any way since then or like is he involved in any way other than just the marketing," Connelly responded, "no, absolutely not." *Id.* at 9. The undercover asked further "So this - - he's not someone you've seen in years? Like you're not regularly interacting with him or anything?" *Id.* at 12. Again, Connelly answered "no." *Id.* In fact, however, Connelly and the defendant worked together in Sanctuary Belize's California office, where the defendant's desk was located just "a couple feet" from Connelly's, in the same large room. Tr. at 336; GX 1002. Paige Reneau, a former Sanctuary Belize sales representative testified at trial that another sales representative "castigated" her for using Pukke's name, and explained that she was "not to say his name anywhere but to use the name Marc Romeo." Tr. at 720, 765. Potential lot buyers asked Reneau approximately twice whether Pukke was involved in Sanctuary Belize. Tr. at 768-69. Reneau testified she answered "no," while fully aware that her answer was false because that was what she had been directed to do. Tr. at 769.

a. <u>The Defendant Was in Charge</u>

The evidence at trial left little doubt that the defendant was in charge of Sanctuary Belize and the defendant has conceded this point. Def. Rule 33 Mot. at 3 ("Pukke was intimately involved in Sanctuary Belize and worked hard every day to make the development succeed. He was a hands-on boss with minute attention to detail"). Reneau testified that, based on her three years working at Sanctuary Belize, she understood that the defendant controlled the Sanctuary Belize companies. Tr. at 720-22, 744, 749-50. The defendant made Reneau a co-manager of Sanctuary Belize's Santa Ana office, and later demoted her back to salesperson. Tr. at 742. Later, it was the defendant who

approved a proposal by Reneau and another Sanctuary Belize employee to attempt to sell Sanctuary Belize lots to potential Canadian buyers. Tr. at 743-44. In April 2015, the defendant emailed Reneau to ask her if she had any interest in coming back as a sales representative. Tr. at 764; GX 418. The defendant decided what Sanctuary Belize personnel would say to lot buyers on phone calls. Tr. at 749. And it was the defendant who approved deals for all lot sales involving down payments of less than $5,000. Tr. at 750-63; GX 419-29. Witness Patricia Kaelin worked at Global Property Alliance from May 2013 until 2015, as director of finance and accounting. Tr. at 1066-70, 1115-16. Her supervisor, Sanctuary Belize Chief Financial Officer Rod Kazazi, told her that Pukke "runs the place." Tr. at 1069-70. Kaelin also observed that the defendant ultimately made all the decisions and was "in charge." Tr. at 1086-87. On a later occasion, Kaelin learned the defendant had his own private office in the same building, on a separate floor, and that the defendant's office was "opulent" as compared to the other Sanctuary Belize offices. Tr. at 1071. Witness John Vipulis, the defendant's lifelong friend, understood that the defendant was in charge of Sanctuary Belize from speaking with both the defendant and Baker, who was himself a childhood friend of the defendant's. Tr. at 559, 574. The defendant received notifications of Sanctuary Belize deposits and payments, *see, e.g.,* Tr. at 1101-02, GX 227, 2087, approved invoices before Sanctuary Belize sent payments, *see, e.g.,* GX 2073-74, and made decisions concerning assessment of Sanctuary Belize lot buyers' late fees and interest. GX 2257, 2016-18, 304, 2314, 2325, 2345-46, 2348-49, 2352, 2354-56, 2358-59, 2414. In November 2018, FTC personnel conducted a court-ordered "immediate access" of Sanctuary Belize's California office and found the defendant present outside the company's office building. Tr. at 180-81, 186, 264, 406-31. Documents found at the defendant's workstation and computer during the immediate access included: 1) a list of online advertising accounts for various Sanctuary Belize entities, with

passwords and usernames; 2) an unaddressed August 26, 2010 letter signed by John Usher and Marc Romeo with the salutation "Dear Sanctuary Belize Property Owner," requesting that all future payments be directed and payable to Eco-Futures Development, Inc.; 3) development drawings of Sanctuary Belize with handwritten notes on them; and 4) a "Memorandum of Association of Sittee River Wildlife Reserve" and "Articles of Association of Sittee River Wildlife Reserve" designating Pukke as one of five "permanent director[s]." Tr. at 190; GX 2406-A- 2406-H.

b. The Defendant Understood Lot Buyers Would Not Want to Invest in a Development Run by Him

The defendant had good reason to hide his involvement in the development from potential lot buyers. He had an extensive and public history of fraud and criminal convictions and fully understood that any reasonable lot buyer would have serious misgivings about buying into a project being developed and controlled by a known convicted fraudster. For example, the defendant had two federal felony convictions during much of the time the fraud was ongoing: a 1996 conviction for mail fraud and a 2011 conviction for obstruction of justice, for which he was sentenced to 18 months' imprisonment. In 2006, in the District of Maryland, the defendant settled a lawsuit in which the Federal Trade Commission alleged that he and his company, Ameridebt, Inc., engaged in deceptive practices while promoting credit counseling. Tr. at 562-63; GX 720. The defendant agreed to the entry of a $172 million judgment against him, of which all but $35 million would be suspended as long as he turned over assets to the court-appointed receiver. GX 720. This case generated substantial press attention from, among other sources, the New York Times, the Washington Post, and the Orange County Register. GX 741, 743, 747, 740, 742, 74-45, 756; *see also* Tr. at 535-36. In March 2007, the court held the defendant in contempt for failure to turn over property to the receiver as required by the settlement. GX 722 at 3. Approximately a

month later, the court ordered the defendant incarcerated for failing to cure the contempt. GX 722 at 3-4; Tr. at 563. The Washington Examiner reported that the defendant had been jailed for concealing funds from authorities. GX 752. The defendant was released after entering into a stipulation under which the defendant's friend, John Vipulis, agreed to pay $4.5 million to the Ameridebt receiver. Tr. at 562-64; GX 722 at 4. The stipulation required that the defendant not repay all or any portion of the loan from Vipulis until after he had paid the judgment he owed to the FTC. GX 722 at 6.

During the sentencing for his 2011 obstruction of justice conviction, the defendant's lawyer removed all doubt about the impact the defendant's history would have on his ability to start or to run a business:

> He is unable to start up again in view of the smear [ ] on his reputation. You punch in Andris Pukke into Google, and you will see all these articles about fraud. I don't think this man can ever get a start back in business.
>
> . . .
>
> Of course, Mr. Pukke was, you know, fabulously wealthy, all that money is gone. He's now essentially destitute.
>
> . . .
>
> His reputation is unsalvageable. That's a harsh thing to say, but I think it's about as clear as it can be.

GX 735 at 4-7.

The evidence at trial confirmed the defendant understood how important it was for him to remain incognito. When a Sanctuary Belize employee inadvertently copied Pukke, at his ekupp@msn.com email address, on an email to a lot buyer, Sanctuary Belize employee Frank Connelly emailed Pukke "WHAT THE FUCK!!!!!!" GX 2419. The defendant responded, "I doubt [the lot buyer] noticed that I was CC'd on it. Likely only my email shows up, not my name.

[The Sanctuary Belize employee] does need to be more careful about that. Please let him know when you talk to him next." *Id.* Connelly replied, "I will. We take exhaustive measures to create distance and careless error could be major setback." *Id.* When the Wall Street Journal sought comment for an upcoming article about the defendant's involvement in Sanctuary Belize and his prior history, the defendant reviewed and approved the response written by Connelly. The response said in relevant part "Mr. Pukke was a paid employee of the third-party company that handles our sales and marketing, period! He is neither an owner, shareholder or director of any of the development companies. . . the judge found that Mr. Pukke's role was limited to that of an employee and nothing more." GX 2232.

2. False Statements That All Money From Lot Sales Would Be Used to Develop Sanctuary Belize

Sanctuary Belize personnel and marketing materials repeatedly represented that all of the money Sanctuary Belize received from lot sales until the project was complete would be used to develop Sanctuary Belize's infrastructure and amenities. PSR ¶¶ 18-28.

a. Marketing Materials

For example, a publication containing the Sanctuary Belize name and logo entitled "Top 5 Tips for Mitigating Risk While Investing Abroad" that was given to potential lot buyers, stated in relevant part that:

> Choosing a developer with no debt takes away the biggest risk of failure, because every dollar earned can go right back into the development itself. . . . *Sanctuary Belize has been completely debt free since the land was first purchased in 2003. All income goes directly to development and not a dollar goes to paying any loans.*
>
> . . .
>
> For debt-free developers who are able to offer in-house financing, they are in the prime position of being able to depend on monthly cash flow from their buyers to fund progress.

> The bigger the book of loans the developer has, the bigger the cash flow available for development. This serves almost as insurance that progress will continue regardless of any new buyers entering the picture.
>
> *Sanctuary Belize has offered in-house financing for the last five years, and as such has built up a monthly receivables list in the high six figures. Even if not a single new buyer comes on board, we can count on that monthly income to keep moving forward.*

GX 1239, 1313, 1231-34, 1236-39) (emphasis in original). The defendant approved of this language. In December 2013, he edited a Sanctuary Belize email to be sent to prospective lot buyers containing a hyperlink to this brochure. Tr. at 523-25; GX 1239-B, 2139, 2139-A, 2139-B. Similarly, Sanctuary Belize's written script for "virtual tours" stated:

> ZERO DEBT – number one challenge facing many developers is their income is not their own – *When you buy in SB [Sanctuary Belize] not a penny goes to paying a loan – it goes right into the progress of the development.* This project will never foreclose – and no question over whether or not it will come to completion. There is zero risk of failure.

GX 448-A at 8 (emphasis added).

Sanctuary Belize also sent prospective lot buyers a link to what the defendant referred to as the "No Debt" video. Tr. at 532-35; GX 1103, 1103-A, 1104, 1104-A. Referring to the video in a November 2018 email in which the video was hyperlinked, the defendant stated: "[w]e show this to all clients." Tr. at 532-35; GX 1103. The video purports to explain the "equity model" of development and its reduced risk for buyers, and further leads prospective buyers to believe the developer takes his profit only after development is complete, in that as more and more units are sold:

> more funds are then diverted to development and less to marketing until such time as the developer is sold out and all funds are then used to bring the development to final completion. Finally, the developer is left with the balance and legacy of the receivables, which should continue for many years to come, which ultimately become his profit.

GX 1104-A at 5:10-5:27.

b. Misrepresentations by Salespeople

Sanctuary Belize representatives told lot buyers the money Sanctuary Belize received from lot sales would go to building "world class amenities in a gated community." GX 2409-B at 10. During a recorded call with an undercover FTC paralegal in the fall of 2017, Sanctuary Belize personnel represented that "every dollar" from sales would be put back into the project, GX 308-B at 27, and "straight into the completion of everything they need at the marina and everything else that they've been doing," GX 318-B at 28, 29.

Reneau testified that her sales script contained assurances for potential lot buyers that all of the money they paid would be reinvested back into the development. Tr. at 779. Reneau worked in a room full of other Sanctuary Belize telemarketers who were using similar scripts, and she overheard them making the same representations about where money paid by lot buyers would go. Tr. at 802-03.

Victim Nancy Cunningham testified that sales representative Bill Bannon told her in 2008 that lot prices were higher at Sanctuary Belize than some other communities in part because "all the money . . . from lot payments was going to go right back into the development of the community," and that it had no debt, so all the money could go back into the community. Tr. at 1192-93. In April 2012, Sanctuary Belize representative Luke Chadwick told Cunningham that Sanctuary Belize was debt free and that "all the money from lot sales was going to go back into the development." Tr. at 1214.

Victim Frank Balluff testified that Robert Schafnitz, the Director of Investment Relations, told him that all money received from lot buyers would be going directly into the development of the property. Tr. at 96-97; 100-01. Schafnitz further told Balluff that the developers would make their money on the back end, when the development was completed, from planned commercial

portions of the development, including a shopping area and hotel. Tr. at 100-01. When Balluff visited Sanctuary Belize in the spring of 2012, both Schafnitz and Luke Chadwick, one of the three "Principals" listed on Sanctuary Belize promotional materials, told Balluff that all of the money from lot buyers would go back into the development. Tr. at 126, 142, 170-71; GX 125. When Balluff asked if any principals were taking any money out of the project, Chadwick responded, "no, we're not taking any money out until the back end, when we get in the commercial aspects, and that's where we're going to make our money because we'll have a successful hotel and a shopping district, and we're going to retain ownership of that stuff." Tr. at 127.

Victim Carl Dudick traveled to Belize in 2018, where he and his wife met Peter Baker, the purported part owner and developer of the property, and Baker's wife. The Bakers told him that, going forward, the project would be paid for through monthly receivables. Tr. at 85. The "no-debt" model was important to Dudick because it made it seem like it was a "very sound investment." Tr. at 50. Had Dudick learned that one of Sanctuary Belize's principals was diverting money from the project for his personal use, it would have affected his decision to buy a lot there. Tr. at 90.

c. The Defendant Stole a Substantial Amount of Money That Should Have Gone to Development

The representation that every dollar a lot buyer sent to Sanctuary Belize would go to develop Sanctuary Belize's infrastructure was false. In fact, as the defense conceded in its Rule 33 motion, the defendant embezzled more than $9.9 million from the Sanctuary Belize entities. Def. Rule 33 Mot. at 7 ("Under this heading ('all income'), the government did prove that Pukke used some Sanctuary Belize funds for personal purposes, such as renovating a home in Newport Beach, California and investing in startups."); *see also* GX 1003 (Summary of Payments Connected to Andris Pukke). For example:

i. Personal Investments in Start-Up Companies

From in or about March 2014 to in or about October 2018, the defendant directed that more than $1.8 million of Sanctuary Belize funds be used to make personal investments in Outsource.com, later called Remote.com; Online Wedding Solutions, also known as Wedding Solutions or Wedding.com; Chivalry.com; and Attorney.com. *See* GX 1003 at 5, 2197 (email from the defendant to Kazazi: "Hey buddy, I know we're pretty tight but can you send $10 to attorney.com?"), 2175, 2179-81, 2185, 2187, 2189, 2198, 2200, 2202, 2229. These payments were falsely recorded on the books of Sanctuary Belize entities as professional fees, loans receivable, legal fees, marketing (online advertising), and loan receivable. GX 1003 at 5. However, Brett Reynolds, the entrepreneur who started the companies and communicated with the defendant about them, testified that they did no business with Sanctuary Belize, and that the payments were purely investments, which the defendant directed be held mostly in his girlfriend's name. Tr. at 446-64, 478-90.

ii. Purchase and Renovation of Waterfront Home

The defendant purchased and renovated a waterfront home in Newport Beach, California for his own use with $1,150,000 he took from Sanctuary Belize entities from June 2012 through December 2014. Tr. at 1385-95; GX 500-01 (contractor invoices), 1307 (wire transfers from Global Property Alliance used to purchase Newport Beach residence); 510-518 (deeds for Newport Beach residence); 1003 at 2 (payments in connection with Newport Beach property). Payments to the contractor were recorded on Global Property Alliance's books as a "master planning" expense. GX 1003, 2315. The defendant and his girlfriend lived in the home together. Tr. at 1385-95.

iii. Repayment of Personal Loan

From July 2012 through October 2018, the defendant transferred more than $4.2 million to Vipulis from the Sanctuary Belize entities to repay the Ameridebt loan. Tr. at 586; GX 1003, 2183, 2196-A, 2238. As described above, this was a personal loan unrelated to Sanctuary Belize, and, moreover, the defendant was prohibited from repaying that loan until he satisfied the judgment in the Ameridebt Case. These transfers were recorded on the books of the Sanctuary Belize entities as loans. Tr. at 1031-38; GX 2326, 2327, 2308.

iv. Child Support Payments

From in or about July 2012 to in or about September 2018, the defendant directed the transfer of more than $700,000 from Sanctuary Belize entities to a bank account in the name of his father's estate. *See* GX 1003 at 12; *see also* GX 2188 (July 3, 2014 email from the defendant to Kazazi: "Hey, buddy, can you send $30 to outsource and $15 to my father's estate? . . . I saw we got a decent sized wire in yesterday."), 2211 (January 5, 2015 email from the defendant to Kazazi: "Hey, buddy, I'll be in in an hour or so. Let's sit down and catch up on everything when I get there. In the meantime, I need you to send ten to my father's estate account this a.m. Thanks."), 2212. The defendant served as his father's estate's sole representative and was the only signatory on the account. GX 862-C at 1, 3, 4. The funds were then paid in substantial part to, or on behalf of, Aimee Vaccarelli and Lesley Beador, by checks bearing the defendant's signature. GX 862-A-1, 862-A-2. Both women had at least one child fathered by the defendant's brother and received the funds for the benefit of those children. GX 1312, 1314. Absent the transfers from the Sanctuary Belize entities, the estate account would not have had sufficient funds with which to make the payments. GX 862-D. Global Property Alliance's, Buy International's, Eco-Futures Development's, and Foundation Development Management's QuickBooks accounting records

recorded these payments to the John Pukke Estate as loan payments and consulting fees. GX 2306, 2322-24.

v. Investment in Bahamian Land

From August 2017 through October 2018, the defendant caused wire transfers totaling slightly more than $1 million from the Newport Land Group, a company controlled by the defendant, to the escrow account of an attorney in Florida. GX 1003 at 10. The account held by the Newport Land Group from which these payments were made was funded almost entirely by payments from Buy International, Eco Futures Development, and Global Property Alliance, all Sanctuary Belize entities. GX 801-B. The payments were sent to buy land in the Bahamas on behalf of the Newport Land Group. GX 543, 1309.

vi. Payments to Family and Friends

From March 2012 through July 2015, the defendant caused transfers of more than $1.2 million of Sanctuary Belize funds to be made directly to, or on behalf of, his family members and friends. Tr. at 1084, 1850 (testimony of defense witness Anthony Mock that the defendant's children did not work at Sanctuary Belize); GX 1003 at 20, 2407-E through GX 2407-H.

vii. Other Diversions

Sales manager Jim Catsos received salaries and commissions of approximately $30,000 per month, but explained to Kaelin that he "didn't get to keep it all," and that "part of it went to the boss, to Andi." Tr. at 1088, 1095.

viii. The Defendant Lied Under Oath About His Thefts

The defendant lied about his embezzlements from Sanctuary Belize both under oath when in court and on his tax returns. During a November 13, 2015 violation of supervised release hearing in the District Court for the District of Maryland, the court asked the defendant: "Now, all

those entities that are related to the Sanctuary Belize projects, you are not getting any compensation other than $10 an hour?" GX 738 at 1, 5. The defendant answered: "Correct." *Id.* at 5. The defendant's IRS Forms 1040 for tax years 2012 through 2014 reported wages and adjusted gross income in equal amounts, always less than $34,000, each year, and the IRS had no record of having received a Form 1040 for the defendant for tax years 2011, 2017, or 2018. GX 2-5; 1311.

3. False Statements About Development's Debt

At the defendant's direction, Sanctuary Belize personnel and marketing materials also repeatedly represented that Sanctuary Belize had no debt. PSR ¶ 29. Sanctuary Belize's written script for "virtual tours" stated:

> ZERO DEBT – number one challenge facing many developers is their income is not their own – *When you buy in SB [Sanctuary Belize] not a penny goes to paying a loan – it goes right into the progress of the development.* This project will never foreclose – and no question over whether or not it will come to completion. There is zero risk of failure.

GX 448-A at 8 (emphasis added).

Internal emails and sales scripts found throughout Sanctuary Belize's office further proved that Sanctuary Belize sales representatives pitched prospective clients by touting that Sanctuary Belize had "zero debt," GX 2408-A, that it was a "debt free developer," GX 2409-C at 10, and that it was "one of the ONLY, DEBT FREE developments in the entire world." Tr. at 279; GX 2409-A (emphasis in original); *see* GX 414 at 7; 415 at 3; 436 at 5; 444-A; 444-C; 2410-C at 19; 2410-D at 5 and 7; 2410-E at 4; 300-A. Sanctuary Belize sales representatives explained to prospective clients: "So what that means for you is you don't have to worry about dealing with a developer who borrowed too much money and went bankrupt, and you're left with a useless piece of property, that will never happen because they have NO debt." GX 2409-A at 9, 2409-B at 4 (emphasis in original).

During a recorded call with an undercover FTC paralegal in the fall of 2017, Sanctuary Belize personnel touted the property as "debt-free," GX 308-B at 25-27, and "completely debt free," GX 305-B at 7; 318-B at 28, 29, and represented that "every dollar" from sales would be put back into the project, GX 308-B at 27, and "straight into the completion of everything they need at the marina and everything else that they've been doing," GX 318-B at 28, 29.

Reneau testified that the defendant approved sales scripts, including GX 413, which contained the same assurances that Sanctuary Belize had "ZERO debt," and was "completely debt free." Tr. at 726-27; GX 413 at 2-4. During her "thousands and thousands" of calls with potential lot buyers, Reneau frequently gave assurances that Sanctuary Belize had no debt, because that was what was in the script and what sales representatives were told to say "every time when we spoke to a potential client." Tr. at 778-79, 800-02; GX 416. Reneau worked in a room full of other Sanctuary Belize telemarketers who were using similar scripts, and she overheard them making the same representations about Sanctuary Belize having no debt and where money paid by lot buyers would go. Tr. at 802-03. Reneau sent potential buyers form emails repeating the "zero debt" assurance. Tr. at 799-800; GX 437 at 7. Sales representatives gave potential buyers the aforementioned virtual tour of Sanctuary Belize over the Internet and phone, which repeated the false assurances that it had no debt and that all payments from lot buyers would go towards development, after which the sales representatives tried to obtain a $5,000 down payment on a lot. Tr. at 728-33, 783-86; GX 435; 438; 439; 448-A at 8.

Notwithstanding the defendant's assertions through Sanctuary Belize marketing materials and personnel that Sanctuary Belize had no debt, Sanctuary Belize had more than $12 million in debt and was spending significant amounts of lot buyer funds to repay that debt. For example, CVM Corporation loaned Eco-Future Belize $2.5 million in approximately February 2013. GX

1302. The promissory note called for repayments over a five-year term commencing on April 1, 2013. GX 920. Eco-Futures books showed more than $1.5 million in payments on this loan from January 13, 2014 through October 2018. GX 2342.

The Gordon Barienbrock Family Trust made loans to Eco Futures beginning in approximately August 2014, including a $1 million loan in or about October 2014. The Trust's loans to Eco Futures were consolidated in or about November 2017 into a single loan in the amount of $4,635,500. Eco Futures made some loan repayments to the Trust, but did not fully pay back the $4,635,500 loan. GX 1304. The November 10, 2017 promissory note specified that Eco Futures "has loaned borrower funds secured by deeds of trust on land in this development," provided that the loan would be amortized over 20 years starting on January 1, 2018, and provided that it would be secured by a first deed of trust on the marina property currently known as the "hotel site." Tr. at 1049-51; GX 910. Global Property Alliance's, Sittee River Wildlife Reserve's, and Eco Futures Development's QuickBooks accounting records reflect payments from 2016 through 2018 totaling more than $1 million, some with the notation "G.B. Loan," and "loan repayment." Tr. at 1053-59; GX 2020-21; 2343.

As discussed in more detail below, in December 2010 Sanctuary Belize also borrowed $5.3 million from Harlequin Holdings, an entity owned by John Vipulis and his business partner, Patrick Callahan, to build its marina. Tr. at 562-72, 575-76; GX 722. Vipulis and Callahan agreed to make this loan because they believed it would increase the odds that the defendant would be able to repay the then outstanding Ameridebt loan. Tr. at 575. They agreed that payments would begin once the defendant finished serving his prison sentence on his 2011 obstruction conviction. Tr. at 1305.

B. The Defendant Attempted to Obstruct Justice

After he learned that the United States Attorney's Office was investigating his conduct at Sanctuary Belize, the defendant attempted to obstruct justice. PSR ¶¶ 37-41. Specifically, as detailed above, in addition to the $5.3 million marina loan, Vipulis also made an earlier $4.5 million loan to the defendant personally in 2007 in order to obtain the defendant's release from imprisonment. Tr. at 562-64; GX 722 at 4. The defendant thereafter caused Sanctuary Belize to make payments to Vipulis of more than $4.2 million from July 2012 to October 2018 to repay that loan. GX 1003 at 16.[2] The evidence at trial showed not only that those payments were to repay the defendant's personal debt but also that the defendant subsequently attempted to obstruct a grand jury investigation by asking Callahan to generate a false document that would have falsely indicated that the payments to Vipulis were for the marina loan and, therefore, a legitimate use of Sanctuary Belize's funds.

In 2012, the defendant told Vipulis he was able to begin making repayments on "the loan," without specifying the Ameridebt loan or the marina loan. Tr. at 579. Vipulis treated the repayments as going towards the Ameridebt loan. Tr. at 579, 589. According to Vipulis, the defendant never started making repayments on the marina loan. Tr. at 585. Vipulis understood that Callahan was not being repaid, and that had the repayments been for the marina loan, Callahan "would be getting repaid half the amount as well." Tr. at 580.

While the defendant was making these payments, Callahan emailed the defendant, "November [2012] is upon us, and we agreed for the payments to begin on November 1. Let's

[2] Although the U.S. District Court for the District of Maryland's Order Approving Stipulation for Conditional Release, GX 722, provided that $1.25 million of the $4.5 million wired by Vipulis would be paid in consideration of property in Latvia, GX 722 at 6, Vipulis had not wanted to buy the property, and both Pukke and Vipulis understood that Pukke owed Vipulis the full $4.5 million that Vipulis had paid for Pukke's release. Tr. at 640-43.

discuss what the amount is." GX 523. It was only through this email exchange that Callahan learned for the first time from the defendant that he had been sending $10,000 monthly payments to Vipulis for the prior five months. Tr. at 1311-12; GX 523. Vipulis did not send Callahan any portion of the loan repayments he received from the defendant. Tr. at 582-86. The repayments stopped after Vipulis' account was frozen as a result of the defendant sending Vipulis the funds, after which Vipulis gave the more than $4 million he had received from the defendant to the FTC. Tr. at 581-84.

Neither Harlequin nor Callahan ever received any payments on the marina moan. Tr. at 1314-16, 1321-23; GX 521; 2326-27. According to Callahan, Vipulis received all loan repayments that the defendant made and, that based on Callahan's communications with Vipulis, the payments were going towards the Ameridebt loan. Tr. at 1314-15.

While the grand jury investigation relating to Sanctuary Belize was underway in November 2021, Tr. at 521-22, the defendant's counsel at that time arranged to meet with the Assistant U.S. Attorney handling the grand jury investigation, GX 1315, and the meeting took place on December 17, 2021. Tr. at 522. Nine days before that meeting, the defendant sent Vipulis the following WhatsApp text message:

> ANDI: I really hate to bother you with this but I just spoke to my attorneys and we need to do an accurate accounting of where money went and I need PC's help. ***Can you ask him if he or his attorney would be willing to confirm that he loaned us the money to finish the marina in 2011, including the amount, and that he requested we pay it back to you?*** I know he wants to stay out of this but I really need his help to confirm that, even if it comes from his attorney. I have emails[3] from him that pretty clearly suggest it but a letter from him is really what I need. ***I just need him to confirm the amount he loaned and that he requested that it be paid back to you.*** Hopefully he's willing to do that. Sorry again for the hassle and thanks again for everything!!

[3] Although Pukke presented a substantial defense case, he did not introduce these purported emails.

Tr. at 589-91; GX 601 (emphasis added).

Vipulis explained that he understood that "PC" in the message was a reference to Patrick Callahan, and that based on Vipulis' knowledge of the Marina Loan, the defendant's request that Callahan or his attorney confirm that Callahan had requested that repayments for the Marina Loan be sent to Vipulis did not make sense. Tr. at 591, 593. To Vipulis' knowledge, neither Vipulis nor Callahan had ever requested that repayments of the Marina Loan be paid to Vipulis. Tr. at 592-93.

Vipulis did not respond to the defendant's initial message. GX 601. The next day, the defendant sent a follow-up message to Vipulis:

> ANDI: Can you help me with this? I don't need much. Just a quick letter or email confirming it. If he has a problem doing that for some reason let me know and I'll try to figure out another way. Thanks!

GX 601. Vipulis responded, "Check your signal," by which Vipulis was referring to a "more secure" messaging service that would ensure others would not be able to copy or see their communications, and the two ended their WhatsApp communications about the subject. Tr. at 593-95; GX 601. To the extent they continued the discussion over Signal, Vipulis no longer had copies of the messages because they had been "set to erase after a few days." Tr. at 596. Vipulis testified that he passed the defendant's message on to Callahan, and that Callahan rejected the defendant's request. Tr. at 592.

Vipulis read the defendant's foregoing December 8, 2018 text message to Callahan over the phone. Tr. at 1323. Callahan told Vipulis that he would not "cooperate with this text" and had "nothing to offer." Tr. at 1324. Callahan asked Vipulis to convey to the defendant that "[a]nything [Callahan] had to offer would not support [the defendant's] case." Tr. at 1325. Callahan further testified that he never requested that the defendant pay the marina loan back to Vipulis or told the

defendant that he should make payments on the marina loan to Vipulis. Tr. at 1324. Further, Callahan was not aware of Vipulis ever having told the defendant to make payments on the marina loan to Vipulis. Tr. at 1324; se*e* Tr. at 1372 ("[The defendant] must have gotten [Vipulis'] wire instructions to start payments, and I was not aware of that.").

The FTC obtained a court order by which a court-appointed receiver seized the Sanctuary Belize property in November 2018. The grand jury returned an indictment charging the defendant with wire fraud and obstruction of justice. The trial jury returned guilty verdicts on both counts in July 2024.

II. <u>The Sentencing Guidelines Calculation</u>

The offense level should be 43. The criminal history category should be II. The resulting Guidelines range is life imprisonment which, due to the combined statutory maximum sentences for the two offenses of conviction, is reduced to 40 years' imprisonment.

A. <u>The Loss Amount</u>

The loss, for purposes of the Sentencing Guidelines and as calculated pursuant to Section 2B1.1, is $77,764,722.44 for the reasons stated in the Government's brief on calculation of the loss, (Gov't. Brief on Loss, ECF 110), and during the oral argument on the loss on July 8, 2025.[4] As noted in the Government's brief, this is a conservative[5] loss figure.

---

[4] The Government had calculated a loss figure of $79,816,351.44 in its loss calculation brief. At oral argument, it noted that it had not subtracted out the portion of the Belizean sales tax attributable to the 295 lots for which it had given credit against the Guidelines loss figure pursuant to U.S.S.G. § 2B1.1, Application Note 3(D)(i). Since the 295 lots represent a rounded 24 percent of the 1207 lots at Sanctuary Belize, the Government subtracted 24 percent of $8,496,824 in Belize General Sales Tax, or $2,051,629, to arrive at the new loss figure of $77,764,722.44.

[5] The defendant incorrectly asserts that "[t]he 295 purchasers who obtained title to their lots outright, ***as the government acknowledges***, suffered no loss," (Def. Mem. at 12) (citing ECF 110 at 13) (emphasis added). These 295 lot buyers did suffer a loss, in that they received title to properties in a community vastly different than the one Pukke sold them under false pretenses, and therefore far less valuable than the ones they should have received. The Government's

The defendant's continuing assertion that Sanctuary Belize's failure is "largely attributable to the FTC's decision to halt all work," (Def. Mem. at 13), is astonishing. This argument – the same that was rejected by the jury – reflects the defendant's refusal to accept responsibility for his crimes.

B. <u>Substantial Financial Hardship to Five or More Victims</u>

The Court should apply a four-level increase to the offense level pursuant to U.S.S.G. § 2B1.1(b)(2)(B) because the offense resulted in substantial financial hardship to five or more victims.

The commentary to Section 2B1.1 provides that in determining whether an offense resulted in substantial financial hardship to a victim, a sentencing court should consider, among other factors, whether the offense resulted in a victim becoming insolvent; filing for bankruptcy; suffering substantial loss of a retirement, education or other savings or investment fund; making substantial changes to his or her employment, such as postponing retirement plans; or making substantial changes to his or her living arrangements, such as moving to a less expensive home. U.S.S.G. § 2B1.1, Application Note 4(F).

---

conservative loss estimate omits this loss because it is impossible to calculate. As the Government explained in its brief regarding loss, these lot buyers received titles to their lots. However, they had already paid for their lots in full, or close to full, when the fraud was discovered, and had little to lose by paying an average additional $3,000 in order to obtain title as opposed to ending up with little or nothing to show for their money. (ECF 110, at 13). The vast majority of the payments they made were based upon Pukke's fraudulent representations that Sanctuary Belize would use the money they and other lot buyers paid to build out Sanctuary Belize's infrastructure and amenities as promised, which the evidence at trial showed was not the case. (*Id.*). "***Despite that***, the credit against loss proposed by the Government consists of the full amounts that were paid for the 295 lots." (*Id.*) (emphasis added). The Government's conservative loss figure also represents only a portion of the actual loss, as opposed to the greater intended loss, excludes interest, and does not include $4 million of "other payments," which the receiver identified as payments for lots. (*Id.* at 3-13).

The victim impact statements submitted to the Court from Sanctuary Belize lot buyers show that significantly more than five victims suffered substantial financial hardship as a result of the defendant's offenses. *See, e.g.,* PSR ¶ 46 (quoting Statements 5, 37, 41, 49, 68). *See also* Statements:

7 ("Retirement dreams crushed! Retirement funds lost!");

8 ("I lost all of my life savings leaving me broke!");

13 (loss of more than $370,000 "represented a significant portion of our retirement proceeds. . . . Needless to say, our lives were altered significantly as a result of [the defendant's] greed, and dishonesty");

23 ("And so we have had to make lesser or smaller plans with the time he had remaining");

32 ("The money I once relied upon for my retirement is gone, and I have nothing to show for it. . . . [M]y financial foundation has been shattered . . .."");

46 ("I am now 69 years old and have been forced to continue working due to this travesty");

77 ("I'm just now realizing how this scam impacted my retirement date. Forced to retire later");

95 ("Not only were our funds/savings stolen from us but many more years of having to work to recover from this loss");

104 ("The financial consequences of this crime have been devastating. I lost 300,000 USD due to the defendant's actions, which has left me struggling to meet my basic needs and financial obligations. . . . I am 68 years old and I have to continue working in order to secure my retirement");

108 ("The purchase of two lots is a financial disaster. . . . At age 75 and 81 we are not in a position to overcome this financial loss. We are living on a fixed income that does not meet monthly expenses");

127 ("I had put every penny of our inheritance into that property as I paid in full on my purchase. . . . My quality of life is not what I imagined it should have been . . .. That was our nest egg");

140 ("There is no way we can recoup the lost moneys. I am now 73 and working at Walmart to offset our retirement money lost");

173 ("Unfortunately, we have nothing left. No savings, no vacation home for my wife and family. Now not even my health worrying about this scam. I'm not sure how people get away of stealing a persons life savings dreams and be able to just walk away");

178 ("It HURTS – financial and emotionally. My husband cannot afford to retire now at age 74, and we have only been able to partially recover financially because my mother left me a bit of money when she died in 2023 . . . our retirement plans, hopes and dreams were blown apart and we have had no choice but to re-think everything and try to recoup some of our lost funds by working more years than we had planned");

179 ("The **Victim Impact** for us is that **that was our life savings**. . . . We are both now too old to make up that kind of financial difference. This loss has also forced us to work much longer than we intended as we were trying to regain some of our retirement savings loss. We will both end of [sic] working 10 years longer than we had originally planned . . . . At 10 years out, we are unable to retire) (emphasis in original);

183 ("We invested our hard-earned retirement savings into a property that turned out to be part of a fraudulent scheme orchestrated by the defendant. This was meant to be a secure investment for our future and our retirement. Instead, we lost nearly everything. The financial loss was devastating and unrecoverable for us. I am currently on Social Security Disability and live on a very limited fixed income. Losing our retirement funds has left us in a precarious financial position with no means to recover what we have lost. We now face the harsh reality of an uncertain future");

187 (2/27/19 Letter: "The funds we were using were from our Trust and were to be the basis of a trust, to be created, to support our son who has had disabilities from birth." 11/30/24 Letter: "We have continued to liquidate most all physical assets of value including our 2021 sale of our sailboat we cherished for family time. We live as frugally as we can and still fear the future. Even with the small amount of recompense we received from Ankura last year we have still lost over $500,000 of our son's future support. My wife and I are now in our mid-seventies with corresponding health issues that threaten the savings we have attempted to build up. . . . My wife and I are one major health issue from being forced to spend what we have attempted to build back for the care of our son while we are gone. . . . He will hopefully have many years after our parting and without these lost funds he will not financially survive for those years.")

191 ("I had purchased this land using $140,000 of my retirement funds under the promise, and belief that this would be an excellent investment. . . . I was counting on using these funds to help support myself upon retirement. This has put a terrible strain on my life.")

The defendant argues that the Court should disregard all of the victims letters, and not factor them into his sentence, because "[a]ll of the statements were written in late 2024 and in 2025

[and t]he writers' present feelings of loss and anger cannot be divorced from the financial and emotional uncertainty the writers have experienced since the FTC shutdown of Sanctuary Belize in 2018." (Def. Mem. at 7).[6] Just as he did in his brief regarding the loss and at the July 8, 2025 oral argument regarding same, the defendant asks the Court to find that the FTC is to blame for his victims' losses. In the defendant's telling, the FTC should not have stopped him from victimizing additional people and further victimizing those he had already defrauded by continuing to receive monthly payments obtained under false pretenses. The Court should again reject this argument, which is simply a continuation of the defendant's theme – rejected by the jury that convicted him and by the Court in denying his Rule 29 motion – that his fraudulent actions did not cause any economic loss to the victims. (*See, e.g.,* July 25, 2025 Opinion and Order (ECF 112) at 6) ("Furthermore, even if the Government were required to show economic losses, it did so. . . . A rational jury could conclude that the unforeseen lack of medical facilities, an airport, a marina, restaurants and shops, and more constituted economic losses that were directly related to the violation of promises Pukke made to his investors, including that "all income" would be put into development.")

C. Violation of Prior Judicial Order

The defendant does not object to an enhancement of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(9)(C) because his offenses involved a violation of a prior, specific judicial order not addressed elsewhere in the Guidelines. PSR ¶ 54. As the evidence at trial showed, the defendant was found in contempt of the Maryland District Court's order that he turn property over to the Ameridebt receiver and was incarcerated until he purged the contempt on May 4, 2007. Thereafter,

[6] Pukke also argues that victims' statements about Kanantik should not factor into Pukke's sentence. (Def. Mem. at 7, fn. 1). All of the foregoing Statements are from Sanctuary Belize lot buyers.

Vipulis agreed to pay the receiver $4.5 million, and consider it to be a loan to the defendant, in exchange for the defendant's release from incarceration. The Court released the defendant but ordered on May 31, 2007 that "Pukke shall not repay all or any portion of the Vipulis Loan to Vipulis until such time as the FTC judgment is satisfied in full . . .." GX 722 at 6. Although the defendant has never met the condition that the FTC judgment be satisfied in full, the evidence at trial showed he paid repaid Vipulis more than $4.2 million on this debt in violation of the May 31, 2007 order. *See, e.g.,* GX 1003 at 16-19 and corresponding testimony.

D. Sophisticated Means

The defendant does not object to a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10) because a substantial part of his scheme was committed from outside the United States and because his offense involved sophisticated means and he intentionally engaged in or caused the conduct constituting sophisticated means. PSR ¶ 55.

Obviously, a substantial part of the scheme took place in Belize. Most victims were subjected to the defendant's marketing, which included the three key misrepresentations, while they were in Belize. Most signed agreements to buy their lots while they were in Belize. And, obviously, the lots themselves were in Belize. In addition, numerous victims were from countries other than the United States, including Belize, Canada, the United Kingdom, Australia, Mexico, Spain, Portugal, Italy, and the Czech Republic. Victims from those countries were subject to Sanctuary Belize's marketing, including the three key representations, through online presentations, telephone calls and emails while they were in their home countries. That a substantial part of the scheme took place outside the United States is alone sufficient to warrant this enhancement. U.S.S.G. § 2B1.1(b)(10)(B).

The enhancement is also warranted because the defendant's fraud involved sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C). Sophisticated means for purposes of this enhancement means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, Application Note 9. The enhancement "targets conduct that is more complex, demonstrates greater intricacy, or demonstrates greater planning than a routine [criminal offense of the same variety]." *United States v. Lewis*, 93 F.3d 1075, 1081 (2d Cir. 1996). There is no doubt the defendant's fraud was sophisticated for purposes of this enhancement. It spanned many years and was international in its scope. It required extensive planning and daily effort to purchase Sanctuary Belize's 13,000 acres, to plan its development, to develop it sufficiently over time in an effort to create at least the appearance of progress, to maintain the property and, most importantly, to market it. Both the ongoing development and marketing operations required numerous employees who had to be trained, directed, supervised and paid.

E. Vulnerable Victims

Several unique characteristics of the defendant's offense, particularly when considered in combination, require the application of the 2-level enhancement for vulnerable victims at U.S.S.G. § 3A1.1(b). (PSR ¶ 56). This subsection requires a 2-level enhancement "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." A "vulnerable victim" is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." The enhancement is to be applied "where an extra measure of deterrence and punishment is necessary because the defendant knew of a victim's substantial inability to avoid the crime." *United States v. McCall*, 174 F.3d 47, 51 (2d Cir. 1998); *United States v. Sangemino,* 136 F.Supp.2d 293, 299 (S.D.N.Y. 2001) (Chin, J.). A sentencing court may

rely on a defendant's history of similar conduct, even if the prior schemes and victims were different, to find that the defendant understood how his scheme relied on the vulnerabilities of victims. *United States v. Palmer*, 830 F. App'x. 26, 29 (2d Cir. 2020). In deciding whether a victim is vulnerable and "particularly susceptible to the criminal conduct," courts consider whether a victim was "less likely to thwart the crime, rather than more likely to suffer harm if he crime is successful." *Id.* at 49-50, *quoting United States v. Kaye,* 23 F.3d 50, 54 (2d Cir. 1994), *and citing United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1998)("[F]ocus not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime.").

While a victim's enhanced age does not, by itself, render him or her vulnerable, the Court of Appeals has held in the context of advance fee schemes that "similar elderly victims of similar schemes were unusually vulnerable . . . to telemarketing schemes very similar to the one involved here." *Palmer*, 830 Fed. App'x at 28, *citing O'Neil*, 118 F.3d at 75; *United States v. Williams*, 2023 WL 2613503 at *11 (D.Conn. 2023) ("There must be some other indicator of vulnerability, such as in *Palmer* where the court found elderly people are unusually vulnerable to telemarketing fraud schemes."). Another common aggravating factor leading to application of the enhancement is "re-loading," or the solicitation of additional payments or investments from individuals who had already been victimized. *United States v. Boyd*, 2 Fed. App'x 86, 89 (2d Cir. 2001) (affirming enhancement due to reloading); *O'Neil*, 118 F.3d at 75-76 (same); *see United States v. Randall,* 162 F.3d 557, 560 (9th Cir. 1998) (enhancement appropriate because reloading "seeks out people who have a track record of falling for vulnerable schemes"); *United States v. Jackson*, 95 F.3d 500, 508 (7th Cir. 1996) (victims of reloading "vulnerable in a way and to a degree not typical of the general population."); *but see Palmer,* 830 F. App'x. at 29 (reloading by itself does not justify

enhancement but "help[s] to justify" it), *citing United States v. Dupre,* 462 F.3d 131, 146 (2d Cir. 2006). A third relevant aggravating factor that would support a vulnerable victim enhancement is a victim's precarious financial condition. *United States v. Patasnik,* 89 F.3d 63, 72-73 (2d Cir. 1996) (advance fee scheme); *Borst,* 62 F.3d at 47 (victim's "precarious financial situation alone may serve as the sole basis of a § 3A1.1 enhancement").

Most of the victims were unable to thwart the defendant's ongoing crime because key evidence of that crime – the lack of progress on the development – was in a foreign country that was difficult and expensive to visit. Further key evidence – the books and records of the Sanctuary Belize entities showing how the money was embezzled by the defendant, showing the defendant's control over the companies, and showing the debt – was not available to lot purchasers. While most of the victims were making monthly payments on their lots, they were oblivious to the lack of progress on the development, despite the defendant's false promise that all income from lot buyers would go to development. The lot buyers were largely dependent on the defendant and his employees to provide them with information about their investments. Although a few buyers did visit Belize after they bought their lots, the majority did not and continued to make their monthly payments while unaware that their money was not going where they had been told it would go. Thus, these victims were more impeded in their abilities to protect themselves from the defendant's ongoing crime than, for example, similar victims of a land fraud in the United States. *Palmer*, 830 F. App'x at 49-50; *Kaye*, 23 F.3d at 54; *O'Neil*, 118 F.3d at 75.

Second, the marketing and the financing of lot purchases were arranged in such a way as to attract potentially vulnerable victims. Sanctuary Belize, with its primarily half-acre lots, was not designed for, or marketed to, the wealthy. Instead, as the victim statements show, it attracted primarily middle-class retirees. *See, e.g.*, Statements 4-5, 7, 13, 17-18, 22-23, 32-33, 40, 42, 49,

68, 76, 83, 85-86, 88, 95-96, 106, 108, 116, 135, 140, 173, 178, 179, 183, 187, 191. It provided victims with internal financing for lots. It promoted the fact that it would not conduct any credit checks, thus encouraging victims who would not have been able to finance the purchase of a lot otherwise due to precarious credit to purchase. Unlike a conventional bank mortgage, Sanctuary Belize required buyers to agree that if they stopped making payments, Sanctuary Belize could "foreclose" on their lots without refunding any payments the victims already made or any equity the victims earned on their lots.

Not surprisingly, many of the lot buyers were financially vulnerable. The victim impact statements show that some of the victims were in such a financially precarious state that their loss has left them "broke." Statements 8 (loss left "me broke!"), 32 (retirement funds "gone") and 108 (couple, ages 81 and 75, now unable to meet expenses). Several described how they had to keep working, even at relatively advanced ages, because of their losses. Statements 46 (69-year-old "forced to continue working"), 49 ("continuing to work well past our planned retirement date"), 77 ("Forced to retire later"), 104 (68-year-old must continue to work), 140 (73-year-old "working at Walmart to offset our retirement money lost"), 178 ("My husband cannot afford to retire now at age 74"), 179 ("We will both end of [sic] working 10 years longer than we had originally planned"). Still others described how they had to alter their plans for retirement as a result of their losses. *E.g.,* Statements 13 ("our lives were altered significantly") and 23 ("we have had to make lesser or smaller plans").

Third, Sanctuary Belize routinely reloaded its victims. The evidence showed that buyers were routinely encouraged to buy, and often did buy, additional lots as an investment. Buyers were also encouraged to buy lots in Kanantik, another development near Sanctuary Belize controlled by Pukke, as additional investments.

In an effort to avoid an enhancement, the defense has construed Section 3A1.1 far too narrowly. The Government's argument goes well beyond just the fact that the defendant marketed Sanctuary Belize to retirees. Instead, the enhancement should apply because the defendant, an experienced con man, targeted potentially vulnerable victims in that he marketed Sanctuary Belize in part to buyers on fixed incomes, encouraged those with precarious finances to apply, compelled buyers to continue making payments at the risk of losing everything, and attempted to reload those he persuaded to buy, all while knowing that his fraud was difficult to detect because evidence of it was located primarily in another country.

F. Organizer or Leader

The defendant does not object to a 4-level enhancement, pursuant to U.S.S.G. § 3B1.1(a), because he was an organizer and leader of a criminal activity that either involved five or more or was otherwise extensive. PSR ¶ 57. The evidence at trial showed that the defendant was in charge of Sanctuary Belize. It showed that the fraud was committed by five or more knowing participants, including, for example, the defendant himself; Paige Reneau, who testified that she knowingly denied the defendant's involvement when speaking with lot buyers, Tr. at 769; Rod Kazazi, who carried out the defendant's directions by which he embezzled Sanctuary Belize funds, GX 2175; 2185; 2187; 2197-81; 2200; 2202 and 2229; Frank Connelly, who knowingly denied Pukke's role in Sanctuary Belize to the FTC undercover paralegal, Tr. at 335-36; GX 321-B; Luke Chadwick, who falsely told Balluff that Pukke had no role in Sanctuary Belize, Tr. at 128; and Peter Baker, the purported part owner and developer of Sanctuary Belize, who told Carl Dudick that Sanctuary Belize had no debt and that the project was financed through receivables, Tr. at 48-50; 85. Further, the fraud was "otherwise extensive," an alternative ground for the 4-level enhancement.

G. Obstruction of Justice

The defendant has withdrawn his earlier objection to the PSR's inclusion of a 2-level enhancement for his attempt to obstruction of justice pursuant to U.S.S.G. § 3C1.1, because he was convicted of obstructing an official proceeding. PSR ¶ 58.

H. Calculation of the Offense Level

Accordingly, the offense level should be calculated as follows:

1. The base offense level is 7. U.S.S.G. § 2B1.1(a)(1).

2. The loss is $77,764,722.44. Since the loss is more than $65 million and less than $150 million, the offense level is increased by 24 levels. U.S.S.G. § 2B1.1(b)(1)(M).

3. The offense resulted in substantial financial hardship to five or more victims. Accordingly, the offense level is increased by 4 levels. U.S.S.G. § 2B1.1(b)(2)(B).

4. The offense involved a violation of a prior, specific judicial order not addressed elsewhere in the Guidelines. Accordingly, the offense level is increased by 2 levels. U.S.S.G. § 2B1.1(b)(9)(C).

5. A substantial part of the fraudulent scheme was committed from outside the United States. U.S.S.G. § 2B1.1(b)(10)(B). Alternatively, the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C). Accordingly, the offense level is increased by 2 levels.

6. The defendant should have known that a victim of the offense was a vulnerable victim. Accordingly, the offense level is increased by 2 levels. U.S.S.G. § 3A1.1(b)(1).

7. The defendant was an organizer and leader of a criminal activity that involved five or more participants. Alternatively, the defendant was an organizer and leader of a criminal activity that was extensive. Accordingly, the offense level is increased by 4 levels. U.S.S.G. § 3B1.1(a).

8. The defendant willfully attempted to obstruct and impede the administration of justice with respect to the investigation and prosecution of an offense of conviction and the obstructive conduct related to the defendant's offense of conviction and relevant conduct. Accordingly, the offense level is increased by 2 levels. U.S.S.G. § 3C1.1.

The applicable Guidelines offense level is 47, which is reduced to the maximum offense level of 43. U.S.S.G. § 5.A, Application Note 2.

The parties agree that, as set forth in the PSR, the defendant is in criminal history category II. PSR ¶ 65-69.

Accordingly, the defendant's Guidelines range would be life imprisonment, but becomes 40 years' imprisonment due to the statutory maximum sentences of imprisonment. U.S.S.G. § 5G1.1(a). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. The applicable fine range for offense levels 38 and above is $50,000 to $500,000.

The Probation Department recommends a sentence of 20 years' imprisonment. PSR at 43.

## III. Application of the Relevant Section 3553(a) Factors

An analysis of the relevant Section 3553(a) factors shows that a sentence of no less than 20 years' imprisonment, as recommended by the Probation Department, is warranted in this case.

### A. The Nature and Circumstances of the Offense

The defendant's fraud was unique in terms of its size, scope, complexity, duration and impact on the defendant's hundreds of victims. The numerous aggravating characteristics of the defendant's massive fraud justify the Government's requested sentence.

#### 1. The Fraud's Massive Scope

The defendant's fraud was international in its scope. Its loci were in Belize and at Sanctuary Belize's offices in southern California and it drew its victims from the United States, Canada, the United Kingdom, Australia, Mexico, Spain, Portugal, Italy, the Czech Republic and, surprisingly, Belize. GX 200. It required extensive planning and daily effort to purchase Sanctuary Belize's 13,000 acres, to plan its development, to develop it over time to a degree sufficient to create the appearance of some progress, to maintain the property and, most

importantly, to market and sell it. Both the ongoing development and marketing operations required numerous employees who had to be trained, directed, supervised and paid.

As the evidence at trial showed, the fraudulent operation was conceived and managed by the defendant. Several employees identified him as the boss. He decided who would get hired, promoted, demoted, and fired. The defendant oversaw the marketing and sales. He played a key role in procuring the property and in planning the development. And, as his embezzlement of more than $9.9 million from the development showed, he controlled the money.

2. The Defendant Targeted Vulnerable Victims

The evidence clearly showed the defendant targeted vulnerable victims. The development, with its half-acre lots, was not designed for the leisured wealthy. Given its location in Belize, it obviously was not designed for Americans who still worked for a living. The cost of buying a lot and building a home made it impractical for most as a short-term vacation home.

The defendant, in large part, marketed Sanctuary Belize to middle-class retirees. The marketing brochures consistently offered Sanctuary Belize as a retirement community. For example, the Buy Belize Buyer's Guide sent to potential buyers touted Sanctuary Belize as an investment primarily due to the increasing number of baby boomer retirees. GX 302 at 4 ("the thousands of inquiries we receive each week convince us that a growing number of those retirees want to spend their golden years in tropical climates") and 1 ("Whether you're interested in Belize as a place to live, invest, or retire, we're certain that we can help you find the perfect property!"). The first reason it gave for why clients buy lots was for retirement. *Id.* at 10. It described Belize's Qualified Retired Persons Program that permits foreign retirees to import assets without import duties or taxes. *Id.* at 6. An "Investment Prospectus" described lots in Sanctuary Belize as an unprecedent opportunity in part because "the baby-boomer generation, currently one of the largest

segments of real estate investors as 10,000 retire daily in the USA, will be migrating to areas such as Belize." GX 113 at 3. Another marketing brochure contained a testimonial from a retiree:

> Like a lot of boomers, we were concerned about things we were seeing in the USA and were searching for where we eventually wanted to retire. We spent some time in Panama, but it just didn't feel like a place we'd want to live. Imagine my surprise when my wife told me she had put down a deposit at Sanctuary Belize. We'd never even been to Belize but I trusted her and we planned a quick trip. After two days looking at the site and one on the private island, I thanked my wife for being the smart one who found us our new home and started our next adventure!

GX 154 at 6.

The Sanctuary Belize sales scripts also showed that the marketing was directed toward retirees. One sales script described a "**frenzy** of activity from **International Investors, Retirees** and **Travelers** who have fallen in love with our **ONE-OF-A-KIND** Master-Planned Gated Community . . .." GX 436 (emphasis in original). Another sales script described how Forbes magazine "did a study on the best places to retire and the happiest places on earth. Belize ranked #4 on both!!" GX 448-A. Yet another script touted the Belizean program for foreign retirees. GX 444-C.

Telemarketer Paige Reneau described Sanctuary Belize as:

> It was a 14,000-acre beautiful development in Belize, designed to develop 4,000 acres and set aside the rest as a nature reserve for the idea of people buying land and building property and retiring.

Tr. at 721. Similarly, a Sanctuary Belize telemarketer told the undercover FTC employees that:

> Uh, when it comes time to retirement, you know, are you looking at, at, uh, is what you are looking at rather, um, a reward for all of the hard work that you've done? Or is it gonna be punishment and 20 years of punishment for the 40 years hard labor that you just did working, uh, you know, tirelessly every day and being away from your family?
>
> . . .
>
> And, uh, I really believe with every inch of my soul that Belize is a place that can make you extraordinarily happy from a retirement perspective.

GX 123T at 4-5.

Not surprisingly, each lot buyer who testified, whether called by the Government or the defendant, said they bought their lots to use in retirement. Tr. at 89 (Dudick); 95-96 (Balluff); 1191 (Cunningham); 1987 (Goff); 1678 (Curley). Many of those victims who submitted victim impact statements said the same. *See, e.g.,* 4-5, 7, 13, 17-18, 22-23, 32-33, 40, 42, 49, 68, 76, 83, 85-86, 88, 95-96, 106, 108, 116, 135.

But the defendant went beyond targeting just those who were on, or would soon be on, fixed incomes. He made Sanctuary Belize attractive to those who had to stretch financially to afford it. He provided victims with internal financing for lots. He then promoted the fact that the development would not conduct any credit checks, thus encouraging victims who would not have been able to finance the purchase of a lot through conventional means, with credit checks and income and net worth requirement, to purchase. To reduce the risk that victims would stop making payments when they became frustrated by the lack of progress, the defendant required buyers to agree that if they stopped making payments, Sanctuary Belize could "foreclose" on their lots. The victims would then lose any payments they had already made and, unlike with a conventional bank, they would also lose any equity they might have earned on their lots.

3. The Significant Victim Impact

As the more than one hundred victim statements show, the impact on the victims, both financial and emotional, was significant. Since there is no real resale market for the lots, the lot buyers have been stuck with the Hobson's choice of walking away from their lots or purchasing them from the receiver under the program discussed in the Government's loss calculation brief and at the oral argument on the loss figure. The owners of more than eighty percent of the lots -- 988 out of the 1207 lots – have chosen to walk away from their lots or wait and see what the new

developer – who has explicitly made no promises – does before committing any more money to Sanctuary Belize.[7] The fact that so many lot buyers have given up hope speaks volumes about the impact the defendant's fraud has had on his victims. The majority of victims will get nothing more than the redress payments from the receiver, which will return only pennies on the dollar to them.[8]

a. Lack of Resale Market for Lots

The evidence at trial showed that the lots essentially could not be resold. For example, trial witness Frank Balluff testified that he tried to list the lot for resale even before the fraud was uncovered, but that his attempt failed. Tr. at 141-42. He further testified that, "I talked to a real estate agent, and he said that nobody down there would get involved in listing that lot with the problems that have been going on there." Tr. at 142. Similarly, victim Nancy Cunningham also testified that she tried to sell her lot before the fraud was exposed. Tr. at 1220. She was told by realtors that, "it's extremely difficult to sell anything in Sanctuary Belize." Id. Cunningham ultimately sold the lot through Facebook—before the fraud was uncovered—at a loss of $20,000.

[7] In response to the Receiver's survey of the lot owners last summer, owners of 250 lots chose to complete their sale and obtain title; owners of 117 lots chose to wait and see what the new developer would do; owners of 551 lots did not respond to the survey, thus indicating that they no longer cared what happened to their lots; and the owners of 320 lots chose to walk away from their lots.

[8] The receiver returned a total of $10 million in redress payments to victims in August 2023. Assuming a lot buyer paid $100,000 in full for a lot, he would have received $7,353.60 in August 2023. *See* sanctuarybelizereceivership.com/documents/392 at 21. That payment was obviously made after the offense was discovered and, therefore, does not reduce the Guidelines loss figure. U.S.S.G. § 2B1.1, Application Note 3(D)(i). While the receiver is likely to make additional redress payments in the future, those payments could not possibly return anything close to what the victims have lost. The receiver had approximately $11.8 million in net cash on hand as of December 31, 2024. *See* sanctuarybelizereceivership.com documents/538 at 25. He expects to receive $15.4 million for the sale of the Sanctuary Belize land and $1.4 million for the undeveloped Plenty Tract. Assuming that the receiver distributes the entire amount, the hypothetical lot buyer referenced above could only expect to receive another $21,031.27, for a total of redress payments of approximately 28 cents on the dollar. That calculation assumes, unrealistically, that the receiver will not have any additional expenses.

Tr. at 1221-22. Even now, the defendant is unable to provide even a single example of an arms-length sale of a lot that took place after his fraudulent scheme became known to the public seven years ago.

The victim impact statements provide additional proof that there is no real market for these lots. *See, e.g.,* Statements 14 ("We are losing around $90,000 . . . We considered selling our lot before all this happened and any outside realtors couldn't sell lots, only realtors associated with the project."); 15 ("The amount we paid for our lot may not be much to some, but we paid cash and it was a lot of money to us. Worse still we had no recourse to [] and get our money in a failed and [] community."); 18 ("When the bottom fell out and we received notice of the lawsuit, we quickly tried to sell the property, but of course that was impossible at this point. To this day there is no sense in even listing these properties according to real estate agents in the area."); 25 ("we have been unable to sell the property . . . If and when we do sell the property it will more than likely be much less than what we have purchased it for."); 68 ("When the two year mark came, I was anxious to sell my second lot, and get my $50,000 profit. Suddenly, Richard, who had been extremely friendly, stopped taking my calls. He transferred me to a local realtor, who told me there was no resale market for these lots. . . . I got back pennies on the dollar. I will never recover all the money that I paid for my lot. As of today, I have gotten back less than 10% of the money I paid.").

b. <u>Significant Financial Hardship</u>

Not surprisingly, many victims noted in their victim impact statements that the financial loss had resulted in hardships, changed retirement plans, or the need to postpone retirement. *See, e.g.,* Statements 5 (loss "resulted in an extremely limited retirement"); 7 ("Retirement dreams crushed! Retirement funds lost!"); 8 ("I lost all of my life savings leaving me broke!"); 13 (loss

of more than $370,000 "represented a significant portion of our retirement proceeds. . . . Needless to say, our lives were altered significantly as a result of [the defendant's] greed, and dishonesty"); 23 ("And so we have had to make lesser or smaller plans with the time he had remaining"); 32 ("The money I once relied upon for my retirement is gone, and I have nothing to show for it. . . . [M]y financial foundation has been shattered . . .."); 46 ("I am now 69 years old and have been forced to continue working due to this travesty"); 49 (loss "has meant that we had to make significant financial cutbacks and changes to our retirement including selling assets we wanted to keep for retirement and also continuing to work well past our planned retirement date"); 77 ("I'm just now realizing how this scam impacted my retirement date. Forced to retire later"); 95 ("Not only were our funds/savings stolen from us but many more years of having to work to recover from this loss"); 104 ("The financial consequences of this crime have been devastating. I lost 300,000 USD due to the defendant's actions, which has left me struggling to meet my basic needs and financial obligations. . . . I am 68 years old and I have to continue working in order to secure my retirement"); 108 ("The purchase of two lots is a financial disaster. . . . At age 75 and 81 we are not in a position to overcome this financial loss. We are living on a fixed income that does not meet monthly expenses"); 127 ("I had put every penny of our inheritance into that property as I paid in full on my purchase. . . . My quality of life is not what I imagined it should have been . . .. That was our nest egg"); 140 (There is no way we can recoup the lost moneys. I am now 73 and working at Walmart to offset our retirement money lost").

c. Shattered Dreams

Several victims noted that their dreams of retiring in a tropical paradise had been shattered. *See, e.g.,* Statements 13 ("Our dream of building our retirement home in Belize has been stolen");

23 ("Our dream was completely destroyed"); 28 ("To have it all taken away has left us heartbroken and disillusioned"); 68 ("My dream died").

d. Other Victim Impact

Still other victims spoke in their impact statements of feelings of fear, humiliation, betrayal, depression or suspicion of others as a result of their realization that they had been swindled. *See, e.g.,* Statements 7 ("Health impacted in major ways by stress and worry! Feelings of anger and hopelessness and frustration . . .."); 15 ("A lasting impact beyond our loss of money is our lack of trust since then. We hate what they did to us . . .."); 24 ("I have spent countless sleepless nights grappling with feelings of anger, helplessness, and regret. This ordeal has eroded my confidence in others, making it difficult to trust again in both personal and professional relationships"); 32 ("Not only has my financial security been jeopardized, but I have also experienced anxiety, sadness, and fear about my future." The emotional toll has been devastating, as I now find myself questioning the trust I placed in others and worrying about how I will support myself in my retirement years"); 77 ("Caused humiliation and lots of fighting with my spouse"); 83 ("Our life savings were used to purchase these two lots and, rather than achieving peace in our later years, we have [] endured a hellish experience fearing the major loss of our life savings and being unable to begin our retirement at SB"); 87 ("The feeling of being duped out of our hard earned money was not only deeply hurtful but frankly embarrassing and humiliating. It haunts us to this day!").

e. The Court Should Consider Other Financial Losses

The Court should also consider that the $77 million loss figure does not reflect the full out-of-pocket loss to the victims. As noted in the Government's loss calculation brief, Sanctuary Belize financed many of the victims' lot purchases and charged more than $11 million for that financing. Subtracting out the interest attributable to the 295 lots for which the Government had

given credit against the Guidelines loss figure pursuant to U.S.S.G. § 2B1.1, Application Note 3(D)(i) shows that the victims paid the defendant $8,488,812.83 in interest. Since 2001, the Guidelines have directed that payments of interest not be included in the loss figure. U.S.S.G. § 2B1.1, Application Note 3(C)(i)("Loss shall not include . . . [i]nterest of any kind.") In drafting that amendment, the Commission did not appear to consider whether interest should be included in a loss where, as here, Sanctuary Belize financed lot purchases to promote the fraud by providing financing to buyers with poor credit who would have been ineligible for conventional financing and for purchases of foreign properties that also would have been ineligible for conventional financing in the United States. There is post-amendment precedent for the proposition that interest can be included in loss where, as here, it was an essential element of the fraud and where, as here, interest was not continuing to accrue during an investigation and prosecution. Regardless, the Government has not included interest in its loss figure. The 2001 Amendment did provide, however, that "a departure may be warranted in the rare case in which exclusion of interest would under-punish the offender." U.S.S.G. § 2B1.1, Amend. 617 (2001). While the Government is not seeking a departure where, as here, its calculation of the offense level is already above the highest level of 43, the Court should consider that the defendant defrauded his victims of this additional $8.4 million in interest charges when considering the Section 3553(a) factors, as well as the $4 million in "other payments" that the receiver has described as payments of principal for lots sales, and $2.7 million in homeowner association fees.

B. History and Characteristics of the Defendant

While the defendant is not a career offender as defined by the Sentencing Guidelines, he is clearly a career criminal. The only employment for 25 years of this 56-year-old man's adult life has been fraud. The defendant developed and ran Ameridebt, which provided fraudulent credit

counseling services from 1993 until the Federal Trade Commission brought a civil suit and shut it down in 2003. While running Ameridebt during 1994 and 1995, the defendant also developed and ran Potomac Financial, which fraudulently sought loan applications, and corresponding application fees, but did not perform any lending. After the FTC shut down Ameridebt, the defendant began to develop Sanctuary Belize, which he ran until the FTC shut it down in November 2018. During the entire 25-year period from 1993 to 2018, the defendant cannot honestly claim to have held any legitimate, non-fraudulent employment.

The defendant's career of fraud shows that his two prior federal felony convictions, along with his 1988 shoplifting conviction, did nothing to deter him from offending again. The defendant was convicted in 1996 of mail fraud arising out of his Potomac Financial fraud and was given a probationary sentence. The defendant ran his Ameridebt fraud during the entire period of three years' probation. Then, the defendant lied about his finances, in part by lying about his ownership of the land that became Sanctuary Belize, in the Ameridebt litigation and in his personal bankruptcy. As a result, he was convicted of obstruction of justice and sentenced to 18 months' imprisonment, to be followed by three years' supervised release. Just as he did during his previous probationary period, the defendant engaged in fraud – this time, the Sanctuary Belize fraud – while on supervised release following his release from prison in September 2012. This history shows not only that convictions and prison have not deterred the defendant from crime but also that the defendant is largely unsupervisable. Not only has he ignored two courts' conditions of probation and supervised release by repeatedly committing serious federal crimes during supervision but he has now been convicted twice for obstructing, or attempting to obstruct, investigations into his conduct.

The defendant steals because he likes money and high living and is otherwise unable or unwilling to generate enough money in any legitimate way to satisfy him. The evidence at trial showed the defendant's penchant for high living. For example, the evidence showed how the defendant used funds he stole from Sanctuary Belize to buy and to renovate extensively his waterfront home in Newport Beach that the Sanctuary Belize receiver sold for $13.8 million in January 2022. The evidence also showed that the defendant shared $1.2 million of his stolen wealth with family members.

The defendant's recidivism, arrogant and willful disregard of court orders, repeated efforts to obstruct justice and taste for high living are not unheard of among white collar offenders, although they are present here to such a degree as to make the defendant stand out. What really makes the defendant much more dangerous than other white collar offenders, though, are his undeniable creativity, marketing and management skills and determination. Not many offenders could put together fraudulent operations on such a huge scale as Sanctuary Belize and Ameridebt. The defendant did. Even fewer could do it twice. The defendant did. And, if he has the opportunity to do it again, his history and characteristics show he will. The defendant's unique combination of talent, excessive greed and dishonesty create a toxic brew of recidivism that, unless checked by a lengthy period of incarceration, will very likely lead to another fraud and yet another group of hundreds of victims.

C. Deterrence and the Need for the Sentence to Promote Respect for the Law

The defendant's offenses were serious for the reasons stated above. A Guideline sentence is therefore necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. ' 3553(a)(2)(A).

Contrary to the defendant's claim, the Second Circuit, in *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016), did not criticize the fraud Guidelines as "overly harsh." (Def. Mem. at 10). Nor did the *Algahaim* court hold that district court "should" consider the unusualness of making loss amount the principal determinant of offense level. (*Id.*). Rather, in affirming Algahaim's sentence, the court merely recognized that loss amount was the predominant determination of the offense level for monetary offenses, that the Sentencing Commission could have approached the monetary offenses differently, and that district courts are *permitted* to consider a non-Guidelines sentence on this basis. *Algahaim*, 842 F.3d at 800. Nowhere in the decision did the Second Circuit render judgment as to the "harshness" of the fraud Guideline. *See id.* Without question, application of the fraud Guideline, as well as other Guidelines, has the potential to result in a mismatch of sentencing range to conduct when applied to specific facts of a particular case. And this Court is entitled to consider the unusual nature of the fraud loss Guidelines in assessing the Guidelines range – which is advisory in any event – and determining the appropriate sentence in this case. The Government respectfully submits, however, that for all of the reasons set forth in this memorandum, no more than a 50% downward variance from the Guidelines range is appropriate in this case.

As outlined above, the defendant's history shows that he has never yet been deterred. Given his history of multiple efforts to obstruct justice and his repeated disregard for court orders, including conditions of supervised release and probation, it is unlikely that he can be deterred. The more practical and realistic goal at this point is incapacitation to prevent yet another fraud and more victims.

The need for general deterrence is an aggravating factor as well. This is a high profile case that has attracted nationwide attention. A significant sentence here would send a signal that could

be heard by those who may otherwise be inclined to engage in mass-marketing or consumer fraud schemes. "The need for general deterrence is particularly acute in the context of white-collar crime." *United States v. Johnson,* 2018 WL 1997975 at *5 (E.D.N.Y. 2018). Courts have recognized that potential white collar criminals are more likely to be deterred because they are more likely to weigh the potential gains from crime against the risk of punishment than other criminals. *See, e.g., United States v. Zukerman*, 897 F.3d 423, 430 (2d Cir. 2018) (tax offenders are more likely to analyze potential risks and rewards and "to eschew criminal conduct if it will be unprofitable"), *citing United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence"), *and United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment to deter it").

This defendant is now a recidivist offender with felony convictions in separate federal cases in three districts going back to 1996 – all for fraud and obstruction of justice offenses. But his criminal history alone does not paint the full picture of his decades-long, mostly uninterrupted pattern of large-scale consumer fraud. The defendant was the mastermind behind Ameridebt, which the FTC advises was the largest credit counseling scam in FTC history, with over $170 million in injury. The FTC further advises that Sanctuary Belize was the largest land scam in FTC history. Courts held the defendant in contempt in both the Sanctuary Belize and the Ameridebt FTC cases.[9] And, it was while he was on supervised release following his conviction for

[9] *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 560 (D. Md. 2005), No. 03-cv-3317, ECF 571 (Contempt Order Mar. 30, 2007), ECF 604 (Coercive Incarceration Order May 4, 2007); *In re Sanctuary Belize Litig.*, 2023 WL 3766084 (D. Md. May 31, 2023), *aff'd*, FTC v. Pukke, 53 F.4th

obstruction of justice in the Ameridebt case that the defendant began the fraud scheme underlying his convictions in this case. Among other things, with a portion of the funds he stole from his Sanctuary Belize victims, and with the Ameridebt judgment also still outstanding, the defendant bought and renovated extensively his waterfront home in Newport Beach that the Sanctuary Belize receiver sold for $13.8 million in January 2022. He gave another $1.2 million of his stolen wealth with family members.

Given this backdrop, the 20-year term of imprisonment requested by the Government is necessary in order to deter others and promote respect for the law. A sentence even close to that requested by the defendant – 27 or fewer months' imprisonment, (Def. Mem. at 117) – would have precisely the opposite effect.

D. Need to Avoid Unwarranted Sentencing Disparities

Finally, imposition of a sentence within the advisory Guidelines range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In creating the Guidelines, "Congress sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct." *Rita v. United States*, 551 U.S. 338, 349 (2007)(internal quotation omitted). Even after *Booker*, "uniformity remains an important goal of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 107 (2007). The Guidelines "help to avoid excessive sentencing disparities," *id*. (internal quotation omitted), because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall v. United States*, 552 U.S. 38, 54 (2007).

80 (4th Cir. 2022), *In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373 (D. Md. 2020), *aff'd in relevant part sub nom., remanded*, *FTC v. Pukke*, 53 F.4th 80 (4th Cir. 2022), *on remand*, No. 18-cv-3309, ECF 1113 (Contempt Order Jan. 13 2021).

The sentence the Government requests would be comparable to sentences imposed by courts around the country for others convicted of large-scale frauds – including those without prior federal convictions, who did not also commit obstruction of justice in the cases for which they were sentenced, or who accepted responsibility for their crimes. For example:

- Irving Stitsky and Mark Alan Shapiro were each sentenced to 85 years of imprisonment in 2010. *United Sates v. Shapiro* No. 06 Cr. 357 (S.D.N.Y.) (KMW). Stitsky and Shapiro ran a real estate investment fraud scheme through the company Cobalt Capital which defrauded 352 victims of approximately $23 million. The Court put particular weight on the fact that the two defendants, like Pukke, had prior fraud convictions and were on supervised release when they engaged in the scheme. The Second Circuit affirmed the reasonableness of the sentence, noting that the District Court imposed it in light of the fact that one of the defendants "was a recidivist who seemed not to hold himself accountable for the devastating harm he inflicts on victims." *United States v. Stitsky*, 536 F. App'x 98, 116 (2d Cir. 2013). In that case, like here, "Part of the government's theory at trial was that defendants fraudulently induced victims to invest in Cobalt by failing to disclose their leadership roles in the company *and* their prior convictions, facts that investors would have considered material in making their investment decisions." *Id*. at 106.

- Pasquale Pappalardo was sentenced to 20 years' imprisonment in 2014. *United States v. Pappalardo et al.*, No. 13 Cr. 60049 (S.D. Fla. 2013). Pappalardo ran a timeshare sale scam wherein he pressured buyers into paying upfront for timeshares that did not materialize and was convicted for conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering. Pappalardo was in criminal history category II, with a Guidelines range of 235-293 months' imprisonment.

- Steven Dorfman was sentenced to 25 years imprisonment in 2024 for multiple counts of mail and wire fraud and conspiracy. *United States v. Dorfman*, No. 22 Cr. 30024 (S.D. Ill. 2022). Dorfman, who had no prior felony convictions, a Criminal History Category of I, led a telemarketing scam that sold bogus health insurance policies. *Id.* (ECF 222 at 1 and 9).

- Hitesh Patel and Miteshkumar Patel were sentenced to 20 years' imprisonment in 2018 and 2020. *United States v. Joshi, et al.*, No. 16 Cr. 00385 (S.D. Tx. 2016). Both Patels and their co-conspirators operated a large-scale telemarketing scam that impersonated government officials from call centers located in India. Hitesh Patel was a call center owner. Miteshkumar Patel ran a group of "runners' who liquidated fraud proceeds.

- Andrew Smith and Christopher Griffin were sentenced to 25 and 20 years' imprisonment, respectively, in 2018. *United States v. Smith, et al.*, No. 14 Cr. 82

(W.D.N.C. 2014). Smith, Griffin, and their co-conspirators ran a sweepstakes telemarketing fraud that preyed on elderly victims from call centers in Costa Rica, were responsible for a loss of approximately $11 million. *Id.* (ECF 210 at 4-5; ECF 211).

- Willoughby Farr was sentenced to 20 years' imprisonment in 2010. *United States v. Farr*, No. 10 Cr. 80021 (S.D. Fla. 2010). Farr operated a "cramming scheme" wherein consumers were charged on their telephone bills for collect calls that were not made and accepted responsibility, pleading guilty to two counts of mail fraud, and was responsible for a loss of $20 million to $50 million. *Id.* (ECF 29).

- Steve Warshak was sentenced to 25 years' imprisonment in 2008. *United States v. Warshak*, No. 06 Cr. 111 (S.D. Ohio 2006). Warshak ran the Berkley Premium Nutraceuticals dietary supplement business. He and his coconspirators enrolled consumers in subscription programs that were advertised as free samples, and made deceptive efficacy claims for some supplements. Warshak was held responsible for a loss of "over $100 million". *Id.* (ECF 829 at 7).

The defendant's conduct, combined with his history and lack of acceptance of responsibility, is at least as egregious. By contrast, the sentence the defendant requests would be essentially the same as that required for a defendant convicted of a single count of aggravated identity theft for the fraudulent use of another person's credit card.

IV. <u>The Defendant's Sentencing Arguments</u>

The defendant argues that his stressful childhood and early adult years weigh in favor of a more lenient sentence. The defendant grew up in a middle-class neighborhood and graduated college with a marketing degree in 1991, but informs the Court that that these years were tumultuous in that his parents divorced when he was young, and that he experienced the effects of drinking and tension in the household, a mother's boyfriend who yelled and used drugs, and several fights between his father and his mother's boyfriend. Accepting all of the defendant's assertions as true, they do not begin to excuse his crimes or significantly counterbalance the harm he has wrought to hundreds of victims for almost two decades. As it always does, the Court can and should consider all of the defendant's history and characteristics. The defendant's stressful

childhood was undoubtedly considered by another court when he was sentenced for mail fraud in 2006. And considered again when he was sentenced for obstruction of justice in 2011. The defendant is now a 56-year-old man. The Court should give very slight weight to his stressful childhood in connection with sentencing for his years-long fraud scheme and obstruction of justice in this case, crimes he committed well into middle age and after two prior federal criminal convictions.

Nor does the defendant's awkward reference to his self-inflicted "Seven Years of Legal Struggles," (Def. Mem. at 5-6), weigh in his favor. The defendant's complaint that the U.S. District Judge overseeing the FTC case did not let the defendant use Sanctuary Belize funds to hire an attorney (or spend more Sanctuary Belize funds on anything else) in that case is bizarre, not least because the defendant had been stealing funds from Sanctuary Belize and causing Sanctuary Belize to obtain funds from victims on the basis of false pretenses that included pretending he was not a part of, let alone running, Sanctuary Belize. Furthermore, it is unclear why the defendant believes the conduct of the court in the FTC case is relevant here, where the defendant was well represented, including by four court-appointed counsel at trial.

Even more curious is the defendant's reliance upon a letter of support from William Wilson, a/k/a "Bo Wilson," a/k/a "James Wilson". In an effort to portray himself in a positive light as he stands before the Court for sentencing once more, the defendant asserts that "[h]e is currently working for a nonprofit foundation that seeks to help previously incarcerated people find jobs," (*id.* at 19), a more laudable work endeavor than any in which he has previously been engaged. The defendant claims that he "began working with William Wilson, a successful African-American businessman, to create a foundation that would assist previously incarcerated persons with help in finding meaningful employment," that he "***was hired to build the website*** and

apply for grants," and that this foundation pays him "about $4,000 a month." (*Id.* at 6-7) (emphasis added). The defendant reports that the foundation is called the "Straight A Foundation." (*Id.* at 6). Wilson's letter provides a somewhat vague explanation as to what his foundation does and what the defendant does for it, oddly omitting even the purported charitable foundation's name. (*See* Def. Mem., Ex. M). The PSR reports that the defendant reported working for Straight A Foundation, that copies of the defendant's pay records were requested but not received, and that a signed release form was not received from the defense. PSR ¶ 99.

One may fairly wonder why, when hiring someone to apply for government grants, Wilson selected an individual with convictions for mail fraud and obstruction of justice who was also awaiting sentencing for more recent wire fraud and obstruction convictions. Perhaps even more remarkable is Wilson's bold assertion that Wilson himself built a "long career in the time share sales industry, overseeing sales and marketing for several resort locations," and "can definitely attest to what 'aggressive' sales tactics are," but that "the Sanctuary Belize operation was the opposite of unethical sales practices." (*Id.* at 1-2). Wilson explains that he knows a great deal about the way Sanctuary Belize operated because he subleased office space from it for five years and witnessed its operation first-hand, and that he never heard anything about it being a fraud or dishonest in any way. (*Id.* at 1). Wilson's statements about Sanctuary Belize and the defendant fly in the face of the overwhelming evidence presented at trial and the jury's verdict. One potential explanation could be that, notwithstanding Wilson's presence in the Sanctuary Belize office for five years as a purported tenant, the FTC takeover of that office while Wilson was present within it, the widely publicized FTC case, and this criminal case, Wilson simply remains unaware of how the defendant ran Sanctuary Belize and was not curious enough to look into it despite his relationship with the defendant and his own extensive experience with "aggressive sales tactics".

The alternative, vastly more likely explanation is that Wilson has not been fully forthcoming in his letter to the Court.

Wilson asserts that he "left the timeshare industry to become a consumer advocate for consumers that enter into bad timeshare contracts," (*id.* at 2). But another federal court's recent findings in Wilson's own federal civil trial make clear that he is not the philanthropical "consumer advocate" he claims to be. *See* Oct. 30, 2023 Verdict and Order Following Non-Jury Trial, *Bluegreen Vacations Unlimited, Inc. v. Timeshare Lawyers P.A., et al.*, No. 20 cv 24681 (S.D. Fla.) (ECF 561) (entering $100,000 judgment and permanent injunction again Wilson and three other defendants involved in a scheme to dupe consumers of timeshare exit services through Wilson's company, Pandora Marketing, LLC). As an introductory description of Wilson and his codefendants' conduct, the Court's verdict and order states:

> In this trial, the Court has learned that tens of thousands of timeshare owners have been victimized twice: first by the timeshare industry, which used false and misleading tactics to induce the owners to purchase their timeshares —often financed with high-interest mortgages; and ***second by the timeshare exit industry, which charged the owners thousands of dollars and used false and misleading tactics to tortiously induce them to breach their contracts with the timeshare companies,*** thus exposing them to damaged credit.

*Id.* at 1 (emphasis in original). The court found that Wilson was personally responsible for the creation and approval of the misleading sales scripts and advertising used to victimize, as opposed to "advocate for," the timeshare owners he would have this court believe he champions. *Id.* at 7. The court's discussion of misleading sale scripts and advertising, *id.*, harkens back to the defendant's trial in this case and the defendant's own masterful use of fraudulent sales scripts and advertising. But the similarities do not end there. In addition to purportedly helping his victims to exit their timeshare contracts, Wilson and his codefendants also engaged in the misleading

marketing of "credit management" services, *id.* at 11-12, which harkens back to another earlier venture of the defendant's, Ameridebt.

More recently, another federal court entered a $16,231,197 judgment against William Wilson, a/k/a "Bo Wilson," a/k/a "James Wilson," again for participating in a conspiracy to mislead and defraud timeshare owners to default on their timeshares through false and misleading advertisements through Wilson's company, Pandora Servicing, LLC. *See Wyndham Vacation Ownership, Inc. v. Slattery, et al.*, No. 19 cv 1908 (M.D. Fla.), Sept. 26, 2024 Order Adopting Magistrate Judge's Report and Recommendation (ECF 1105) and Oct. 10, 2023 Amended Report and Recommendation (ECF 1065).

The defendant and Wilson assert in their submissions to this Court that the defendant was integral to launching Wilson's purported charitable foundation a year ago and personally responsible for creating its website (something the defendant is more than capable of accomplishing as evidenced by his leadership and marketing of Ameridebt and Sanctuary Belize). Yet a Google search on today's date does not produce any website or other apparent internet present for the "Straight A Foundation."

Equally concerning, Wilson did not merely rent space within the Sanctuary Belize offices for five years as he claims. Substantial evidence indicates that Pukke was a part owner in Wilson's timeshare termination business, which two federal courts have now found operated by misleading consumers. In a May 17, 2016 Sanctuary Belize email from Sanctuary Belize CFO Rod Kazazi to another of the defendant's former employees, with cc to William "Bo" Wilson at a "tscompliance.com" email address, attached hereto as Exhibit 1, Kuhns documented that "Andris," i.e., the defendant, owned 20% of the shares of TS Compliance. Wilson's company, Pandora

Marketing, LLC, did business as "Timeshare Compliance."[10] *See Bluegreen Vacations*, No. 20 cv 24681 (S.D. Fla.) (ECF 561) (finding that Wilson's sales scripts misled victim consumers, including by stating "I want to tell you the reasons as to why we are taking your case. ***Timeshare Compliance*** doesn't take every case, we are consumer advocates, we've never lost a single case, we have successful resolution for every case we've taken.").

Given all of the foregoing, this Court should ask the questions why, after a year of the defendant's hard work creating a website for Wilson's purported charitable foundation, does Straight A Foundation still have no website or internet presence? If not for a website, why has Wilson been paying $4,000 per month ($48,000 over the past year) to the defendant, a world-class expert in fraudulent sales scripts, marketing, and credit-counseling services? Should the defendant receive the leniency he is requesting from this Court for working for a "charitable foundation"? The Government respectfully submits that the Court should entirely disregard Wilson's letter and sentence the defendant for his unrelenting fraud and obstruction of justice, which appear to continue even as he faces sentencing before this Court.

V. <u>Restitution and Forfeiture</u>

The FTC has agreed to administer and distribute funds received in restitution to the victims. It is already in the process of doing so, as it has obtained a $120.2 million judgment against the defendant for contempt of the Ameridebt order based on his conduct with respect to Sanctuary Belize. *Federal Trade Comm. v. Pukke, et al.,* 53 F.4th 80, 105-06 (4th Cir. 2022). The FTC intends to distribute any funds it receives on this judgment to victims. The FTC has significant experience in making such payments and has a structure already in place to do so. It is obviously

[10] As of today's date, tscompliance.com redirects to a website for timesharecompliance.com, where William "Bo" Wilson appears in marketing photographs.

familiar with this case and has all the information needed to distribute funds to the lot buyers. It would be a duplication of effort and a potential source of confusion and disruption for both the FTC and the Court to collect and distribute restitution payments for the same conduct.

Accordingly, the Government requests that the Court order as a condition of the defendant's supervised release that he fully cooperate with the FTC in its effort to collect the judgment referenced above, including the FTC's efforts to locate assets, gain title to them, take possession of them, liquidate them and distribute the proceeds to the victims.

The Government also asks that the Court enter a forfeiture order in the amount of $9,912,396, which represents the amount of funds the defendant embezzled from Sanctuary Belize. GX 1003 at 1.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court sentence the defendant to a significant sentence of incarceration not less than twenty years.

The United States respectfully moves the Court for an order directing that the defendant be remanded immediately after sentence. *See* 18 U.S.C. § 3143(b). The defendant has long been aware of the impending sentencing and faces a significant term of imprisonment. The defendant's attorneys have not identified any substantial question of law or fact likely to form a viable basis for an appeal.

Dated: New York, New York
September 18, 2025

Respectfully submitted,

JAY CLAYTON
United States Attorney

/s/___________________________

By: Jeffrey C. Coffman
James McMahon
Kevin Mead
Assistant United States Attorneys

cc: Defense Counsel (by ECF)